# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Vista Proppants and Logistics, LLC, *et al.*,[1] | § | Case No. 20-42002-elm11 |
| | § | |
| Debtors. | § | (Jointly Administered) |

---

## SECOND AMENDED DISCLOSURE STATEMENT IN SUPPORT OF THE SECOND AMENDED JOINT PLAN OF REORGANIZATION OF VISTA PROPPANTS AND LOGISTICS, LLC, ET AL., PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

Stephen M. Pezanosky
State Bar No. 15881850
Matthew T. Ferris
State Bar No. 24045870
David L. Staab
State Bar No. 24093194
**HAYNES AND BOONE, LLP**
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile: 214.651.5940
Email: stephen.pezanosky@haynesboone.com
Email: matt.ferris@haynesboone.com
Email: david.staab@haynesboone.com

**COUNSEL FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION**

Dated: August 18, 2020

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Vista Proppants and Logistics, LLC (7817) ("Vista HoldCo"); VPROP Operating, LLC (0269) ("VPROP"); Lonestar Prospects Management, L.L.C. (8451) ("Lonestar Management"); MAALT Specialized Bulk, LLC (2001) ("Bulk"); Denetz Logistics, LLC (8177) ("Denetz"); Lonestar Prospects, Ltd. (4483) ("Lonestar Ltd."); and MAALT, LP (5198) ("MAALT"). The location of the Debtors' service address is 4413 Carey Street, Fort Worth, TX 76119-4219.

# TABLE OF CONTENTS

ARTICLE I. INTRODUCTION.................................................................................................... 1

    A.    Summary of Plan............................................................................................... 1

    B.    Filing of the Debtors' Chapter 11 Cases ....................................................... 6

    C.    Purpose of Disclosure Statement ................................................................... 6

    D.    Hearing on Approval of the Disclosure Statement...................................... 6

    E.    Hearing on Confirmation of the Plan ........................................................... 6

    F.    Disclaimers......................................................................................................... 7

ARTICLE II. EXPLANATION OF CHAPTER 11 ................................................................. 9

    A.    Overview of Chapter 11 ................................................................................... 9

    B.    Chapter 11 Plan................................................................................................. 9

ARTICLE III. VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS ................. 10

    A.    Ballots and Voting Deadline......................................................................... 10

    B.    Holders of Claims Entitled to Vote.............................................................. 11

    C.    Definition of Impairment ............................................................................... 11

    D.    Classes Impaired or Unimpaired Under the Plan ...................................... 12

    E.    Information on Voting and Vote Tabulations ............................................. 12
        1.    Transmission of Ballots to Holders of Claims and Interests................. 12
        2.    Ballot Tabulation Procedures................................................................... 13
        3.    Execution of Ballots by Representatives................................................. 15
        4.    Waivers of Defects and Other Irregularities Regarding Ballots ......... 16
        5.    Withdrawal of Ballots and Revocation ................................................... 16

    F.    Confirmation of Plan ..................................................................................... 16
        1.    Solicitation of Acceptances ...................................................................... 16
        2.    Requirements for Confirmation of the Plan........................................... 17
        3.    Acceptances Necessary to Confirm the Plan ......................................... 19
        4.    Cramdown.................................................................................................... 19
        5.    Conditions Precedent to Confirmation and Effectiveness of the Plan ............................. 20

ARTICLE IV. BACKGROUND OF THE DEBTORS............................................................ 20

    A.    Description of Debtors' Businesses............................................................... 20
        1.    Formation and Current Structure ........................................................... 20
        2.    The March 2017 Transactions................................................................... 21
        3.    November 2017 Buy-Out Transaction ..................................................... 22

    B.    Events Leading to the Chapter 11 Cases ..................................................... 22

    C.    The Debtors' Prepetition Restructuring Initiatives ................................... 23
        1.    PlainsCapital Bank Prepetition Default and Potential Claims Related
            Thereto .......................................................................................................... 24

    D.    Go-Forward Business Plans .......................................................................... 25

ARTICLE V. DEBTORS' ASSETS AND LIABILITIES ..................................................... 25

    A.    Prepetition Assets ........................................................................................... 25

    B.    Prepetition Liabilities ..................................................................................... 26

|  |  | 1. | Term Loans | 26 |
|  |  | 2. | ABL Facility | 27 |
|  |  | 3. | Intercreditor Agreement | 27 |
|  |  | 4. | MAALT Facility | 27 |
|  |  | 5. | Capital Leases and Lease Obligations | 28 |
|  |  | 6. | Tax Obligations | 28 |
|  |  | 7. | General Unsecured Claims | 28 |
|  | C. | | Debtors' Scheduled Amount of Claims | 29 |

**ARTICLE VI. BANKRUPTCY CASE ADMINISTRATION** ......................................................... 30

|  | A. | First and Second Day Motions | 30 |
|  | B. | Bar Date for Filing Proofs of Claim | 31 |
|  | C. | Meeting of Creditors | 31 |
|  | D. | Official Committee of Unsecured Creditors | 31 |
|  | E. | The Committee's Motion to Convert | 31 |
|  | F. | The DIP Facility and Use of Cash Collateral | 32 |
|  | G. | Contract and Lease Rejections | 32 |
|  | H. | The Committee's Investigation and Standing Motion | 33 |
|  | I. | Rejection of Railcar Leases and Agreement Regarding Sale of Finished Sand Inventory | 35 |

**ARTICLE VII. DESCRIPTION OF THE PLAN** ............................................................................... 36

|  | A. | | Introduction | 36 |
|  | B. | | Designation of Claims and Interests | 36 |
|  | C. | | Grouping of Debtors for Convenience Only | 37 |
|  | D. | | Allowance and Treatment of Administrative Claims and Priority Claims | 37 |
|  |  | 1. | Administrative Claims | 37 |
|  |  | 2. | Professional Compensation Claims | 38 |
|  | (a) | | Final Fee Applications and Payment of Professional Compensation Claims | 38 |
|  | (b) | | Professional Compensation Claim Reserve | 38 |
|  | (c) | | Professional Compensation Claim Amount | 39 |
|  | (d) | | Post-Confirmation Fees and Expenses | 39 |
|  |  | 3. | Priority Tax Claims | 39 |
|  |  | 4. | DIP Facility Claims | 39 |
|  | E. | | Allowance and Treatment of Classified Claims and Interests | 40 |
|  |  | 1. | Allowance and Treatment of Other Secured Claims (Class-1) | 40 |
|  |  | 2. | Allowance and Treatment of Other Priority Claims (Class - 2) | 41 |
|  |  | 3. | Allowance and Treatment of Term Loan Secured Claims (Class - 3) | 41 |
|  |  | 4. | Allowance and Treatment of PlainsCapital ABL Secured Claims (Class - 4) | 42 |
|  |  | 5. | Allowance and Treatment of MAALT Secured Claims (Class - 5) | 42 |
|  |  | 6. | Allowance and Treatment of General Unsecured Claims (Class - 6) | 42 |
|  |  | 7. | Allowance and Treatment of Intercompany Claims (Class - 7) | 45 |
|  |  | 8. | Allowance and Treatment of Interests in Debtors Other than Vista HoldCo (Class - 8) | 45 |
|  |  | 9. | Allowance and Treatment of Interests in Vista HoldCo (Class - 9) | 45 |
|  | F. | | Procedures for Resolving Contingent, Unliquidated, and Disputed Claims | 45 |
|  |  | 1. | Claims Administration Responsibilities | 45 |

|   |   | 2. | Estimation of Claims and Interests | 46 |
|   |   | 3. | Adjustment to Claims or Interests without Objection | 46 |
|   |   | 4. | Time to File Objections to Claims | 46 |
|   |   | 5. | Disallowance of Claims or Interests | 46 |
|   |   | 6. | Amendment to Claims or Interests | 47 |
|   |   | 7. | No Distributions Pending Allowance | 47 |
|   |   | 8. | Distributions After Allowance | 47 |
|   | G. |   | Treatment of Executory Contracts and Unexpired Leases | 48 |
|   |   | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases Under the Plan | 48 |
|   |   | 2. | Indemnification Obligations | 48 |
|   |   | 3. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 49 |
|   |   | 4. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 49 |
|   |   | 5. | Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases | 50 |
|   |   | 6. | Insurance Policies | 50 |
|   |   | 7. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 50 |
|   |   | 8. | Reservation of Rights | 50 |
|   |   | 9. | Non-occurrence of Effective Date | 51 |
|   |   | 10. | Contracts and Leases Entered into after the Petition Date | 51 |

**ARTICLE VIII. MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN** .......... 51

|   | A. | Corporate Existence | 51 |
|   | B. | Reorganized Debtors | 51 |
|   | C. | Restructuring Transactions | 51 |
|   | D. | Sources of Plan Distributions | 52 |
|   |   | 1. Issuance of Equity Interests | 52 |
|   |   | 2. Exit Facility | 53 |
|   | E. | Vesting of Assets in the Reorganized Debtors | 53 |
|   | F. | Cancellation of Existing Equity and Agreements | 54 |
|   | G. | Corporate Action | 54 |
|   | H. | Updated Governance Documents | 55 |
|   | I. | Governance and Board of the Reorganized Debtors | 55 |
|   | J. | Effectuating Documents; Further Transactions | 56 |
|   | K. | Section 1146 Exemption | 56 |
|   | L. | Director and Officer Liability Insurance | 57 |
|   | M. | Management Incentive Plan | 57 |
|   | N. | Employee and Retiree Benefits | 57 |
|   | O. | Retained Causes of Action | 57 |
|   | P. | Litigation Trust | 58 |
|   | Q. | Release of Debtors | 59 |
|   | R. | Release of Liens | 60 |
|   | S. | Releases by the Debtors | 61 |

T. Releases by Holders of Claims and Interests ...................................................... 62

U. Exculpation ........................................................................................................... 62

V. Injunction ............................................................................................................. 63

W. Protections against Discriminatory Treatment .................................................... 63

X. Reimbursement or Contribution .......................................................................... 64

Y. Retention of Jurisdiction ...................................................................................... 64

Z. Modifications and Amendments, Revocation, or Withdrawal of the Plan ........... 66

**ARTICLE IX. LEGAL PROCEEDINGS** ............................................................................. 67

A. *MAALT, LP v. Sequitur Permian, LLC, Case No. CV19-003* .............................. 67

B. *Standing Motion Claims* ..................................................................................... 67

C. Recovery on Preference Actions and Other Avoidance Actions .......................... 67

D. Retained Causes of Action or Litigation Trust Causes of Action ....................... 68

**ARTICLE X. PROVISIONS GOVERNING DISTRIBUTIONS** ...................................... 68

A. Timing and Calculation of Amounts to Be Distributed ....................................... 68

B. Disbursing Agent .................................................................................................. 69

C. Rights and Powers of Disbursing Agent ............................................................... 69
   1. Powers of Disbursing Agent ......................................................................... 69
   2. Expenses Incurred on or After the Effective Date ........................................ 69

D. Delivery of Distributions and Undeliverable or Unclaimed Distributions .......... 69
   1. Record Date for Distributions ....................................................................... 69
   2. Delivery of Distributions in General ............................................................. 69
   3. Minimum Distributions ................................................................................. 70
   4. Undeliverable Distributions and Unclaimed Property .................................. 70

E. Manner of Payment ............................................................................................... 70

F. Distributions to Holders of General Unsecured Claims ....................................... 71

G. Section 1145 Exemption ....................................................................................... 71

H. Compliance with Tax Requirements ..................................................................... 71

I. Allocations ............................................................................................................. 72

J. No Postpetition Interest on Claims ....................................................................... 72

K. Foreign Currency Exchange Rate ......................................................................... 72

L. Setoffs and Recoupment ....................................................................................... 72

M. Claims Paid or Payable by Third Parties .............................................................. 72
   1. Claims Paid by Third Parties ........................................................................ 72
   2. Claims Payable by Third Parties ................................................................... 73
   3. Applicability of Insurance Policies ............................................................... 73

**ARTICLE XI. ALTERNATIVES TO THE PLAN** ............................................................ 73

A. Chapter 7 Liquidation ........................................................................................... 73

B. Dismissal ............................................................................................................... 74

C. Exclusivity and Alternative Plan Potential ........................................................... 74

iv

**ARTICLE XII. FEASIBILITY** ............................................................................................................ **74**

**ARTICLE XIII. CERTAIN RISK FACTORS TO BE CONSIDERED** ............................................... **75**

    **A.**     **Bankruptcy Law Considerations** ...................................................................... **75**

        1.     **Parties in Interest May Object to the Plan's Classification of Claims and Interests** ................................................................................................ **75**

        2.     **The Conditions Precedent to the Effective Date of the Plan May Not Occur** ......................................................................................................... **75**

        3.     **The Debtors May Fail to Satisfy Vote Requirements** ................................. **76**

        4.     **The Debtors May Not Be Able to Secure Confirmation of the Plan** ............. **76**

        5.     **The Debtors May Object to the Amount or Classification of a Claim** ........... **77**

        6.     **Risk of Non-Occurrence of the Effective Date** ............................................ **77**

        7.     **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject** ......................................................................................................... **77**

        8.     **Releases, Injunctions, and Exculpation Provisions May not be Approved** .................................................................................................... **77**

    **B.**     **Failure to Confirm or Consummate the Plan** ................................................ **78**

    **C.**     **Claim Estimates May Be Incorrect** ................................................................ **78**

    **D.**     **Risks Related to Debtors' Business and Industry Conditions** ......................... **78**

    **E.**     **Risks Relating to the New Equity Interests** .................................................... **79**

        1.     **No Current Public Market for Securities** ..................................................... **79**

        2.     **Implied Valuation of New Equity Interests Not Intended to Represent the Trading Value of the New Equity Interests** ........................................... **79**

        3.     **No Intention to Pay Dividends** ..................................................................... **79**

    **F.**     **Inability to Close the Exit Facility** ................................................................. **80**

    **G.**     **Certain Tax Implications of the Plan** ............................................................. **80**

    **H.**     **Uncertainty of Recovery Under Litigation Trust** ........................................... **80**

    **I.**     **Disruptions to Information Systems and Cyber Security Attacks** ................... **80**

**ARTICLE XIV. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ............................................................................................................................. **81**

    **A.**     **U.S. Federal Income Tax Consequences Under the Plan to Holders of Existing Equity Interests of Vista HoldCo** ................................................... **82**

        1.     **Cancellation of Indebtedness Income** ......................................................... **82**

        2.     **Gain or Loss from the Disposition of Assets** ................................................ **82**

    **B.**     **Federal Income Tax Consequences to Holders of Claims** ............................... **83**

    **C.**     **Other Considerations for U.S. Holders** .......................................................... **83**

        1.     **Accrued Interest** .......................................................................................... **83**

        2.     **Market Discount** .......................................................................................... **83**

    **D.**     **Information Reporting and Back-Up Withholding** .......................................... **84**

    **E.**     **Consequences of Ownership and Disposition of the New Equity Interests** ..... **84**

    **F.**     **Consequences of Litigation Trust** ................................................................... **85**

**ARTICLE XV. CONCLUSION** ....................................................................................................... **85**

## EXHIBITS TO THE DISCLOSURE STATEMENT

**Chapter 11 Plan**.................................................................................................................**Exhibit 1**
**Corporate Organization Chart**.........................................................................................**Exhibit 2**
**Liquidation Analysis**..........................................................................................................**Exhibit 3**
**Financial Projections** ........................................................................................................**Exhibit 4**

# ARTICLE I.
## INTRODUCTION

The Debtors[2] hereby submit this Disclosure Statement for use in the solicitation of votes on the *Second Amended Joint Plan of Reorganization of Vista Proppants and Logistics, LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code* (*i.e.*, the Plan).[3] The Plan is annexed as **<u>Exhibit 1</u>** to this Disclosure Statement.

This Disclosure Statement sets forth certain relevant information regarding the Debtors' prepetition operations and financial history, the need to seek chapter 11 protection, significant events that have occurred during the Chapter 11 Cases, and the resultant analysis of the expected return to the Debtors' Creditors. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. Additionally, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims and Interests must follow for their votes to be counted.

All descriptions of the Plan set forth in this Disclosure Statement are for summary purposes only. To the extent of any inconsistency between this Disclosure Statement and the Plan, the Plan shall control. You are encouraged to review the Plan in full.

**YOU ARE BEING SENT THIS DISCLOSURE STATEMENT BECAUSE YOU ARE A CREDITOR OR OTHER PARTY IN INTEREST OF THE DEBTORS. THIS DOCUMENT DESCRIBES A CHAPTER 11 PLAN WHICH, WHEN CONFIRMED BY THE BANKRUPTCY COURT, WILL GOVERN HOW YOUR CLAIM OR INTEREST WILL BE TREATED. THE DEBTORS URGE YOU TO REVIEW THE DISCLOSURE STATEMENT AND THE PLAN CAREFULLY. THE DEBTORS BELIEVE THAT ALL CREDITORS SHOULD VOTE IN FAVOR OF THE PLAN.**

### A.      Summary of Plan

The Plan provides for the resolution of Claims against and Interests in the Debtors and implements a distribution scheme pursuant to the Bankruptcy Code. Distributions under the Plan shall be funded with: (1) Cash on hand; (2) the ABL Priority Collateral; (3) the MAALT Priority Collateral; (4) the issuance and distribution of the New Equity Interests; (5) the Exit Facility; (6) the GUC Cash Pool (if any); and (7) interests in the Litigation Trust, as applicable.

---

[2] Except as otherwise provided in this Disclosure Statement, capitalized terms herein have the meaning ascribed to them in the Plan. Any capitalized term used herein that is not defined in the Plan shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules, whichever is applicable.

[3] The information contained in this Disclosure Statement was prepared by Gary Barton, the Debtors' Chief Restructuring Officer, with assistance from Alvarez & Marsal North America, LLC, Kristin Whitley-Smith, the Debtors' Chief Financial Officer, the Debtors' current management team, employees of the Debtors, and Haynes and Boone, LLP, the Debtors' attorneys. The information contained in the Disclosure Statement was not prepared, reviewed, or approved by any officers or managers of the Debtors except for the Chief Restructuring Officer, Chief Financial Officer, and the Debtors' independent manager, Steve Straty.

Under the Plan, Claims and Interests are classified and each class has its own treatment. The table below describes each class of Claims and Interests, which holders of Claims and Interests belong in each class, the treatment of each class of Claims or Interests, and the expected recovery of each holder of Claims or Interests in the respective class.[4]

### Summary of Plan Treatment

| Class Description | Treatment |
|---|---|
| Class 1 - Other Secured Claims | On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Other Secured Claim, each holder of an Allowed Other Secured Claim Shall receive, at the option of the applicable Debtor, with the prior written consent of the Required Consenting Lenders, the following: (i) payment in full in Cash of its Allowed Class 1 Claim; (ii) the collateral securing its Allowed Class 1 Claim; (iii) reinstatement of its Allowed Class 1 Claim; or (iv) such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.<br><br>**Estimated total Allowed Class 1 Claims: $8,894,000[5]**<br><br>**Projected recovery: 100%** |
| Class 2 – Other Priority Claims | Each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to the full amount of such Allowed Class 2 Claim on the later of (i) the Effective Date, or (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction, contract, or other agreement giving rise to such Allowed Class 2 Claim.<br><br>**Estimated total Allowed Class 2 Claims: $0.00**<br><br>**Projected recovery: 100%** |

---

[4] The estimated totals contained in the Summary of Plan Treatment are based upon the Debtors' Schedules of Assets and Liabilities, unless otherwise provided.

[5] Includes scheduled Other Secured Claims against Lonestar Ltd. of approximately $5,684,593 and scheduled Other Secured Claims against MAALT in the amount of approximately $4,000, plus approximately $3,000,407 in Other Secured Claims against Lonestar Ltd. related to Hogg Ranch reclamation secured by a certificate of deposit, and approximately $205,000 in Other Secured Claims against Bulk related to workers' compensation secured by a certificate of deposit.

4812-2168-3656

| **Class Description** | **Treatment** |
|---|---|
| Class 3 – Term Loan Secured Claims | On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Term Loan Secured Claim, each holder of an Allowed Term Loan Secured Claim shall receive the following: (i) its Pro Rata share of 100% of the New Parent Units in the New Parent Company, which New Parent Company shall receive 100% of the equity interests of VPROP (which shall continue to hold the equity interests of its direct and indirect subsidiaries); (ii) its Pro Rata share of Tranche C Exit Facility Notes equal to $50,000,000; and (iii) the right to participate in Tranche A of the Exit Facility up to its Pro Rata share of $30,000,000 of new money in exchange for an equal amount of Tranche A Exit Facility Notes.

**Estimated total Allowed Class 3 Claims:** On the Effective Date, the Term Loan Secured Claims shall be Allowed in the amount of $369,300,998.02 _minus_ the amount of the Term Loan Deficiency Claim _plus_ (i) accrued but unpaid interest, including default interest, under the Term Loan Documents as of the Petition Date, and (ii) unpaid reasonable and documented fees, expenses, costs, and other charges incurred or accrued by the Term Loan Agent in connection with any and all aspects of the Chapter 11 Cases as of the Effective Date, subject to the provisions of the DIP Financing Order and this Plan.

**Projected recovery: 100%** |
| Class 4 – PlainsCapital ABL Secured Claims | On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed PlainsCapital ABL Secured Claim, each holder of an Allowed PlainsCapital ABL Secured Claim shall receive the ABL Priority Collateral securing such Allowed PlainsCapital ABL Secured Claims.

**Estimated total Allowed Class 4 Claims:** On the Effective Date, the PlainsCapital ABL Secured Claims shall be Allowed in the aggregate amount equal to the value of ABL Priority Collateral securing such PlainsCapital ABL Secured Claims.

**Projected recovery: 100%** |
| Class 5 – MAALT Secured Claims | On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each MAALT Secured Claim, each holder of an Allowed MAALT Secured Claim shall receive, at the option of applicable Debtor, with the prior written consent of the Required Consenting Lenders, the following: (i) the collateral securing its Allowed MAALT Secured Claim; (ii) Reinstatement of its Allowed MAALT Secured Claim; or (iii) such other treatment rendering its Allowed MAALT |

3

| Class Description | Treatment |
|---|---|
| | Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.<br><br>**Estimated total Allowed Class 5 Claims:** On the Effective Date, the MAALT Secured Claims shall be Allowed in the aggregate amount equal to the value of the collateral securing such MAALT Secured Claims.<br><br>**Projected recovery: 100%** |
| Class 6 - General Unsecured Claims If Class 6 Accepts | **If and only if Class 6 votes to accept the Plan, the following Treatment:**<br><br>On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Litigation Trust Interests, and the Litigation Trust shall be funded by a GUC Cash Pool in the amount of $500,000. The GUC Cash Pool shall be utilized or distributed at the discretion of the Litigation Trustee, subject to the terms of the Litigation Trust.<br><br>Further, if the holders of Class 6 Claims vote to accept this Plan, solely for purposes of calculating distributions from the Litigation Trust, the holders of Allowed Term Loan Deficiency Claims shall limit their distributions from the Litigation Trust to the amount they would receive if their Allowed Term Loan Deficiency Claims were equal to the total value of all other Allowed General Unsecured Claims; provided, however, that such limitation shall no longer apply after all Allowed General Unsecured Claims, other than Allowed Term Loan Deficiency Claims, have been paid in full, after which time payments shall continue to be made on account of the Allowed Term Loan Deficiency Claims until such Claims have also been paid in full.<br><br>As set forth in Article VIII.C of the Plan, in the event that Class 6 accepts the Plan or the Standing Motion is denied, then the Standing Motion Claims against the Term Loan Secured Parties shall be released by the Debtors, the Reorganized Debtors, and their Estates. The Term Loan Secured Parties intend to vote the entirety of their Class 6 Term Loan Deficiency Claims in favor of the Plan.<br><br>**Estimated total Allowed Class 6 Claims:** The Term Loan Agent has asserted that the aggregate amount of the Term Loan Deficiency Claim is approximately $225,000,000. The rights of parties in interest to contest the allowed amount of the Term Loan Deficiency Claim are reserved. The Debtors will put on valuation evidence at the Confirmation Hearing to support the valuation of the Term Loan Secured Claim and the Term Loan Deficiency Claim.<br><br>If Class 6 votes to accept the plan, the estimated total amount of Allowed Class 6 Claims for distribution purposes is approximately **$171,624,000**, comprised of (i) estimated trade Claims in the aggregate amount of approximately $40,850,000, (ii) estimated rejection damage Claims in the aggregate amount of approximately $44,962,000, and (iii) the reduced Term Loan Deficiency Claim in the aggregate estimated amount of approximately $85,812,000 for distribution purposes (until all Allowed General Unsecured Claims |

4

| **Class Description** | **Treatment** |
|---|---|
| | have been paid in full). |
| | **Projected recovery: $500,000** for the GUC Cash Pool, plus potential recoveries from Litigation Trust Causes of Action ranging from **0% - 100%** for Allowed General Unsecured Claims, including the reduced Term Loan Deficiency Claim of approximately $85,812,000**.** The potential recoveries from Litigation Trust Assets are uncertain, and it is not possible for the Debtors to ascribe a meaningful valuation to Litigation Trust Causes of Action. |
| Class 6 - General Unsecured Claims If Class 6 Rejects | **If and only if Class 6 votes to reject the Plan, the following Treatment:**<br><br>On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim (including Allowed Term Loan Deficiency Claims), each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Litigation Trust Interests, and the Litigation Trust shall receive no funding for the GUC Cash Pool. The holders of Allowed Term Loan Deficiency Claims shall not be required to waive any portion of their Allowed Term Loan Deficiency Claims if the holders of Class 6 Claims vote to reject the Plan.<br><br>As set forth in Article VIII.C of the Plan, in the event that Class 6 rejects the Plan and the Standing Motion is granted, then the Standing Motion Claims against the Term Loan Secured Parties shall be included in the Litigation Trust Causes of Action and shall not be released by the Debtors, the Reorganized Debtors, and their Estates.<br><br>**Estimated total Allowed Class 6 Claims:** The estimated total amount of Allowed Class 6 Claims if Class 6 rejects the Plan is approximately **$310,811,000**, comprised of (i) estimated trade Claims in the aggregate amount of approximately $40,850,000, (ii) estimated rejection damage Claims in the aggregate amount of approximately $44,962,000, and (iii) Allowed Term Loan Deficiency Claims in the aggregate estimated amount of $225,000,000.<br><br>**Projected recovery: $0.00** for the GUC Cash Pool plus potential recoveries from Litigation Trust Causes of Action ranging from **0% - 100%** for Allowed General Unsecured Claims**,** including the full Term Loan Deficiency Claim of approximately $225,000,000. The potential recoveries from Litigation Trust Assets are uncertain, and it is not possible for the Debtors to ascribe a meaningful valuation to Litigation Trust Causes of Action. |
| Class 7 - Intercompany Claims | On the Effective Date, Class 7 Claims shall be, at the option of the Debtors, with the consent of the Required Consenting Lenders, either (i) Reinstated, or (ii) cancelled, released, and extinguished without any distribution.<br><br>**Estimated total Allowed Class 7 Claims**: Approximately $263,956,000. |

| Class Description | Treatment |
|---|---|
| Class 8 – Interests in Debtors other than Vista HoldCo | On the Effective Date, all existing Interests in each of the Debtors, other than Interests in Vista HoldCo, shall be, at the option of the applicable Debtor, with the consent of the Required Consenting Lenders, either (i) Reinstated, or (ii) cancelled, released, and extinguished without any distribution, and will be of no further force or effect. |
| Class 9 – Interests in Vista HoldCo | All Interests in Vista HoldCo shall be canceled, released, and extinguished as of the Effective Date and will be of no further force or effect. Holders of an Interest in Vista HoldCo will not receive any distribution on account of such Interest. |

### B. Filing of the Debtors' Chapter 11 Cases

On June 9, 2020 (*i.e.*, the Petition Date), the Debtors Filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. The Debtors Filed the Chapter 11 Cases to preserve the value of their estates and to restructure their financial affairs. To such end, the Debtors have continued to manage their properties and are operating and managing their businesses as debtors in possession in accordance with sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

### C. Purpose of Disclosure Statement

Section 1125 of the Bankruptcy Code requires the Debtors to prepare and obtain court approval of the Disclosure Statement as a prerequisite to soliciting votes on the Plan. The purpose of the Disclosure Statement is to provide information to holders of Claims and Interests that will assist them in deciding how to vote on the Plan.

Approval of this Disclosure Statement does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereunder. The Bankruptcy Court's approval does indicate, however, that the Bankruptcy Court has determined that the Disclosure Statement contains adequate information to permit a Creditor to make an informed judgment regarding acceptance or rejection of the Plan.

### D. Hearing on Approval of the Disclosure Statement

The Bankruptcy Court has set August 17, 2020, at 1:30 p.m. (prevailing Central Time) as the time and date for the hearing (the "Disclosure Statement Hearing") to consider approval of this Disclosure Statement. At the Disclosure Statement Hearing, the Bankruptcy Court approved the Disclosure Statement and procedures regarding solicitation of the Plan.

### E. Hearing on Confirmation of the Plan

The Bankruptcy Court has set September 24, 2020, at 1:30 p.m. Central Time as the date and time for a hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of holders of Claims, and whether the other standards for

confirmation of the Plan have been satisfied. Once commenced, the Confirmation Hearing may be adjourned or continued by announcement in open court with no further notice.

F.     **Disclaimers**

THIS DISCLOSURE STATEMENT IS PROVIDED FOR USE SOLELY BY HOLDERS OF CLAIMS AND INTERESTS AND THEIR ADVISERS IN CONNECTION WITH THEIR DETERMINATION TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY OTHER ENTITY FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR ON YOUR DECISION REGARDING ACCEPTING THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS THE REPRESENTATION OF THE DEBTORS ONLY AND NOT OF THEIR ATTORNEYS, ACCOUNTANTS OR OTHER PROFESSIONALS.     FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECTED TO AN AUDIT BY AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT.  THE FINANCIAL PROJECTIONS AND OTHER FINANCIAL INFORMATION, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, NECESSARILY WERE BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY UNCERTAIN AND MAY BE BEYOND THE CONTROL OF THE DEBTORS' MANAGEMENT.

THE DEBTORS ARE NOT ABLE TO CONFIRM THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT INCLUDE ANY INACCURACIES.  HOWEVER, THE DEBTORS HAVE MADE THEIR BEST EFFORT TO PROVIDE ACCURATE INFORMATION AND ARE NOT AWARE OF ANY INACCURACY IN THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN INDEPENDENTLY INVESTIGATED BY THE BANKRUPTCY COURT AND HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  IN THE EVENT THIS DISCLOSURE STATEMENT IS APPROVED, SUCH APPROVAL DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

THE ONLY REPRESENTATIONS THAT ARE AUTHORIZED BY THE DEBTORS CONCERNING THE DEBTORS, THE VALUE OF THEIR ASSETS, THE EXTENT OF THEIR LIABILITIES, OR ANY OTHER FACTS MATERIAL TO THE PLAN ARE THE REPRESENTATIONS MADE IN THIS DISCLOSURE STATEMENT.  REPRESENTATIONS CONCERNING THE PLAN OR THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT ARE NOT AUTHORIZED BY THE DEBTORS.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL,

BUSINESS, FINANCIAL, OR TAX ADVICE AND ALL SUCH HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR OWN ADVISERS.

THE DEBTORS HAVE NO ARRANGEMENT OR UNDERSTANDING WITH ANY BROKER, SALESMAN, OR OTHER PERSON TO SOLICIT VOTES FOR THE PLAN. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THE PLAN OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATIONS SHOULD NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME AFTER THE DATE HEREOF OR THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN OR IN THE AFFAIRS OF THE DEBTORS SINCE THE DATE HEREOF. ANY ESTIMATES OF CLAIMS AND INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE FINAL AMOUNTS OF CLAIMS OR INTERESTS ALLOWED BY THE BANKRUPTCY COURT. SIMILARLY, THE ANALYSIS OF ASSETS AND THE AMOUNT ULTIMATELY REALIZED FROM THEM MAY DIFFER MATERIALLY.

THE DESCRIPTION OF THE PLAN CONTAINED HEREIN IS INTENDED TO BRIEFLY SUMMARIZE THE MATERIAL PROVISIONS OF THE PLAN AND IS SUBJECT TO AND QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS OF THE PLAN.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

## ARTICLE II.
## EXPLANATION OF CHAPTER 11

### A.     Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor in possession may seek to reorganize its business or to sell the business for the benefit of the debtor's Creditors and other interested parties.

The commencement of a chapter 11 case creates an estate comprising all of the debtor's legal and equitable interests in property as of the date the petition is filed. Unless the bankruptcy court orders the appointment of a trustee, a chapter 11 debtor may continue to manage and control the assets of its estate as a "debtor in possession," as the Debtors have done in the Chapter 11 Cases since the Petition Date.

Formulation of a chapter 11 plan is the principal purpose of a chapter 11 case. Such plan sets forth the means for satisfying the Claims of Creditors against, and interests of equity security holders in, the debtor.

### B.     Chapter 11 Plan

After a plan has been filed, the holders of claims against, or equity interests in, a debtor are permitted to vote on whether to accept or reject the plan. Chapter 11 does not require that each holder of a claim against, or equity interest in, a debtor vote in favor of a plan in order for the plan to be confirmed. At a minimum, however, a plan must be accepted by a majority in number and two-thirds in dollar amount of those claims actually voting from at least one class of claims impaired under the plan. The Bankruptcy Code also defines acceptance of a plan by a class of equity interests as acceptance by holders of two-thirds of the number of shares actually voted.

Classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan, and therefore are not entitled to vote. A class is "impaired" if the plan modifies the legal, equitable, or contractual rights attaching to the claims or equity interests of that class. Modification for purposes of impairment does not include curing defaults and reinstating maturity or payment in full in cash. Conversely, classes of claims or equity interests that receive or retain no property under a plan of reorganization are conclusively presumed to have rejected the plan, and therefore are not entitled to vote.

Even if all classes of claims and equity interests accept a chapter 11 plan, the bankruptcy court may nonetheless deny confirmation. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and, among other things, requires that a plan be in the "best interest" of impaired and dissenting Creditors and interest holders and that the plan be feasible. The "best interest" test generally requires that the value of the consideration to be distributed to impaired and dissenting Creditors and interest holders under a plan may not be less than those parties would receive if the debtor were liquidated under a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. A plan must also be determined to be "feasible," which generally requires a finding that there is a reasonable probability that the debtor will be able to

9

perform the obligations incurred under the plan and that the debtor will be able to continue operations without the need for further financial reorganization or liquidation.

The bankruptcy court may confirm a chapter 11 plan even though fewer than all of the classes of impaired Claims and equity interests accept it. The bankruptcy court may do so under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. In order for a plan to be confirmed under the cramdown provisions, despite the rejection of a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not discriminate unfairly and that it is fair and equitable with respect to each impaired class of claims or equity interests that has not accepted the plan.

The bankruptcy court must further find that the economic terms of the particular plan meet the specific requirements of section 1129(b) of the Bankruptcy Code with respect to the subject objecting class. If the proponent of the plan proposes to seek confirmation of the plan under the provisions of section 1129(b) of the Bankruptcy Code, the proponent must also meet all applicable requirements of section 1129(a) of the Bankruptcy Code (except section 1129(a)(8) of the Bankruptcy Code). Those requirements include the requirements that (i) the plan comply with applicable Bankruptcy Code provisions and other applicable law, (ii) that the plan be proposed in good faith, and (iii) that at least one impaired class of Creditors or interest holders has voted to accept the plan.

## ARTICLE III.
## VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS

### A. Ballots and Voting Deadline

Holders of Claims and Interests entitled to vote on the Plan will receive instructions for submitting a Ballot to vote to accept or reject the Plan. After carefully reviewing the Disclosure Statement, including all exhibits, each holder of a Claim or Interest (or its authorized representative) entitled to vote should follow the instructions to indicate its vote on the Ballot. All holders of Claims or Interests (or their authorized representatives) entitled to vote must (i) carefully review the Ballot and the instructions for completing it, (ii) complete all parts of the Ballot, and (iii) submit the Ballot by the deadline (*i.e.*, the Voting Deadline) for the Ballot to be considered. Holders of Claims or Interests entitled to vote must mail the Ballot(s) to Kurtzman Carson Consultants LLC (*i.e.,* the Claims and Balloting Agent) at the following address: Vista Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300. Holders of Claims or Interests may contact the Claims and Balloting Agent by telephone at (866)-475-7847 or 781-575-2036 (if outside of the United States or Canada), or by email at VistaInfo@kccllc.com.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be received by the Claims and Balloting Agent by no later than **September 17, 2020, at 4:00 p.m. prevailing Central Time**.

**BALLOTS MUST BE SUBMITTED IN PAPER FORM SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS AND BALLOTING AGENT NO LATER THAN SEPTEMBER 17, 2020, AT 4:00 P.M. PREVAILING CENTRAL TIME. ANY**

**BALLOTS SUBMITTED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.**

### B. Holders of Claims Entitled to Vote

Any holder of a Class 3 Term Loan Secured Claim or a Class 6 General Unsecured Claim (including a Term Loan Deficiency Claim) is entitled to vote if either (i) the Claim has been listed in the Schedules of Assets and Liabilities in an amount greater than zero (and the Claim is not scheduled as disputed, contingent, or unliquidated) or (ii) the holder of a Claim has Filed a Proof of Claim (that is not contingent or in an unknown amount) on or before the Voting Record Date.

Any holder of a Claim as to which an objection has been Filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court (on motion by a party whose Claim is subject to an objection) temporarily allows the Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan. Such motion must be heard and determined by the Bankruptcy Court on or before the Voting Deadline.

In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

### C. Definition of Impairment

Under section 1124 of the Bankruptcy Code, a class of Claims or equity interests is impaired under a chapter 11 plan unless, with respect to each Claim or equity interest of such class, the plan:

(1) leaves unaltered the legal, equitable, and contractual rights to which such Claim or interest entitles the holder of such Claim or interest; or

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or interest to demand or receive accelerated payment of such Claim or interest after the occurrence of a default:

 (a) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured;

 (b) reinstates the maturity of such Claim or interest as such maturity existed before such default;

 (c) compensates the holder of such Claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

4812-2168-3656

(d)     if such Claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such Claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(e)     does not otherwise alter the legal, equitable, or contractual rights to which such Claim or interest entitles the holder of such Claim or interest.

### D.     Classes Impaired or Unimpaired Under the Plan

Classes 3, 6, and 9 are Impaired under the Plan, and only holders of Allowed Claims in Class 3 and Class 6 (including Allowed Term Loan Deficiency Claims) are entitled to vote to accept or reject the Plan. Holders of Claims in Class 3 and Class 6 will receive Ballots containing detailed voting instructions.

Classes 3, 6, and 9 are Impaired because one or more of the proposed potential alternative treatments of Classes 3, 6, and 9 alters the legal, equitable, or contractual rights of holders of Allowed Claims in such Classes. Holders of Class 9 Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Class 9 Interests are not entitled to vote to accept or reject the Plan.

Classes 1, 2, 4, and 5 are Unimpaired under the Plan. Holders of Allowed Claims in Classes 1, 2, 4, and 5 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

Class 7 is Unimpaired to the extent the Class 7 Claims are Reinstated and Impaired to the extent the Class 7 Claims are cancelled. Holders of Allowed Claims in Class 7 are conclusively deemed to have accepted or rejected the Plan pursuant to sections 1126(f) or 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

Class 8 is Unimpaired to the extent the Class 8 Interests are Reinstated and Impaired to the extent the Class 8 Interests are cancelled. Holders of Allowed Interests in Class 8 are conclusively deemed to have accepted or rejected the Plan pursuant to sections 1126(f) or 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

### E.     Information on Voting and Vote Tabulations

#### 1.     Transmission of Ballots to Holders of Claims and Interests

Instructions for completing and submitting Ballots are being provided to all holders of Claims entitled to vote on the Plan in accordance with the Bankruptcy Rules.  Those holders of Claims or Interests whose Claims or Interests are Unimpaired under the Plan are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and therefore need not vote with regard to the Plan.  Under section 1126(g) of the Bankruptcy Code, holders of

Claims or Interests who do not either receive or retain any property under the Plan are deemed to have rejected the Plan. In the event a holder of a Claim or Interest does not vote, the Bankruptcy Court may deem such holder of a Claim or Interest to have accepted the Plan.

## 2.  Ballot Tabulation Procedures

The Claims and Balloting Agent shall count all Ballots filed on account of (1) Claims in the Schedules of Assets and Liabilities, that are not listed as contingent, unliquidated or disputed, and are listed in an amount in excess of $0.00; and (2) Proofs of Claim Filed by the Voting Record Date that are not asserted as contingent or unliquidated, and are asserted in an amount in excess of $0.00. If no Claim is listed in the Schedules of Assets or Liabilities, and no Proof of Claim is Filed by the Voting Record Date, such Creditor shall not be entitled to vote on the Plan on account of such Claim, subject to the procedures below. Further, the Claims and Balloting Agent shall not count any votes on account of Claims that are subject to an objection which has been Filed (and such objection is still pending), unless and to the extent the Court has overruled such objection by the Voting Record Date. The foregoing general procedures will be subject to the following exceptions and clarifications:

(a)     if a Claim is Allowed under the Plan or by order of the Court, such Claim is Allowed for voting purposes in the Allowed amount set forth in the Plan or the order;

(b)     if a Claim is listed in the Debtors' Schedules of Assets and Liabilities or a Proof of Claim is timely Filed by the Voting Record Date, and such Claim is not listed or asserted as contingent, unliquidated, or disputed, and is listed or asserted in an amount in excess of $0.00, such Claim is temporarily Allowed for voting purposes in the amount set forth in the Debtors' Schedules of Assets and Liabilities or as asserted in the Proof of Claim;

(c)     if a Claim is listed in the Debtors' Schedules of Assets and Liabilities or a Proof of Claim is timely Filed by the Voting Record Date, and such Claim is only partially listed or asserted as contingent, unliquidated, or disputed, such Claim is temporarily Allowed for voting purposes only in the amount not listed or asserted as contingent, unliquidated or disputed in the Debtors' Schedules of Assets and Liabilities or in the Proof of Claim;

(d)     if a Claim is listed in the Debtors' Schedules of Assets and Liabilities or a Proof of Claim is timely Filed by the Voting Record Date, and such Claim is listed or asserted as contingent, unliquidated, or disputed, or is listed or asserted for $0.00 or an undetermined amount, such Claim shall not be counted for voting purposes;

(e)     if a Claim is not listed in the Debtors' Schedules of Assets and Liabilities and a Proof of Claim is Filed after the Voting Record Date, but before the

applicable bar date and before September 11, 2020,[6] then such Claim is temporarily Allowed for voting purposes;

(f)     any Claim to which there remains a pending objection as of the Voting Deadline, or an order has been entered granting such objection, such Claim shall not be counted for voting purposes;

(g)     if a Creditor has Filed duplicate Proofs of Claim by the Voting Record Date against one or more Debtors, such Creditor's Claim shall only be counted once for the Debtor at which the Creditor's Claim is pending for voting purposes unless the Debtors determine there is a Claim pending against multiple Debtors;

(h)     if a Proof of Claim has been amended by a later-Filed Proof of Claim, the earlier-Filed Claim will not be entitled to vote, and to the extent the later-Filed Proof of Claim is filed after the Voting Record Date, such later-Filed Proof of Claim must have been temporarily allowed for voting purposes by the Voting Record Date to be counted; and

(i)     A counterparty to an Executory Contract or Unexpired Lease that has not been rejected as of the Voting Record Date may file a motion requesting that the Bankruptcy Court estimate such counterparty's rejection damage Claim for voting purposes prior to the Voting Deadline.

The following procedures shall apply for tabulating votes:

(a)     any Ballot that is otherwise timely completed, executed, and properly cast to the Claims and Balloting Agent but does not indicate an acceptance or rejection of the Plan, or that indicates both an acceptance and rejection of the Plan, shall not be counted; if no votes to accept or reject the Plan are received with respect to a particular Class that is entitled to vote on the Plan, such Class shall be deemed to have voted to accept the Plan;

(b)     if a Creditor casts more than one (1) Ballot voting the same Claim before the Voting Deadline, the last properly cast Ballot received before the Voting Deadline shall be deemed to reflect the voter's intent and thus supersede any prior Ballots;

(c)     Allowed Class 6 Term Loan Deficiency Claims shall be deemed voted consistent with such holder's vote submitted with its Class 3 Term Loan Secured Claim Ballot;

---

[6] Pursuant to the Approval Order, the Claims and Balloting Agent will provide the applicable solicitation package to the holder of a Claim that is filed between the Voting Record Date and September 11, 2020 (and before the applicable bar date) within 4 business days of the filing of such Claim. Given that the Voting Deadline is September 17, 2020, the last day to submit a Claim with sufficient time to receive a solicitation package is September 11, 2020 (which is 4 business days prior to the Voting Deadline).

4812-2168-3656

(d)     Creditors must vote all of their Claims within a particular Class to either accept or reject the Plan, and may not split their votes within a particular Class and thus a Ballot (or group of Ballots) within a particular Class that partially accepts and partially rejects the Plan shall not be counted;

(e)     a Creditor who votes an amount related to a Claim that has been paid or otherwise satisfied in full or in part shall only be counted for the amount that remains unpaid or not satisfied, and if such Claim has been fully paid or otherwise satisfied, such vote will not be counted for purposes of amount or number; and

(f)     for purposes of determining whether the numerosity and amount requirements of sections 1126(c) and 1126(d) of the Bankruptcy Code have been satisfied, the Debtors will tabulate only those Ballots received by the Voting Deadline. For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single Creditor in a particular Class shall be aggregated as if such Creditor held one (1) Claim against the Debtors in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan.

The following Ballots shall not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

(a)     any Ballot received after the Voting Deadline, unless the Debtors, in their discretion, grant an extension of the Voting Deadline with respect to such Ballot;

(b)     any Ballot that is illegible or contains insufficient information to permit identification of the voter;

(c)     any Ballot cast by a Person that does not hold a Claim or Interest in a Class that is entitled to vote to accept or reject the Plan;

(d)     any duplicate Ballot will only be counted once;

(e)     any unsigned Ballot or paper Ballot that does not contain an original signature; and

(f)     any Ballot transmitted to the Claims and Balloting Agent by facsimile or electronic mail, unless the Debtors, in their discretion, consent to such delivery method.

### 3.     Execution of Ballots by Representatives

To the extent applicable, if a Ballot is submitted by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations, or others acting in a fiduciary or representative capacity, such Persons must indicate their capacity when submitting the Ballot and, at the Debtors' request, must submit proper evidence satisfactory to the Debtors of their

authority to so act. For purposes of voting tabulation, a Ballot submitted by a representative shall account for the total number of represented parties with respect to the numerosity requirement set forth in this Article.

### 4. Waivers of Defects and Other Irregularities Regarding Ballots

Unless otherwise directed by the Bankruptcy Court, all questions concerning the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtors in their sole discretion, whose determination will be final and binding. The Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liability for failure to provide such notification; *provided, however*, that the Debtors will indicate on the ballot summary the Ballots, if any, that were not counted, and will provide copies of such Ballots with the ballot summary to be submitted at the Confirmation Hearing. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until any irregularities have been cured or waived. Unless otherwise directed by the Bankruptcy Court, Ballots previously furnished, and as to which any irregularities have not subsequently been cured or waived, will be invalidated.

### 5. Withdrawal of Ballots and Revocation

The Debtors may allow any claimant who submits a properly completed Ballot to supersede or withdraw such Ballot on or before the Voting Deadline. In the event the Debtors do permit such supersession or withdrawal, the claimant, for cause, may change or withdraw its acceptance or rejection of the Plan in accordance with Bankruptcy Rule 3018(a).

### F. Confirmation of Plan

### 1. Solicitation of Acceptances

The Debtors are soliciting your vote.

**NO REPRESENTATIONS OR ASSURANCES, IF ANY, CONCERNING THE DEBTORS OR THE PLAN ARE AUTHORIZED BY THE DEBTORS, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE, OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO DEBTORS' COUNSEL FOR APPROPRIATE ACTION.**

4812-2168-3656

**THIS IS A SOLICITATION SOLELY BY THE DEBTORS, AND IS NOT A SOLICITATION BY ANY MEMBER, ATTORNEY, ACCOUNTANT, OR OTHER PROFESSIONAL FOR THE DEBTORS. THE REPRESENTATIONS, IF ANY, MADE IN THIS DISCLOSURE STATEMENT ARE THOSE OF THE DEBTORS AND NOT OF SUCH MEMBERS, ATTORNEYS, ACCOUNTANTS, OR OTHER PROFESSIONALS, EXCEPT AS MAY BE OTHERWISE SPECIFICALLY AND EXPRESSLY INDICATED.**

### 2. Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court shall enter an order confirming the Plan. The Debtors believe that the Plan satisfies all of the statutory requirements of the Bankruptcy Code for confirmation because, among other things:

(a)    The Plan complies with the applicable provisions of the Bankruptcy Code;

(b)    The Debtors have complied with the applicable provisions of the Bankruptcy Code;

(c)    The Plan has been proposed in good faith and not by any means forbidden by law;

(d)    Any payment or distribution made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in connection with the Plan has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e)    The Debtors have disclosed the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint plan with the Debtors, or a successor to the Debtors under the Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of holders of Claims and Interests and with public policy;

(f)    Any government regulatory commission with jurisdiction (after confirmation of the Plan) over the rates of the Debtors has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval;

(g)    With respect to each Impaired Class of Claims or Interests, either each holder of a Claim or Interest of the Class will have accepted the Plan, or will receive or retain under the Plan on account of that Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code. If section 1111(b)(2) of the Bankruptcy Code applies to the

Claims of a Class, each holder of a Claim of that Class will receive or retain under the Plan on account of that Claim property of a value, as of the Effective Date, that is not less than the value of that holder's interest in the Debtors' interest in the property that secures that Claim;

(h)   Each Class of Claims or Interests will have accepted the Plan or is not Impaired under the Plan, subject to the Debtors' right to seek cramdown of the Plan under section 1129(b) of the Bankruptcy Code;

(i)   Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that with respect to a Claim of a kind specified in sections 507(a)(2) or (a)(3) of the Bankruptcy Code, on the Effective Date, the holder of such claim will receive on account of such Claim equal to the Allowed amount of such Claim;

(j)   Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that with respect to a Class of Claims of a kind specified in sections 507(a)(1), 507(a)(4), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a Claim of such Class will receive (i) if such class has accepted the Plan, deferred cash payments of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim, or (ii) if such Class has not accepted the Plan, cash on the Effective Date of the Plan equal to the Allowed amount of such Claim;

(k)   If a Class of Claims or Interests is Impaired under the Plan, at least one such Class of Claims or Interests will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Interest of that Class;

(l)   Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan;

(m)   All court fees, as determined by the Bankruptcy Court at the Confirmation Hearing, will have been paid or the Plan provides for the payment of such fees on the Effective Date; and

(n)   The Plan provides that all transfers of property shall be made in accordance with applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

The Debtors assert that they have proposed the Plan in good faith and they believe that they have complied, or will have complied, with all the requirements of the Bankruptcy Code governing confirmation of the Plan.

### 3. Acceptances Necessary to Confirm the Plan

Voting on the Plan by each holder of an Impaired Claim (or its authorized representative) is important. Chapter 11 of the Bankruptcy Code does not require that each holder of a Claim or Interest vote in favor of the Plan in order for the Bankruptcy Court to confirm the Plan. Generally, under the acceptance provisions of section 1126(a) of the Bankruptcy Code, each Class of Claims or Interests has accepted the Plan if holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class actually voting in connection with the Plan vote to accept the Plan. With regard to a Class of Interests, more than two-thirds of the shares actually voted must accept to bind that Class. Even if all Classes of Claims and Interests accept the Plan, the Bankruptcy Court may refuse to confirm the Plan.

### 4. Cramdown

In the event that any Impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each Impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A chapter 11 plan does not discriminate unfairly within the meaning of the Bankruptcy Code if no Class receives more than it is legally entitled to receive for its Claims or Interests. "Fair and equitable" has different meanings for holders of secured and unsecured Claims and Interests.

With respect to a Secured Claim, "fair and equitable" means either (i) the Impaired secured Creditor retains its Liens to the extent of its Allowed Claim and receives deferred Cash payments at least equal to the allowed amount of its Claims with a present value as of the effective date of the plan at least equal to the value of such Creditor's interest in the property securing its Liens; (ii) property subject to the Lien of the Impaired secured Creditor is sold free and clear of that Lien, with that Lien attaching to the proceeds of sale, and such Lien proceeds must be treated in accordance with clauses (i) and (iii) hereof; or (iii) the Impaired secured Creditor realizes the "indubitable equivalent" of its Claim under the plan.

With respect to an Unsecured Claim, "fair and equitable" means either (i) each Impaired Creditor receives or retains property of a value equal to the amount of its Allowed Claim or (ii) the holders of Claims and Interests that are junior to the Claims of the dissenting class will not receive any property under the Plan.

With respect to Interests, "fair and equitable" means either (i) each Impaired Interest receives or retains, on account of that Interest, property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of the Interest, or (ii) the holder of any Interest that is junior to the Interest of that Class will not receive or retain under the Plan, on account of that junior equity interest, any property.

The Debtors believe that the Plan does not discriminate unfairly and is fair and equitable with respect to each Impaired Class of Claims and Interests. In the event at least one Class of Impaired Claims or Interests rejects or is deemed to have rejected the Plan, the Bankruptcy Court

will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting Impaired Class of Claims or Interests.

          **5.**       **Conditions Precedent to Confirmation and Effectiveness of the Plan**

In addition to the requirements of the Bankruptcy Code, Article IX of the Plan contains certain conditions to confirmation and effectiveness of the Plan.

## ARTICLE IV.
## BACKGROUND OF THE DEBTORS

**A.**      **Description of Debtors' Businesses**

          **1.**       **Formation and Current Structure**

Vista HoldCo is a privately owned limited liability company formed under the laws of the State of Delaware and headquartered in Fort Worth, Texas. The Debtors' principal business is producing mine-to-wellhead high-quality, fine-grade frac sand for oil and gas well completion in producing regions in Texas and Oklahoma, including the Permian Basin, Eagle Ford Shale, and the Southern Central Oklahoma Oil Province and the Sooner Trend (oil field) Anadarko (basin), Canadian and Kingfisher (counties). As of the Petition Date, the Debtors employed approximately fifty-six individuals. Through their mining operations, the Debtors are capable of producing high-quality, fine-grade, 40/70-mesh, 100-mesh, and 200-mesh sand, which is marketed as "Texas Premium White" sand.

The Debtors began business in 2004 as a trucking entity and expanded over time into a vertically integrated frac sand supplier. The Debtors commenced transloading operations in 2006 and began mining in 2011. In 2012, the Debtors' added rail service a few miles away from the Cresson Mine (defined below) for direct shipment of sand in-basin.

As of the Petition Date, the majority (52.79%) of Vista HoldCo is owned by Lonestar Prospects Holdings Company, L.L.C. The remainder of Vista HoldCo is owned by the following non-debtor affiliates and investors: FR Sand Holdings, LLC (30.60%), Future New Deal, Ltd. (6.31%), M&J Partnership, Ltd. (6.31%), ARCC VS Corp. (1.77%), Gary Humphreys (1.06%), Marty Robertson (1.06%), GHMRC, LLC (Series A), Tim Probert (0.05%), Ares Credit Strategies (0.01%), Ares Jasper Fund, L.P. (>.01%), and Ares ND Credit Strategies Fund, LLC (0.05%).

Vista HoldCo owns, either directly or indirectly, the remainder of the Debtor subsidiaries – VPROP; Lonestar Management; Bulk; Denetz; Lonestar Ltd.; and MAALT. An organization ownership chart is attached hereto as **Exhibit 2**.

Prior to the Petition Date, Vista operated a vertically integrated logistics network consisting of three mines in Texas, eleven transloading terminals in Texas and Oklahoma, two trucking facilities in Texas, and a fleet of approximately 100 "last-mile" transport vehicles. The mines operated by the Debtors are located in Granbury, Texas (the "Cresson Mine"), Tolar, Texas (the "Tolar Mine"), and Kermit, Texas (the "West Texas Mine"). The trucking facilities operated by the Debtors are located in Dilley and Monahans, Texas.

As discussed in more detail below, as of the Petition Date, the Debtors are no longer engaging in trucking operations, have substantially reduced transloading operations, and have temporarily shut down their mining operations, other than the minimal operations necessary to preserve equipment and infrastructure.

### 2. The March 2017 Transactions

Before a reorganization that occurred in March 2017, the operations of the Debtors, other than Vista HoldCo and VPROP, neither of which had as yet been formed, were organized as three separate lines of business: (1) mining, (2) trucking, and (3) transloading. In that regard, (i) Debtor Lonestar Ltd., (ii) its general partner, Debtor Lonestar Management, and (iii) non-Debtor Lonestar Prospects Holding Company, L.L.C. ("Lonestar Holding") comprised the mining line of business. Lonestar Ltd. and Lonestar Management are referred to collectively in this Disclosure Statement as the "Non-Logistics Subsidiaries."

The trucking line of business consisted of Debtor Bulk. Debtors MAALT, and its general partner, Denetz, comprised the transloading line of business. Bulk, MAALT, and Denetz are referred to collectively in this Disclosure Statement as the "Logistics Subsidiaries."

By March of 2017, an investor in the energy sector, First Reserve Corporation ("First Reserve"), desired to become an equity sponsor by acquiring a substantial equity interest in these businesses. To rationalize the ownership of the lines of business and facilitate the investment by First Reserve, the decision was made to modify the organizational structure by placing the Non-Logistics Subsidiaries and the Logistics Subsidiaries under the umbrella of a newly formed holding company, then known as Oilfield Sands Holdings, LLC ("Oilfield Sands"). This reorganization was accomplished by the contribution of the equity interest in the Non-Logistics Subsidiaries and the Logistics Subsidiaries to Oilfield Sands on March 20, 2017 (the "March 2017 Reorganization").

In connection with the March 2017 Reorganization, a First Reserve company, FR Sands Holdings LLC ("FR Sands"), acquired an approximately 21% equity interest in Oilfield Sands for $120,000,000, of which $25,000,000 went to the Debtors and $95,000,000 went to pre-existing holders of equity interests. On June 15, 2017, Oilfield Sands changed its name to Vista Proppants and Logistics, LLC (i.e. Vista HoldCo).

Also in March 2017, Lonestar Ltd., as borrower, entered into a credit agreement, dated as of March 1, 2017 (the "March 2017 Term Loan Credit Agreement"), with the Term Loan Agent, as administrative agent, and the other lenders party thereto (collectively with the Term Loan Agent, the "March 2017 Lenders"). The March 2017 Term Loan Credit Agreement provided for term loans to Lonestar Ltd. in the amount of $125,000,000 (the "March 2017 Loans"), with a possibility for obtaining up to an additional $60,000,000 in incremental loans upon the satisfaction of certain conditions. The March 2017 Loans replaced the $75,000,000 of term loans that were previously outstanding under the then existing Term Loan Credit Agreement.

The March 2017 Loans were guaranteed by Lonestar Ltd.'s subsidiaries. As security for the repayment of the March 2017 Loans, Lonestar Ltd., among other things, granted liens in its

real property interests in Texas for the benefit of the Term Loan Agent, in its capacity as agent under the March 2017 Term Loan Credit Agreement.

### 3. November 2017 Buy-Out Transaction

As of November 1, 2017, the vast majority of the common membership units in Vista HoldCo were owned, in various percentages, by: Lonestar Holding, FR Sands, Future New Deal, Ltd. ("Future New Deal"), M&J Partnership, Ltd. ("M&J Partnership"), Gary Humphreys, and Martin Robertson (collectively, the "Vista Members"). At that time, two entities affiliated with R.J. Sikes (a Texas resident), namely, RJS Holdings, LLC ("RJS Holdings") and KCM Enterprises, LP ("KCM Enterprises") owned indirect interests in Vista HoldCo (the "Sikes Interests"), through ownership of common membership units in Lonestar Holding.

By November 2017, the decision had been made for Vista HoldCo to sever its ties with R.J. Sikes. That severance was to include a buy-out of the Sikes Interests that would be funded, in substantial part, by distributions made by the Debtors to the Vista Members in the amount of $85,000,000 (the "Buy-Out Transaction"). To provide the funds to be distributed to the Vista Members for use in the buy-out of the Sikes Interests, the Term Loan Agreement was amended as of November 9, 2017 to provide for (i) new loans to VPROP in the amount of $85,000,000 (the "New Loans"), for use in funding the Buy-Out Transaction, and (ii) "Incremental Loans" to VPROP of up to $60,000,000, for use, principally, in connection with the development of Lonestar Ltd.'s Tolar Facility (a silica sand mine facility) and Winkler Facility (a silica sand mine facility). Under the Term Loan Agreement, proceeds of Incremental Loans were not permitted to be used to fund the Buy-Out Transaction.

In summary, the buy-out of the Sikes Interests was accomplished as follows: (1) a prior agreement under which KCM Enterprises had acquired its interests in Lonestar Holding was rescinded, forgiving $23,000,000 of debt and resulting in the re-conveyance by KCM Enterprises to Future New Deal and M&J Partnership of the interests in Lonestar Holding it had previously acquired from them; (2) Lonestar Holding redeemed RJS Holdings' interests in Lonestar Holding by transferring to RJS Holdings membership interests in Vista Proppants (the "RJS Company Interests") and (3) the Vista Members (including FR Sands) acquired a majority of the RJS Company Interests in exchange for $85,000,000; and (4) certain entities affiliated with the Term Loan Agent and FR Sands acquired the remaining RJS Company Interests for $10,000,000 and $23,000,000, respectively.

As described in more detail below, the Committee has sought authorization from the Bankruptcy Court to commence and prosecute, for the benefit of the Debtors estates, among other claims, certain constructive fraudulent transfer claims against the Term Loan Secured Parties in connection with the Buy-Out Transaction. As set forth in more detail below, the Debtors believe that such alleged claims against the Term Loan Secured Parties are meritless and will not result in any net benefit to the Debtors' Estates.

### B. Events Leading to the Chapter 11 Cases

Pursuant to the Debtors' audited financial statements, as of December 31, 2017, the Debtors had total assets of $415,055,000 and total liabilities of $348,753,000. For the year ended

4812-2168-3656

December 31, 2017, the Debtors generated net sales of $265,693,000, which resulted in income from operations of $59,233,000.

In 2018, the Debtors substantially improved their operational performance, generating net sales of $414,345,000, which resulted in income from operations of $78,924,000. As of December 31, 2018, the Debtors had total assets of $555,386,000 and total liabilities of $452,505,000.

The Debtors began experiencing financial hardship in 2019, with net sales falling to $283,235,000, resulting in a loss from operations of $99,161,000 for the year ended December 31, 2019. Beginning in June 2019 at various times thereafter, the Debtors entered into certain limited waivers with the Term Loan Agent and the MAALT Lender under the Term Loan Credit Agreement and MAALT Credit Agreement, respectively, in connection with the waiver or modification of certain covenants thereunder. The Debtors also entered into certain limited waivers or amendments with the ABL Lender under the PlainsCapital ABL Facility in September 2019 and May 2020 in connection with the limited waiver or modification of certain covenants thereunder.

The Debtors' business and financial performance heavily depends on sales generated by a limited customer base—i.e. exploration and production companies and oilfield service providers engaged in drilling and well services. The Debtors' financial performance has been negatively affected by an ongoing slump in natural gas and oil commodity prices, which adversely affected the fluctuating demand for frac sand. The Debtors' financial performance has also been adversely impacted by an industry shift towards construction of multiple in-basin sand mines and the use of in-basin sand, which did not materially exist prior to 2017.

The Debtors' financial difficulties are compounded by the COVID-19 pandemic. The effects of this pandemic have taken a significant toll on energy markets and the nation's financial system. The COVID-19 pandemic continues to spread, further affecting exploration and production activity and creating operations challenges due to travel restrictions, social distancing guidelines, business restrictions, and other logistical hurdles.

The Debtors have also faced internal obstacles and company-specific business challenges. Internal logistics obstacles, geographic shifts in demand, and the Debtors' overall capital structure have resulted in decreased productivity and revenues. Prior to the Petition Date, the Debtors experienced significant sales declines, resulting in further liquidity pressures. The Debtors' revenue and profitability became insufficient to support their debt service, working capital, and capital expenditures requirements.

To address the financial challenges and the COVID-19 related damage suffered by the Debtors and preserve the going-concern value of their business, the Debtors sought relief under Chapter 11 to implement a restructuring of the business in a manner that will be most beneficial to its various creditors.

### C.     The Debtors' Prepetition Restructuring Initiatives

As a result of the near-cessation of business revenue, the Debtors have engaged in a number of cost savings initiatives, including laying off employees and shutting down all

operations to the minimal extent necessary to preserve the Debtors' ability to recommence business operations in the future. Such minimal operations include activities such as intermittently using, maintaining equipment and infrastructure to ensure that such equipment and infrastructure will remain in good working condition for future use.

By laying off the majority of their employees and moving towards minimal operations, the Debtors were able to significantly reduce operating costs. Despite this reduction, the Debtors have still incurred, and continue to incur, significant costs without the benefit of offsetting sales revenue. The largest costs necessary to preserve the Debtors' assets are the minimum royalty payments required under various leases. Additionally, retention of the Debtors' remaining employees is necessary to preserve the Debtors' ability to maintain current business operations and quickly ramp up in the future. Furthermore, goods and services from certain vendors will be required throughout the Chapter 11 Cases to ensure the preservation of the Debtors' assets.

The Debtors engaged Haynes & Boone and A&M to advise them in exploring various strategic alternatives to right-size and recapitalize their operations and balance sheet. The Debtors have undertaken a review of their business to determine how to address continuing liquidity constraints. As part of this review, the Debtors, their officers, and professionals have considered various operational and strategic options to increase revenue and control costs. The review has also involved an analysis of the Debtors' relationships with strategic partners, lease expenses, and a number of other components of the business to identify opportunities to re-direct the Debtors' business to more financially viable outlets to continue providing high-quality frac sand and accompanying services to the Debtors' loyal customer base.

A central component of the Debtors' review has been a financial analysis to, among other things, restructure their long-term debt with Ares. Prior to the Petition Date, the Debtors engaged in months of negotiations with Ares in an effort to allow the Debtors to continue their operations in an effort to repay their outstanding obligations through an out of court restructuring.

After several months of efforts by the Debtors, with the assistance of their advisors, which included negotiating default/forbearance agreements with Ares, the Debtors determined that the Debtors did not have sufficient liquidity to operate and meet certain debt service obligations during the remainder of 2020, and therefore required additional sources of financing. Left with no other alternative, the Debtors began to consider a Chapter 11 reorganization process and began engaging in restructuring discussions with the prepetition creditors.

1.      **PlainsCapital Bank Prepetition Default and Potential Claims Related Thereto**

As discussed in more detail below, Debtor Lonestar Ltd. is a party, as borrower, to the PlainsCapital ABL Credit Agreement dated January 12, 2018, with PlainsCapital Bank as ABL Lender, under which the ABL Lender agreed to make secured revolving loans to Lonestar Ltd. The ABL Agreement included a financial covenant providing: "Borrower shall maintain at the end of each fiscal quarter, commencing with the fiscal quarter ended June 30, 2017, a Leverage Ratio less than or equal to 3.50 to 1.00." "Leverage Ratio" was defined as the ratio of (1) Total Debt as of the last day of the fiscal quarter, divided by (2) EBIDA for the prior four fiscal quarters on a rolling basis.

24

4812-2168-3656

On June 3, 2020, the ABL Lender notified Lonestar Ltd., by letter dated June 3, 2020 (the "Default Notice"), that Lonestar Ltd.'s financial statements for the fiscal quarter ended December 31, 2019, demonstrated that Lonestar Ltd. had "breached the Leverage Ratio" under the ABL Agreement and that no notice, grace or cure period applied to the alleged breach.

The Default Notice further notified Lonestar Ltd. that (i) the ABL Lender was declaring an Event of Default under the loan agreement, (ii) the ABL Lender had accelerated the maturity of the PlainsCapital ABL Facility, (iii) the ABL Lender demanded immediate payment in full of the indebtedness under the PlainsCapital ABL Facility, (iv) the ABL Lender was imposing, effective the next business day, the default interest rate on the unpaid principal balance, (v) simultaneously with the Default Notice, the ABL Lender had exercised (a) its right of setoff against the Revolving Priority Account and applied the deposits therein against the accrued, unpaid interest and principal outstanding under the PlainsCapital ABL Facility and (b) its right to withdraw the funds under a certificate of deposit that had been pledged to it as security for the PlainsCapital ABL Facility, and (vi) the ABL Lender demanded that any proceeds of the ABL Lender's priority collateral in Lonestar Ltd.'s operating account be immediately transferred to the Revolving Priority Account.

As set forth in greater detail in the Standing Motion (defined below), the Committee asserts that the ABL Lender's set off of funds of Debtor Lonestar Ltd. in deposit accounts at PlainsCapital Bank resulted in improving the ABL Lender's setoff position over its setoff position on the 90th day before the Petition Date. Accordingly, the Committee asserts that Lonestar Ltd.'s Estate is entitled, under section 553(b) of the Bankruptcy Code, to recover the $5,373,359 set off on account of that improvement in position.

The ABL Lender disputes the assertions of the Committee and will vigorously oppose the Standing Motion and contest the related Proposed Complaint (defined below).

### D.      Go-Forward Business Plans

The Debtors anticipate being in a state of minimal operations for a period of up to 18 months after the Effective Date. During this minimal operation period, the Reorganized Debtors intend to maintain and operate the West Texas, Granbury, and Tolar mines, as well as the Barnhart and Gonzalez transload facilities and a corporate office. The Debtors intend to closely monitor industry conditions and maintain operational readiness so that at the appropriate time, the Debtors can recommence their businesses in the future. Attached hereto as **Exhibit 4** are the Debtors' financial projections.

## ARTICLE V.
## DEBTORS' ASSETS AND LIABILITIES

### A.      Prepetition Assets

As of April 20, 2020, Vista's unaudited balance sheets reflected total assets of approximately $400 million and total liabilities of approximately $500 million. The Debtors' principal assets consist of accounts receivable, inventory, equipment, and fixed assets, including information technology assets and leasehold improvements.

On July 23, 2020, each of the Debtors Filed their Schedules of Assets and Liabilities (*i.e.,* the Schedules of Assets and Liabilities). Pursuant to the Schedules of Assets and Liabilities, the Debtors have scheduled the following assets:[7]

| | Vista HoldCo | VPROP | Lonestar Management | Bulk | Denetz | Lonestar Ltd. | MAALT | Total |
|---|---|---|---|---|---|---|---|---|
| Cash | $37,464 | $8,095 | - | $674,233 | - | $3,537,607 | $131,199 | **$4,388,598** |
| Deposits | - | - | - | $51,574 | - | $4,295,349 | $48,227 | **$4,395,150** |
| Accounts Receivable | - | - | - | $1,224,594 | - | $11,406,943 | $1,905,643 | **$14,537,180** |
| Investments | - | - | - | - | - | - | - | **-** |
| Inventory | - | - | - | $49,984 | - | $7,833,972 | - | **$7,883,956** |
| Office FF&E | - | - | - | $17,085 | - | $1,540,775 | $352,604 | **$1,910,464** |
| Machinery | - | - | - | $2,016,131 | - | $285,991,116 | $581,039 | **$288,588,286** |
| Real Property | - | - | - | $341,569 | - | $34,273,267 | $2,697,304 | **$37,312,140** |
| Intangibles | - | - | - | - | - | - | - | **-** |
| Other Assets | $3,781,468 | $4,184,812 | - | $37,961,558 | - | $175,234,539 | $43,007,637 | **$264,170,014** |
| Total Assets | **$3,818,932** | **$4,192,907** | **-** | **$42,336,728** | **-** | **$524,113,568** | **$48,723,653** | **$623,185,788** |

## B.      Prepetition Liabilities

Vista's prepetition debt structure primarily consists of: (i) the Term Loans, (ii) the ABL Debt, and (iii) the MAALT Debt. The Debtors also have outstanding obligations under various lease agreements and owe certain amounts to vendors and other general unsecured creditors.

### 1.      Term Loans

Vista HoldCo, the Term Loan Borrower, and the Term Loan Secured Parties are parties to the Term Loan Agreement.  The Term Loan Agreement provides for the Term Loan Facility. As of the Petition Date, approximately $369,300,998.02 in principal and prepetition interest is outstanding under the Term Loan Facility.

As more specifically described in the Term Loan Documents, the obligations under the Term Loan Facility are secured by liens (the "Term Loan Liens") on substantially all of the assets of VPROP, Lonestar Management, Lonestar Ltd, and Vista HoldCo, including Vista HoldCo's equity interests in each of its subsidiaries (collectively, the "Term Loan Collateral"). Vista Holdco, Lonestar Management, Bulk, Denetz, Lonestar Ltd., and MAALT are guarantors of the obligations under the Term Loan Facility.

Under the Term Loan Facility, the Term Loan Lenders agreed to provide a long-term note payable to the Debtors at LIBOR (with a floor of 1.5%) plus 8.5%. Additionally, the Term

---

[7] References to amounts in the Schedules of Assets and Liabilities are qualified by, and subject to, the *Global Notes, Methodology, and Specific Disclosures Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* filed concurrently therewith.

Loan Facility requires PIK interest equal to 1% of the outstanding principal. The Debtors agreed to repay principal and interest in equal combined installments. The Term Loan Facility was used to fund capital expenditures, including the development of the West Texas Mine and for general corporate purposes. In the absence of default, the Term Loan Agreement matures on August 1, 2021.

## 2. ABL Facility

Lonestar Ltd., as borrower, Lonestar Prospects Holding Company, L.L.C., Gary B. Humphreys, Martin W. Robertson, and the other guarantors party thereto, as guarantors, and the ABL Lender, are parties to the PlainsCapital ABL Credit Agreement. The PlainsCapital ABL Credit Agreement provides for the PlainsCapital ABL Facility in an amount of up to $21,959,690.13, subject to certain terms and conditions. As of the Petition Date, approximately $15,984,430 in principal and interest was outstanding under the ABL Facility (the "ABL Credit Facility Obligations").

The ABL Credit Facility Obligations are secured by first priority liens (the "ABL Liens") on ABL Priority Collateral, and second priority security interests in substantially all personal property of Lonestar Ltd., as more specifically described in the various loan documents entered into in connection with the PlainsCapital ABL Credit Agreement (collectively with the ABL Priority Collateral, the "ABL Collateral").

Pursuant to the PlainsCapital ABL Credit Agreement, the ABL Credit Facility Obligations become due and payable in full on June 14, 2020. The PlainsCapital ABL Facility bears an interest rate per annum equal to the sum of the prime rate minus 0.5%, subject to a floor rate of 4.75%. Following the alleged default referenced in Section IV(C)(1) herein, the ABL Lender asserts that the ABL Facility commenced bearing interest at the default rate set forth in the PlainsCapital ABL Credit Agreement, with additional fees and costs accruing thereunder.

## 3. Intercreditor Agreement

The relative priority of the Term Loan Liens and the ABL Liens is governed by the Amended and Restated Intercreditor Agreement dated November 9, 2017, by and among PlainsCapital, Ares, and the Debtors (the "Intercreditor Agreement"). As more specifically set forth in the Intercreditor Agreement, the Term Loan Liens have first priority with respect to all of the Debtors' assets other than certain accounts receivable, finished sand inventory, general intangibles, and the proceeds of the foregoing.

## 4. MAALT Facility

MAALT, and non-debtor GHMR Operations, L.L.C., as borrowers, Denetz, Gary B. Humphreys, Martin W. Robertson, and certain trust guarantors, as guarantors, and the MAALT Lender, are parties to the MAALT Credit Agreement. The MAALT Credit Agreement provided for three term loans: the first term loan in the amount of $13,826,834, the second term loan in the amount of $3,850,497, and the third term loan in the amount of $1,797,500, as well as a senior secured revolving credit facility in the amount of up to $2 million, subject to certain terms and

conditions. As of the Petition Date, approximately $3,923,450 in principal and prepetition interest was outstanding under the MAALT Facility (the "MAALT Facility Obligations").

The MAALT Facility Obligations are secured by a security interest in certain assets of MAALT, including certain accounts, inventory, equipment, and fixtures, as more specifically described in the MAALT Documents. The MAALT Facility Obligations are also secured by a security interest of certain assets of non-debtor GHMR Operations, L.L.C. (collectively, the "MAALT Collateral").

### 5.     Capital Leases and Lease Obligations

The Debtors are a party to various lease agreements in connection with certain equipment, buildings, office equipment, machinery, transload facilities, trucks, including trucks and freightliners, rail cars, storage facilities, real property, and mineral rights. With regard to real property and mineral rights leases, Vista is the lessee under four large, long-term leases, comprised of two leases in Hood County, Texas; one lease in Tolar, Texas, and one lease in Winkler County, Texas (collectively, the "Mineral Leases"). All of the Mineral Leases require minimum royalty payments in addition to Vista's annual rent and fees.

### 6.     Tax Obligations

In the ordinary course of their businesses, the Debtors collect, remit, withhold, and pay to various taxing authorities and governmental regulatory bodies (collectively, the "Taxing Authorities") among other taxes, certain sales and use taxes (the "Sales/Use Taxes"), property taxes (the "Property Taxes"), and franchise and/or income taxes (the "Franchise/Income Taxes," and together with the Sales/Use Taxes and Property Taxes, the "Taxes").

Property Taxes are assessed and become payable in the ordinary course of business and are calculated based on a statutorily-mandated percentage of property value (for both real and personal property). Generally, Property Taxes are due annually, and the timing of payment of Property Taxes varies from jurisdiction to jurisdiction. As of the Petition Date, the Debtors estimate that they owe (i) approximately $2.2 million in Property Taxes related to the 2019 tax year, including late fees, and (ii) approximately $1.3 million in Property Taxes that have accrued for the prepetition portion of the 2020 tax year.

The Debtors have Franchise/Income Tax obligations they must pay to various state authorities in jurisdictions where the Debtors operate or are authorized to do business. These taxes are assessed annually and are necessary to remain in good standing. The Debtors estimate that they do not owe any Franchise/Income Taxes relating to periods prior to the Petition Date.

### 7.     General Unsecured Claims

In addition to the Debtors' outstanding obligations under the Term Loan Facility, the PlainsCapital ABL Facility, the MAALT Facility, and the Lease Obligations, the Debtors also have unsecured debt obligations, including, inter alia, amounts owed to trade vendors. General Unsecured Claims also include Term Loan Deficiency Claims and rejection damage Claims.

### C.       Debtors' Scheduled Amount of Claims

Pursuant to the Schedules of Assets and Liabilities and based on stipulations under the DIP Financing Order, the Debtors have scheduled the following types and amounts of Claims in the Chapter 11 Cases:

| | Vista HoldCo | VPROP | Lonestar Management | Bulk | Denetz | Lonestar Ltd. | MAALT | Total |
|---|---|---|---|---|---|---|---|---|
| **Priority Tax Claims** | - | - | - | $45,543 | - | $1,333,694 | $206,308 | **$1,585,544** |
| **Other Secured Claims** | - | - | - | - | - | $5,684,593 | $4,063 | **$5,688,656** |
| **Other Priority Claims** | - | - | - | - | - | - | - | **-** |
| **Term Loan Secured Claims** | $369,980,456 | $369,980,456 | - | - | - | $369,980,456 | - | **$369,980,456[8]** |
| **PlainsCapital ABL Secured Claims** | - | - | - | - | - | $15,775,491 | - | **$15,775,491** |
| **MAALT Secured Claims** | - | - | - | - | - | - | $3,043,274 | **$3,043,274** |
| **General Unsecured Claims (Other than Guarantee Obligations on Term Loan Claims)** | $382,873 | - | - | $7,165,171 | - | $30,971,240 | $2,331,131 | **$40,850,416** |
| **General Unsecured Claims for Guaranty Obligations on Term Loan Claims** | $369,980,456 | $369,980,456 | $369,980,456 | $369,980,456 | $369,980,456 | $369,980,456 | $369,980,456 | **$369,980,456[9]** |
| **Intercompany Claims** | $7,382,535 | - | - | $58,306,972 | - | $97,212,368 | $34,693,438 | **$263,956,128** |

As the Bar Date has not yet occurred, few Proofs of Claims have been Filed. The Debtors will have more clarity with respect to the Claims against the Debtors as more Proofs of Claims are Filed.

---

[8] VPROP is the borrower entity under the Term Loan Facility. The Term Loan Collateral includes substantially all the assets of Vista HoldCo, VPROP, and Lonestar Ltd. The Term Loan Secured Parties assert that the full value of their Term Loan Secured Claims may be asserted against Vista HoldCo, VPROP, and Lonestar Ltd., subject to a recovery of not more than 100 cents on the dollar.

[9] VPROP is the borrower entity under the Term Loan Facility. Vista HoldCo, Lonestar Management, Bulk, Denetz, Lonestar Ltd., and MAALT are guarantors of the Term Loan Facility. The Term Loan Secured Parties assert that the Term Loan Deficiency Claim may be asserted against each of the Debtors, subject to a recovery of not more than 100 cents on the dollar.

## ARTICLE VI.
## BANKRUPTCY CASE ADMINISTRATION

### A.      First and Second Day Motions

On or shortly after the Petition Date, the Debtors Filed a number of motions to administer the Chapter 11 Cases in a timely and efficient manner.  Pursuant to those motions, the Bankruptcy Court entered orders that, among other things:

- Permitted the joint administration of the Chapter 11 Cases;

- Authorized maintenance of existing corporate bank accounts and cash management system;

- Authorized the Debtors to pay certain prepetition tax obligations;

- Designated the Chapter 11 Cases as complex chapter 11 cases;

- Authorized the Debtors to employ KCC (Claims and balloting agent);

- Authorized the payment of certain prepetition accrued wages, salaries, medical benefits, and reimbursable employee expenses;

- Authorized the Debtors to enter into the DIP Facility;

- Preserved value for the Debtors estates by prohibiting utility companies from altering or discontinuing service on account of prepetition invoices;

- Extended the time within which the Debtors were required to File the Schedules of Assets and Liabilities and Statements of Financial Affairs;

- Authorized the Debtors to employ Haynes and Boone as attorneys for the Debtors;

- Authorized the Debtors to retain Alvarez & Marsal North America, LLC to provide the Debtors with a Chief Restructuring Officer and certain additional personnel and to designate Gary Barton as Chief Restructuring Officer;

- Authorized the Debtors to employ James Lanter P.C. and Wickes Law, PLLC as special litigation counsel;

- Authorized the Debtors to employ and pay professionals used in the ordinary course of business; and

- Established procedures for interim compensation and reimbursement of expenses for Haynes and Boone, James Lanter P.C. and Wickes Law, PLLC, Kilpatrick Townsend & Stockton LLP, and Province, Inc.

### B.  Bar Date for Filing Proofs of Claim

On July 27, 2020, the Bankruptcy Court entered the *Order (I) Shortening the Bar Date for Filing Proofs of Claim, (II) Establishing Ramifications for Failure to Timely File Claims; (III) Approving Consolidated Notice of Shortened Bar Date, and (IV) Approving the Mailing of Notices* [Docket No. 288] (the "Bar Date Order"). Except as otherwise provided in the Bar Date Order, and as set forth in more detail in the notice of shortened bar date that was served on all creditors following entry of the Bar Date Order, the last day for any person or entity, excluding governmental units, to file a proof of claim in the Chapter 11 Cases is August 31, 2020. The deadline for filing a Proof of Claim by any Governmental Unit is February 3, 2021 (the "Governmental Bar Date").

In the event that the Debtors amend their Schedules of Assets and Liabilities, the Debtors must give notice of such amendment to the holder of a Claim affected thereby, and the affected Claim holder shall have the later of the Bar Date or thirty (30) days from the date on which notice of such amendment was given to File a Proof of Claim. Further, pursuant to Article V.C of the Plan, except as otherwise set forth in any order authorizing the rejection of an Executory Contract or Unexpired Lease, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, (3) the Effective Date, or (4) the date after the Effective Date that the applicable Schedules are altered, amended, modified, or supplemented, but only with respect to any Executory Contract or Unexpired Lease thereby affected.

### C.  Meeting of Creditors

The meeting of Creditors required under section 341 of the Bankruptcy Code occurred on August 7, 2020.

### D.  Official Committee of Unsecured Creditors

On June 23, 2020, the U.S. Trustee filed the *Appointment of the Official Unsecured Creditors' Committee* [Docket No. 109]. On June 25, 2020, the U.S. Trustee filed the *Amended Appointment of the Official Unsecured Creditors' Committee* [Docket No. 119]. The members of the Committee are Trinity Industries Leasing Co., The Andersons, MP Systems Co., LLC, Schlumberger Technology Corporation, and Twin Eagle Sand Logistics, LLC. On June 24, 2020, the Committee selected Kilpatrick Townsend & Stockton LLP as its proposed bankruptcy counsel. On June 25, 2020, the Committee selected Province, Inc. as its proposed financial advisor. The Committee's retention of Kilpatrick Townsend & Stockton LLP and Province, Inc. were approved pursuant to orders entered by the Bankruptcy Court on August 6, 2020.

### E.  The Committee's Motion to Convert

On July 9, 2020, the Committee filed the *Motion of the Official Committee of Unsecured Creditors of Vista Proppants and Logistics, LLC, et al., for Entry of an Order Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code Pursuant to 11*

U.S.C. § 1112(b) [Docket No. 179] (the "Motion to Convert"). In the Motion to Convert, the Committee asserts that cause for conversion exists based primarily on arguments related to the terms of the DIP Financing Order and the terms of the Debtors' original Plan that was filed on July 3, 2020, which did not provide any recovery to holders of General Unsecured Claims.

On July 30, 2020, the DIP Agent, in its capacity as administrative agent under the DIP Facility filed the *Objection of Ares Capital Corporation to the Motion of the Official Committee of Unsecured Creditors of Vista Proppants and Logistics, LLC, et al., for Entry of an Order Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code Pursuant to 11 U.S.C. § 1112(B)* [Docket No. 315] (the "DIP Agent Objection"). On August 3, 2020, the Debtors filed a response to the Motion to Convert and joined the DIP Agent Objection [Docket No. 334] (the "Debtors' Response"). As set forth in the DIP Agent Objection and the Debtors' Response, the Committee's arguments in support of the Motion to Convert are either no longer relevant or are premature.

The Committee's arguments with regard to the DIP Financing Order are moot because the DIP Financing Order has been entered. Moreover, the Debtors believe that the unrefuted record at the hearing on the DIP Financing Order established that the Debtors' creditors, as a body, are better served by these cases continuing in Chapter 11. Furthermore, as set forth in more detail in the Liquidation Analysis, it is the Debtors' position that the Plan provides holders of Class 6 General Unsecured Claims with at least as much as such creditors would receive in a chapter 7 liquidation. Therefore, the Debtors believe that the Committee's arguments that the Plan is unconfirmable under section 1129(a)(7) of the Bankruptcy Code lack merit. The Debtors' position is that the Motion to Convert is unsupported by evidence, is unwarranted, and should be denied.

The Committee has agreed to continue the hearing on the Motion to Convert to the same setting as the Confirmation Hearing.

### F.     The DIP Facility and Use of Cash Collateral

On July 16, 2020, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c), 364(d)(1) and 364(e) and (B) Utilize Cash Collateral of Prepetition Secured Entities, (II) Granting Adequate Protection to Prepetition Secured Entities, and (III) Granting Related Relief* (Dkt. No. 219) (*i.e.*, the DIP Financing Order).

The DIP Financing Order authorized the Debtors to enter into the DIP Facility and enabled the Debtors to fund the Chapter 11 Cases. Specifically, the DIP Facility provided the Debtors with DIP Commitments of $11,000,000.

### G.     Contract and Lease Rejections

The Debtors have filed omnibus motions for the rejection of numerous Unexpired Leases and Executory Contracts. Additionally, the Debtors have been engaged in ongoing negotiations with certain counterparties to negotiate revised terms of certain Unexpired Leases and Executory Contracts. The Debtors cannot predict the outcome of those negotiations.

### H. The Committee's Investigation and Standing Motion

Under the terms of the DIP Financing Order, the Committee had until August 3, 2020 (the "Investigation Termination Date"), "to investigate the validity, extent, priority, perfection, and enforceability of the Term Loan Facility, and ABL Facility and the respective liens of the lenders thereunder, and to assert any other claims or causes of action against the Prepetition Secured Parties."

The DIP Financing Order further provides "if, on or before the Investigation Termination Date, the Committee files a motion seeking standing to file a Challenge (as defined below) or a motion to extend the Investigation Termination Date for cause as provided in this paragraph, the Investigation Termination Date shall be automatically tolled with respect to the Committee upon the Committee's filing of such motion or motions until the Court has ruled upon such motions." DIP Financing Order, ¶21. The Investigation Termination Date is further extended until the date that is three (3) business days after entry of an order conferring standing on the Committee. *Id.*

By letter dated July 29, 2020 (the "Demand Letter"), the Committee demanded that the Debtors assert (i) avoidance claims under the Uniform Fraudulent Transfer Act and section 544(b) of the Bankruptcy Code against the Term Loan Secured Parties arising out of their funding of the New Loans made under the November 9, 2017 Term Loan Credit Agreement, and (ii) a claim pursuant to section 553(b) of the Bankruptcy Code against PlainsCapital Bank in connection with PlainsCapital Bank's prepetition sweep of the Debtors' funds after declaring an event of default on June 3, 2020 (collectively, the "Alleged Claims").

The Debtors responded by letter dated July 31, 2020 (the "Response Letter"). In the Response Letter, the Debtors explained that the Debtors waived the right to pursue any such claims against the Term Loan Secured Parties pursuant to the terms of the DIP Financing Order, including the stipulations contained. Furthermore, the indicated their position that the Alleged Claims against the Term Loan Secured Parties were meritless and pursuing such Alleged Claims against the Term Loan Secured Parties would not result in any net benefit to the Debtors' Estates.

The Debtors do not believe that any cognizable causes of action exist against the Term Loan Secured Parties in connection with the New Loans or the Buy-Out Transaction (the "November 2017 Transaction") because, among other reasons, (i) the Debtors are not aware of, and the Demand Letter did not cite to any, factual basis for concluding that the Debtors or the Term Loan Secured Parties entered into the November 2017 Transaction with the actual intent to hinder, delay, or defraud any creditor of the Debtors; (ii) the Debtors received reasonably equivalent value from the Term Loan Secured Parties in connection with the November 2017 Transaction; (iii) the Debtors were solvent prior to, and immediately after, entering into the November 2017 Transaction; (iv) the Debtors were not left with unreasonably small capital to operate their business after entering into the November 2017 Transaction; and (v) the Debtors reasonably believed that they would be able to pay their debts as they came due following the November 2017 Transaction.

Moreover, the Debtors believe that even if the Committee were able to successfully avoid the New Loans issued in connection with the November 2017 Transaction, the aggregate amount

of Term Loan Claims would be reduced by a maximum amount of approximately $85 million from approximately $369 million to approximately $284 million. The Debtors believe that any such reduced Term Loan Claims would still be secured by the same collateral, the value of which does not exceed $284 million. Even if successful in avoiding a portion of the Term Loan Claims, it is the Debtors' position that the Committee would not be entitled to assert such avoided claims on behalf of unsecured creditors. Avoidance of an obligation, such as a portion of the Debtors' obligation to repay the Term Loan Claims, would reduce the Term Loan Lenders' Claims, but would not entitle the Committee to assert such avoided claims on behalf of unsecured creditors – Bankruptcy Code sections 550 and 551, which preserve avoided transfers and permit recovery on account thereof, do not apply to avoided obligations.

The Committee disagrees with the Debtors' position regarding the viability of the Alleged Claim against the Term Loan Secured Parties and the impact of setting aside $85 million of Term Loan Claims. The Committee's position is that the avoidance of $85 million of Term Loan Claims and liens, to the extent that the liens secure the Term Loan Claims, for the benefit of the estates would result in the sharing by the estates, pro rata, in the total value of the secured assets.

With respect to the Alleged Claim against PlainsCapital Bank, the Debtors indicated in the Response Letter that, consistent with previous correspondence to PlainsCapital Bank and the Committee, the Debtors stand by their assertion that a default did not exist as of June 3, 2020, that would have justified or permitted PlainsCapital to accelerate the PlainsCapital ABL debt and exercise collection remedies, including the offset described in the Demand Letter. Beyond considering whether such default existed, the Debtors have not conducted an analysis to determine whether or not the Alleged Claim against PlainsCapital Bank has merit or whether the potential benefit to the Debtors' estates of pursuing such Alleged Claim would exceed the anticipated costs of litigation. The Debtors further noted that the Debtors have reserved all rights for any such claims to be raised on behalf of their estates. In that regard, the Debtors indicated that if the Committee believes there is merit in pursuing the Alleged Claim against PlainsCapital Bank on behalf of the Debtors' estates, the Debtors would not object.

On August 3, 2020, the Committee filed the *Motion of the Official Committee of Unsecured Creditors for Order Granting (I) Leave, Standing and Authority to Commence and Prosecute Certain Claims on Behalf of the Debtors' Estates and (II) Related Relief* [Docket No. 333] (the "Standing Motion") with a proposed complaint attached thereto regarding the Alleged Claims (the "Proposed Complaint"). Furthermore, the Committee believes that certain avoidance claims may be brought against R.J. Sikes, RJS Holdings, and KCM Enterprises in connection with the Buy-Out Transaction based on the same set of facts alleged in the Standing Motion. Such claims will be included in the Litigation Trust, unless otherwise agreed by the Debtors, the Committee, and the Required Consenting Lenders. A hearing on the Standing Motion has been scheduled for September 1, 2020, at 2:00 p.m. Central Time.

The ABL Lender disputes the assertions of the Committee with respect to the Alleged Claims against the ABL Lender and will vigorously oppose the Standing Motion and contest the related Proposed Complaint.

4812-2168-3656

I.      **Rejection of Railcar Leases and Agreement Regarding Sale of Finished Sand Inventory**

As of the Petition Date, Lonestar Ltd. held inventory of approximately 109,000 tons of fracturing proppant for completing oil and gas wells that had been processed through Lonestar Ltd.'s wet plant and dry plant and otherwise met the standards for purchase under Lonestar's contracts (the "Pre-Petition Finished Sand Inventory"). Pursuant to the PlainsCapital ABL Documents, the ABL Lender was granted first priority liens in the Pre-Petition Finished Sand Inventory and in the proceeds resulting from the sale thereof. A substantial portion of the Pre-Petition Finished Sand Inventory is stored in railcars leased to the Debtors.

On the Petition Date, the Debtors filed the *Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to (I) Reject Certain Unexpired Railcar Leases Pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rule 6006 as of the Petition Date and (II) Abandon any Remaining Personal Property in Connection Therewith* [Docket No. 22] (the "Railcar Rejection Motion"). In the Railcar Rejection Motion, the Debtors sought to reject the Debtors' railcar leases (the "Railcar Leases") and abandon any personal property, including any Pre-Petition Finished Sand, that may be located or stored in connection with the railcars to be surrendered.

In order to maximize value to the estate and for all creditors, the Debtors engaged in good faith, arms-length negotiations with the ABL Lender, Gary B. Humphreys ("GBH") and Martin W. Robertson ("MWR") (collectively with the Debtors, the "ABL Sale Agreement Parties") regarding the sale of Pre-Petition Finished Sand Inventory. As a result of such negotiations, the Parties agreed to the terms of an Agreement Regarding Sale of Finished Sand Inventory (the "ABL Sale Agreement").

Under the ABL Sale Agreement, (i) the Debtors will not incur liability for any of the third-party costs and expenses related to the sale and delivery of the Pre-Petition Finished Sand Inventory; (ii) as provided in more detail in the ABL Sale Agreement, the Finished Sand Inventory Sale Proceeds shall be available for payment of Finished Sand Inventory Expenses from an inventory funding account, and GBH and MWR will, at their cost and expense, incur and provide funds for payment of all Finished Sand Inventory Expenses which exceed the amounts available in the inventory funding account in the manner set forth in the ABL Sale Agreement, (iii) GBH and MWR will provide funds to reimburse the Debtors for any personnel and overhead costs and reasonable attorneys' fees directly incurred in connection with the sale and delivery of Pre-Petition Finished Sand Inventory as provided in the ABL Sale Agreement, and (iv) GBH and MWR will indemnify and reimburse the Debtors for any other costs or expenses that may be directly incurred in connection with the sale and delivery of Pre-Petition Finished Sand Inventory, as set forth in more detail in the ABL Sale Agreement (collectively, "Pre-Petition Finished Sand Inventory Sale Expenses").

On August 6, 2020, the Bankruptcy Court entered the *Order Granting Debtors' Emergency Motion Pursuant to 11 U.S.C. § 363 for Approval of and Authority to Perform Under Agreement Regarding Sale of Finished Sand Inventory* [Docket No. 362] (the "Finished Sand Order") and the *Agreed Order Pursuant to Federal Rule of Bankruptcy Procedure 4001(d)* [Docket No. 363] (the "4001(d) Order"). As set forth in more detail in such orders and subject to

35

the specific provisions therein, the Debtors are authorized to enter into and perform under the ABL Sale Agreement, and the ABL Lender is authorized to sweep the proceeds from the collection of receivables that are the ABL Lender's collateral and apply such proceeds to the principal balance outstanding under the PlainsCapital ABL Facility.

In furtherance of the ABL Sale Agreement, GBH and MWR are entering into agreements with certain railcar lessors. As a result of such agreements, the Debtors believe that the Railcar Rejection Motion will be consensually resolved. A hearing on the Railcar Rejection Motion is scheduled for August 17, 2020, at 1:30 p.m.

## ARTICLE VII.
## DESCRIPTION OF THE PLAN

### A.      Introduction

A summary of the principal provisions of the Plan and the treatment of Classes of Allowed Claims and Allowed Interests is outlined below.  The summary is entirely qualified by the Plan.  This Disclosure Statement is only a summary of the terms of the Plan.

### B.      Designation of Claims and Interests

The following are the Classes of Claims and Interests designated under the Plan.   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Compensation Claims, and Priority Tax Claims are not classified.  No distribution shall be made on account of any Claim that is not Allowed.

Classes of Claims against and Interests in the Debtors are designated as follows:

| | |
|---|---|
| Class – 1 | Other Secured Claims |
| Class - 2 | Other Priority Claims |
| Class - 3 | Term Loan Secured Claims |
| Class - 4 | PlainsCapital ABL Secured Claims |
| Class - 5 | MAALT Secured Claims |
| Class - 6 | General Unsecured Claims |
| Class - 7 | Intercompany Claims |
| Class - 8 | Interests in Debtors other than Vista HoldCo |
| Class - 9 | Interests in Vista HoldCo |

### C.    Grouping of Debtors for Convenience Only

The Plan groups the Debtors together solely for the purpose of describing treatment of Claims and Interests under the Plan and confirmation of the Plan. Although the Plan applies to all of the Debtors, the Plan constitutes seven (7) distinct Plans, one for each Debtor, and for voting and distribution purposes, each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable.  To the extent there are no Allowed Claims or Interest in a Class with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.  Except as otherwise provided in the Plan, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim.  The grouping of the Debtors in this manner shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities. Each separate Plan applies to the separate assets of each separate Debtor. Creditors of each Debtor may not be the same. Some Debtors may have limited or no creditors.

### D.    Allowance and Treatment of Administrative Claims and Priority Claims

#### 1.    Administrative Claims

Except to the extent that a holder of an Allowed Administrative Claim and the Debtor  or the Reorganized Debtor, as applicable, against which such Allowed Administrative Claim is asserted, in each case with the prior written consent of the Term Loan Agent, agree to less favorable treatment for such holder, each holder of an Allowed Administrative Claim (other than holders of Professional Compensation Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (i) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); or (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than ten (10)  days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (iv) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; and (v) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except for Professional Compensation Claims and DIP Facility Claims, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors no later than the Administrative Claim Bar Date. Objections to such

requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (i) 30 days after the Effective Date and (ii) 30 days after the Filing of the applicable request for payment of the Administrative Claims, if applicable. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for such payment of such Administrative Claims that do not File and serve such a request by the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any action by the Bankruptcy Court.

## 2. Professional Compensation Claims

### (a) Final Fee Applications and Payment of Professional Compensation Claims

All requests for payment of Professional Compensation Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than the Professional Compensation Claim Bar Date; provided, however, that Ordinary Course Professionals shall be compensated in accordance with the terms of the Ordinary Course Professionals Order. Objections to Professional Compensation Claims must be Filed and served on the Reorganized Debtors and the Professional to whose application the objections are addressed no later than the Professional Compensation Claim Objection Deadline. The Bankruptcy Court shall determine the Allowed amounts of such Professional Compensation Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Compensation Claims in Cash in the amount the Bankruptcy Court allows by Final Order, including from the Professional Compensation Claim Reserve, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Compensation Claim Amount on the Effective Date.

### (b) Professional Compensation Claim Reserve

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Compensation Claim Reserve with Cash equal to the Professional Compensation Claim Amount. The Professional Compensation Claim Reserve shall be maintained in trust solely for the Professionals. No liens, claims, or Interests shall encumber the Professional Compensation Claim Reserve in any way. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors; provided that obligations with respect to Professional Compensation Claims shall not be limited nor deemed limited to the balance of funds held in the Professional Compensation Claim Reserve. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Compensation Claim Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the

Bankruptcy Court and shall be subject to the Liens securing the Exit Facility, without any further action by the lenders thereunder or order of the Bankruptcy Court.

### (c) Professional Compensation Claim Amount

Professionals shall reasonably estimate their unpaid Professional Compensation Claims and other unpaid fees and expenses incurred prior to and as of the Effective Date, and shall deliver such estimate to the Debtors no later than fifteen (15) days before the Effective Date; provided that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Compensation Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

### (d) Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3. Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor or the Reorganized Debtor, as applicable, against which such Allowed Priority Tax Claim is asserted, in each case with the prior written consent of the Term Loan Agent, agree to less favorable treatment for such holder, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. The estimated total amount of Allowed Priority Tax Claims is approximately $1,586,000, as shown in the table below:

| | Vista HoldCo | VPROP | Lonestar Management | Bulk | Denetz | Lonestar Ltd. | MAALT | Total |
|---|---|---|---|---|---|---|---|---|
| **Priority Tax Claims** | - | - | - | $46,000 | - | $1,334,000 | $206,000 | **$1,586,000** |

### 4. DIP Facility Claims

As of the Effective Date, the DIP Facility Claims shall be Allowed in an amount equal to the total amount outstanding under the DIP Facility on the Effective Date, including principal, interest, fees, and expenses. Except to the extent that a holder of an Allowed DIP Facility Claim

agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP Facility Claim, each such holder thereof shall receive its Pro Rata share of (i) Cash equal to all outstanding interest, fees, and expenses due under the DIP Facility and (ii) in lieu of repayment in Cash in full of the principal amount outstanding under the DIP Facility, the Tranche B Exit Facility Notes in an amount equal to twice the outstanding amount of principal due under the DIP Facility on the Effective Date; and all commitments under the DIP Facility shall terminate.

### E.    Allowance and Treatment of Classified Claims and Interests

It is not possible to predict precisely the total amount of Claims in a particular Class or the distributions that will ultimately be paid to holders of Claims in the different Classes because of the variables involved in the calculations (including the results of the Claims objection process).

### 1.    Allowance and Treatment of Other Secured Claims (Class-1)

This Class includes any Allowed Secured Claim, including any Secured Tax Claim, other than DIP Facility Claims, Term Loan Secured Claims, PlainsCapital ABL Secured Claims, and MAALT Secured Claims. Other Secured Claims includes any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more Debtors, the reimbursement obligation for which is either secured by a lien on collateral or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Other Secured Claim, each holder of an Allowed Other Secured Claim Shall receive, at the option of the applicable Debtor, with the prior written consent of the Required Consenting Lenders, the following: (i) payment in full in Cash of its Allowed Class 1 Claim; (ii) the collateral securing its Allowed Class 1 Claim; (iii) Reinstatement of its Allowed Class 1 Claim; or (iv) such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. The estimated total amount of Allowed Class 1 Claims is $8,894,000[10] as shown in the table below:

| | Vista HoldCo | VPROP | Lonestar Management | Bulk | Denetz | Lonestar Ltd. | MAALT | Total |
|---|---|---|---|---|---|---|---|---|
| **Other Secured Claims** | - | - | - | $205,000 | - | $8,685,000 | $4,000 | **$8,894,000** |

---

[10] Includes scheduled Other Secured Claims against Lonestar Ltd. of approximately $5,684,593 and scheduled Other Secured Claims against MAALT in the amount of approximately $4,000, plus approximately $3,000,407 in Other Secured Claims against Lonestar Ltd. related to Hogg Ranch reclamation secured by a certificate of deposit, and approximately $205,000 in Other Secured Claims against Bulk related to workers' compensation secured by a certificate of deposit.

## 2.    Allowance and Treatment of Other Priority Claims (Class - 2)

This Class includes any Allowed Claim entitled to priority status pursuant to section 507(a) of the Bankruptcy Code that is not (a) a DIP Facility Claim; (b) an Administrative Claim, (c) a Professional Compensation Claim, or (d) a Priority Tax Claim.

Each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to the full amount of such Allowed Class 2 Claim on the later of (i) the Effective Date, or (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction, contract, or other agreement giving rise to such Allowed Class 2 Claim.

Pursuant to the *Order (I) Authorizing Debtors to Pay Certain Prepetition Employee Wages, Other Compensation and Reimbursable Employee Expenses; (II) Continuing Employee Benefits Programs; (III) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations Pursuant to Sections 105(a), 363(a), and 507(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004; and (IV) Granting Related Relief* (Dkt. No. 71) (the "Employee Wages Order"), the Debtors paid certain outstanding obligations owed to their employees for wages, salaries, benefits, and reimbursable expenses that would have otherwise been entitled to priority treatment under section 507(a)(4) or (5) of the Bankruptcy Code. The Debtors therefore estimate that the total amount of Allowed Class 2 Claims is $0.00

## 3.    Allowance and Treatment of Term Loan Secured Claims (Class - 3)

This Class includes any Allowed Secured Claims held by any of the Term Loan Secured Parties arising under or relating to the Term Loan Documents or the DIP Financing Order.

On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Term Loan Secured Claim, each holder of an Allowed Term Loan Secured Claim shall receive the following: (i) its Pro Rata share of 100% of the New Parent Units in the New Parent Company, which New Parent Company shall receive 100% of the equity interests of VPROP (which shall continue to hold the equity interests of its direct and indirect subsidiaries); (ii) its Pro Rata share of Tranche C Exit Facility Notes equal to $50,000,000; and (iii) the right to participate in Tranche A of the Exit Facility up to its Pro Rata share of $30,000,000 of new money in exchange for an equal amount of Tranche A Exit Facility Notes.

On the Effective Date, the Term Loan Secured Claims shall be Allowed in the amount of $369,300,998.02 minus the amount of the Term Loan Deficiency Claim plus (i) accrued but unpaid interest, including default interest, under the Term Loan Documents as of the Petition Date, and (ii) unpaid reasonable and documented fees, expenses, costs, and other charges incurred or accrued by the Term Loan Agent in connection with any and all aspects of the Chapter 11 Cases as of the Effective Date, subject to the provisions of the DIP Financing Order and this Plan.

The Term Loan Agent has asserted that the estimated aggregate amount of Term Loan Secured Claims is approximately $144,300,998 and the estimated aggregate amount of Term Loan Deficiency Claims is approximately $225,000,000. The rights of parties in interest to contest the allowed amount of the Term Loan Secured Claims and the Term Loan Deficiency

Claims are reserved. The Debtors will put on valuation evidence at the Confirmation Hearing to support the valuation of the Term Loan Secured Claims and the Term Loan Deficiency Claims.

### 4. Allowance and Treatment of PlainsCapital ABL Secured Claims (Class - 4)

This Class consists of all Allowed PlainsCapital ABL Secured Claims against any Debtor.

On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed PlainsCapital ABL Secured Claim, each holder of an Allowed PlainsCapital ABL Secured Claim shall receive the ABL Priority Collateral securing such Allowed PlainsCapital ABL Secured Claims.

On the Effective Date, the PlainsCapital ABL Secured Claims shall be Allowed in the aggregate amount equal to the value of ABL Priority Collateral securing such PlainsCapital ABL Secured Claims.

### 5. Allowance and Treatment of MAALT Secured Claims (Class - 5)

This Class consists of all Allowed MAALT Secured Claims against any Debtor.

On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each MAALT Secured Claim, each holder of an Allowed MAALT Secured Claim shall receive, at the option of applicable Debtor, with the prior written consent of the Required Consenting Lenders, the following: (i) the collateral securing its Allowed MAALT Secured Claim; (ii) Reinstatement of its Allowed MAALT Secured Claim; or (iii) such other treatment rendering its Allowed MAALT Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

On the Effective Date, the MAALT Secured Claims shall be Allowed in the aggregate amount equal to the value of the collateral securing such MAALT Secured Claims.

### 6. Allowance and Treatment of General Unsecured Claims (Class - 6)

This Class includes any Allowed Claim that is not: (a) a DIP Facility Claim; (b) an Administrative Claim; (c) a Professional Compensation Claim; (d) a Priority Tax Claim; (e) an Other Secured Claim; (f) an Other Priority Claim; (g) a Term Loan Secured Claim; (h) a PlainsCapital ABL Secured Claim; (i) a MAALT Secured Claim; or (j) an Intercompany Claim.

**If and only if Class 6 votes to <u>accept</u> the Plan, Class 6 shall receive the following treatment:**

On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Litigation Trust Interests, and the Litigation Trust shall be funded by a

GUC Cash Pool in the amount of $500,000. The GUC Cash Pool shall be utilized or distributed at the discretion of the Litigation Trustee, subject to the terms of the Litigation Trust.

Further, if the holders of Class 6 Claims vote to accept this Plan, solely for purposes of calculating distributions from the Litigation Trust, the holders of Allowed Term Loan Deficiency Claims shall limit their distributions from the Litigation Trust to the amount they would receive if their Allowed Term Loan Deficiency Claims were equal to the total value of all other Allowed General Unsecured Claims; provided, however, that such limitation shall no longer apply after all Allowed General Unsecured Claims, other than Allowed Term Loan Deficiency Claims, have been paid in full, after which time payments shall continue to be made on account of the Allowed Term Loan Deficiency Claims until such Claims have also been paid in full. The potential recoveries from Litigation Trust Assets are uncertain, and it is not possible for the Debtors to ascribe a meaningful valuation to Litigation Trust Causes of Action.

As set forth in Article VIII.C of the Plan, in the event that Class 6 accepts the Plan or the Standing Motion is denied, then the Standing Motion Claims against the Term Loan Secured Parties shall be released by the Debtors, the Reorganized Debtors, and their Estates. The Term Loan Secured Parties intend to vote the entirety of their Class 6 Term Loan Deficiency Claims in favor of the Plan. The Term Loan Agent has asserted that the estimated aggregate amount of Term Loan Deficiency Claims is approximately $225,000,000. The rights of parties in interest to contest the allowed amount of Term Loan Deficiency Claims are reserved. The Debtors will put on valuation evidence at the Confirmation Hearing to support the valuation of the Term Loan Secured Claims and the Term Loan Deficiency Claims.

If Class 6 votes to accept the plan, the estimated total amount of Allowed Class 6 Claims for distribution purposes is approximately **$171,624,000**, comprised of (i) estimated trade Claims in the aggregate amount of approximately $40,850,000, (ii) estimated rejection damage Claims in the aggregate amount of approximately $44,962,000, and (iii) the reduced Term Loan Deficiency Claim for distribution purposes in the amount of all other General Unsecured Claims (until all Allowed General Unsecured Claims have been paid in full) of approximately $85,812,000, as shown in the table below:

| | Vista HoldCo | VPROP | Lonestar Management | Bulk | Denetz | Lonestar Ltd. | MAALT | Total |
|---|---|---|---|---|---|---|---|---|
| Trade Claims | - | - | - | $7,165,000 | - | $31,354,000 | $2,331,000 | **$40,850,000** |
| Rejection Damage Claims | - | - | - | $8,557,000 | - | $26,813,000 | $9,592,000 | **$44,962,000** |
| Deficiency Claims | $85,812,000 | $85,812,000 | $85,812,000 | $85,812,000 | $85,812,000 | $85,812,000 | $85,812,000 | **$85,812,000**[11] |
| Total Class 6 GUC Claims | **$85,812,000** | **$85,812,000** | **$85,812,000** | **$101,534,000** | **$85,812,000** | **$143,979,000** | **$97,735,000** | **$171,624,000** |

---

[11] VPROP is the borrower entity under the Term Loan Facility. Vista HoldCo, Lonestar Management, Bulk, Denetz, Lonestar Ltd., and MAALT are guarantors of the Term Loan Facility. The Term Loan Secured Parties assert that the Term Loan Deficiency Claim may be asserted against each of the Debtors in the reduced amount for distribution purposes equal to the amount of all other Allowed General Unsecured Claims.

**If and only if Class 6 votes to reject the Plan, Class 6 shall receive the following treatment:**

On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim (including Allowed Term Loan Deficiency Claims), each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Litigation Trust Interests, and the Litigation Trust shall receive no funding for the GUC Cash Pool. The holders of Allowed Term Loan Deficiency Claims shall not be required to waive any portion of their Allowed Term Loan Deficiency Claims if the holders of Class 6 Claims vote to reject the Plan.

The estimated total amount of Allowed Class 6 Claims for distribution purposes if Class 6 rejects the Plan (and the estimated total amount of Allowed Class 6 Claims for voting purposes) is approximately **$310,811,000**, comprised of (i) estimated trade Claims in the aggregate amount of approximately $40,850,000, (ii) estimated rejection damage Claims in the aggregate amount of approximately $44,962,000, and (iii) Allowed Term Loan Deficiency Claims in the aggregate estimated amount of $225,000,000, as shown in the table below:

| | Vista HoldCo | VPROP | Lonestar Management | Bulk | Denetz | Lonestar Ltd. | MAALT | Total |
|---|---|---|---|---|---|---|---|---|
| **Trade Claims** | - | - | - | $7,165,000 | - | $31,354,000 | $2,331,000 | **$40,850,000** |
| **Rejection Damage Claims** | - | - | - | $8,557,000 | - | $26,813,000 | $9,592,000 | **$44,962,000** |
| **Deficiency Claims** | $225,000,000 | $225,000,000 | $225,000,000 | $225,000 | $225,000,000 | $225,000,000 | $225,000,000 | **$225,000,000[12]** |
| **Total Class 6 GUC Claims** | **$225,000,000** | **$225,000,000** | **$225,000,000** | **$240,722,000** | **$225,000,000** | **$283,167,000** | **$236,923,000** | **$310,811,000** |

As set forth in Article VIII.C of the Plan, in the event that Class 6 rejects the Plan and the Standing Motion is granted, then the Standing Motion Claims against the Term Loan Secured Parties shall be included in the Litigation Trust Causes of Action and shall not be released by the Debtors, the Reorganized Debtors, and their Estates.

---

[12] VPROP is the borrower entity under the Term Loan Facility. Vista HoldCo, Lonestar Management, Bulk, Denetz, Lonestar Ltd., and MAALT are guarantors of the Term Loan Facility. The Term Loan Secured Parties assert that the Term Loan Deficiency Claim may be asserted against each of the Debtors, subject to an aggregate recovery of not more than 100 cents on the dollar for the entire Allowed Term Loan Deficiency Claim if Class 6 does not accept the Plan.

7.      **Allowance and Treatment of Intercompany Claims (Class - 7)**

This Class consists of all Intercompany Claims.

On the Effective Date, Class 7 Claims shall be, at the option of the Debtors, with the consent of the Required Consenting Lenders, either (i) Reinstated, or (ii) cancelled, released, and extinguished without any distribution.

The estimated total amount of Allowed Class 7 Claims is $263,956,128, as shown in the table below:

| | Vista HoldCo | VPROP | Lonestar Management | Bulk | Denetz | Lonestar Ltd. | MAALT | Total |
|---|---|---|---|---|---|---|---|---|
| **Intercompany Claims** | $7,382,535 | - | - | $58,306,972 | - | $97,212,368 | $34,693,438 | **$263,956,128** |

8.      **Allowance and Treatment of Interests in Debtors Other than Vista HoldCo (Class - 8)**

This Class consists of all Interests in Debtors other than Vista HoldCo.

On the Effective Date, all existing Interests in each of the Debtors, other than Interests in Vista HoldCo, shall be, at the option of the applicable Debtor, with the consent of the Required Consenting Lenders, either (i) Reinstated, or (ii) cancelled, released, and extinguished without any distribution, and will be of no further force or effect.

9.      **Allowance and Treatment of Interests in Vista HoldCo (Class - 9)**

This Class consists of all Interests in Vista HoldCo, which consists of all Existing Equity.

All Interests in Vista HoldCo shall be canceled, released, and extinguished as of the Effective Date and will be of no further force or effect. Holders of an Interest in Vista HoldCo will not receive any distribution on account of such Interest.

F.      **Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**

1.      **Claims Administration Responsibilities**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors, with respect to all Interests and Claims shall have the authority to:  (1) File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Interests or Claims immediately prior to the Effective Date.

45

Except as otherwise specifically provided in the Plan, after the Effective Date, the Litigation Trustee, with respect to General Unsecured Claims only, shall have the authority to: (1) File, withdraw, or litigate to judgment, objections to Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. After the Effective Date, the Litigation Trustee shall have and retain any and all rights and defenses the applicable Debtor had with respect to any General Unsecured Claim immediately prior to the Effective Date.

## 2. Estimation of Claims and Interests

Before or after the Effective Date, the Debtors or the Reorganized Debtors, and the Litigation Trustee, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

## 3. Adjustment to Claims or Interests without Objection

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

## 4. Time to File Objections to Claims

Except as otherwise specifically provided in the Plan and unless extended by order of the Bankruptcy Court, any objections to Claims shall be Filed on or before the later of (1) 180 days after the Effective Date and (2) such other period of limitation as may be specifically fixed by a Final Order of the Bankruptcy Court for objecting to such claims.

## 5. Disallowance of Claims or Interests

Except as otherwise specifically provided in the Plan, any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544,

545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as any objection to those Claims or Interests have been settled or a Bankruptcy Court order with respect thereto has been entered.

All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as provided in the Plan or otherwise agreed, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

### 6. Amendment to Claims or Interests

On or after the Effective Date, a Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors and any such new or amended Claim or Interest Filed shall be deemed disallowed in full and expunged without any further action; provided, however, that Governmental Units shall not be required to obtain authorization of the Bankruptcy Court or the Reorganized Debtors to File or amend a Proof of Claim prior to the bar date applicable to the Claim of such Governmental Unit.

### 7. No Distributions Pending Allowance

If an objection to a Claim or Interest or portion thereof is Filed as set forth in Article VII of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

### 8. Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

4812-2168-3656

### G. Treatment of Executory Contracts and Unexpired Leases

#### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases Under the Plan

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court, will be deemed rejected by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) previously were assumed or rejected by the Debtors; (2) previously expired or terminated pursuant to their own terms; (3) are specifically designated on the Schedule of Assumed Contracts and Leases; (4) are subject to a motion to assume Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (5) are subject to a motion to assume an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such assumption is after the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections, as applicable, of the Executory Contracts and Unexpired Leases set forth in the Plan and the Schedule of Assumed Contracts and Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Lenders, reserve the right to alter, amend, modify, or supplement the Schedules identified in Article V of the Plan and in the Plan Supplement at any time through and including 45 days after the Effective Date. Any Executory Contracts or Unexpired Leases removed from the Schedule of Assumed Contracts and Leases after the Effective Date shall be deemed rejected as of the date the Reorganized Debtors file a notice reflecting the same.

#### 2. Indemnification Obligations

All indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable as of the Petition Date, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date. Any indemnification obligations

to Former Directors and Officers of the Debtors shall be terminated on the Effective Date and be of no further force and effect.

### 3.     Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, (3) the Effective Date, or (4) the date after the Effective Date that the applicable Schedules are altered, amended, modified, or supplemented, but only with respect to any Executory Contract or Unexpired Lease thereby affected. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.D.6 of the Plan.

### 4.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. Pursuant to the Approval Order, the Debtors shall provide for notices of proposed assumption and proposed cure amounts and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

## 5. Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

## 6. Insurance Policies

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

## 7. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## 8. Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the the Schedule of Assumed Contracts and Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall

have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under the Plan.

### 9. Non-occurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### 10. Contracts and Leases Entered into after the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VIII.
## MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

### A. Corporate Existence

Except as otherwise provided in the Plan, the Updated Governance Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### B. Reorganized Debtors

On the Effective Date, the New Parent Board shall be established, and the Reorganized Debtors shall adopt their Updated Governance Documents. The Reorganized Debtors shall have the authority to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

### C. Restructuring Transactions

On the Effective Date, the Term Loan Lenders will contribute (the "Contribution"), Pro Rata, all of their rights, title and interests as lenders in and to VPROP under the Term Loan Agreement (the "Specified Pre-Petition Debt") as described in Article III.D.3 of the Plan.

Following the Issuance (as defined below), Vista HoldCo shall transfer 100% of the equity interests of (representing all of its ownership interests in) VPROP to the New Parent Company (the "VPROP Equity Transfer") and the Specified Pre-Petition Debt shall be extinguished. Following the VPROP Equity Transfer, the holders of Existing Equity of Vista HoldCo will dissolve Vista HoldCo.

Further, on the Effective Date, the applicable Debtors or Reorganized Debtors shall enter into any other transaction and shall take any other actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan. The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

### D. Sources of Plan Distributions

Distributions under the Plan shall be funded with: (1) Cash on hand; (2) the ABL Priority Collateral; (3) the MAALT Priority Collateral; (4) the issuance and distribution of the New Equity Interests; and (5) the Exit Facility; (6) the GUC Cash Pool (if any); and (7) interests in the Litigation Trust, as applicable.

### 1. Issuance of Equity Interests

On the Effective Date, the New Parent Company will issue the New Equity Interests, Pro Rata, to the holders of the Allowed Term Loan Secured Claims (the "Issuance"). New Parent Company will take all necessary corporate action to effect the Issuance. The Issuance is authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests. On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents necessary to effect the Issuance. All of the shares, units or equity interests (as the case may be based on how the New Equity Interests are denominated) of the New Equity Interests issued shall be duly authorized, validly issued, fully paid, and non-assessable.

4812-2168-3656

### 2. Exit Facility

On the Effective Date, the Reorganized Debtors shall be authorized to enter into the Exit Facility and execute the Exit Facility Documents substantially in the form contained or described in the Plan Supplement, and any related agreements or filing without the need for any further corporate or organizational action and without further action by or approval of the Bankruptcy Court. The terms of the Tranche A Exit Facility Notes, Tranche B Exit Facility Notes, and Tranche C Exit Facility Notes shall include (i) interest of LIBOR + 9.50% paid in kind for the first year, (ii) original issue discount of 3.00%, (iii) 4 year term, and (iv) no amortization. Additionally, the Exit Facility Documents shall provide that Tranche A Facility Notes shall have priority over the Tranche B Facility Notes, which shall have priority over the Tranche C Facility Notes.

Confirmation shall be deemed approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Bankruptcy Court previously, and the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility, including any and all documents required to enter into the Exit Facility, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtors, in consultation with the Exit Agent, may deem to be necessary to consummate entry into the Exit Facility.

On the Effective Date, (a) upon the granting of Liens in accordance with the Exit Facility, the Exit Agent shall have valid, binding and enforceable Liens on the collateral specified in the Exit Facility Documents, which Liens shall be deemed perfected as of the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facility Documents; and (b) upon the granting of guarantees, mortgages, pledges, Liens and other security interests in accordance with the Exit Facility Documents, the guarantees, mortgages, pledges, Liens and other security interests granted to secure the obligations arising under the Exit Facility shall be granted in good faith and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents.

### E. Vesting of Assets in the Reorganized Debtors

Except with respect to the Litigation Trust Assets and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan (including the Exit Facility Documents) or the Plan Supplement, on the Effective Date, all property in each Estate, all Retained Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Retained

Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Failure to include a Cause of Action on the Schedule of Retained Causes of Action shall not constitute a waiver or release of such Cause of Action.

### F. Cancellation of Existing Equity and Agreements

On the Effective Date, except to the extent otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such cancelled instruments and other documentation will have no rights arising from or relating to such instruments and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.

Notwithstanding the foregoing, the DIP Facility and Term Loan Facility shall continue in effect to the extent necessary to (i) allow the DIP Agent and the Term Loan Agent, as applicable in accordance with Article II and Article III of the Plan, to make distributions to the holders of DIP Facility Claims and Term Loan Secured Claims; (ii) allow the DIP Agent and the Term Loan Agent to maintain any right of indemnification, exculpation, contribution, subrogation or any other claim or entitlement it may have under the DIP Loan Documents or the Term Loan Documents, or both; (iii) permit the DIP Agent and the Term Loan Agent to appear before the Bankruptcy Court or any other court of competent jurisdiction after the Effective Date; (iv) permit the DIP Agent and the Term Loan Agent to perform any functions that are necessary to effectuate the foregoing; and (v) to exercise rights and obligations relating to the interests of the DIP Secured Parties or Term Loan Secured Parties, or both.

### G. Corporate Action

On the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) selection of the directors and officers for the Reorganized Debtors as named in the Plan or the Plan Supplement; (2) the distribution of the equity interest of Reorganized VPROP; (3) implementation of the Restructuring Transactions; (4) entry into the Exit Facility Documents; (5) adoption of the Updated Governance Documents; (6) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (7) funding of the GUC Cash Pool; (8) the establishment of the Litigation Trust; and (9) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).

All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. As applicable, on or prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, shall be

authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Equity Interests, the Updated Governance Documents, the Exit Facility Documents, interests in the Litigation Trust, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### H. Updated Governance Documents

On or immediately prior to the Effective Date, the Updated Governance Documents shall be adopted as may be necessary to effectuate the transactions contemplated by the Plan. Each of the Reorganized Debtors will file its Updated Governance Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. The Updated Governance Documents will prohibit the issuance of non-voting equity securities, to the extent required under Bankruptcy Code section 1123(a)(6). After the Effective Date, the Reorganized Debtors may amend and restate their respective Updated Governance Documents and other constituent documents as permitted by the terms thereof and applicable law. The Updated Governance Documents shall be in form and substance reasonably satisfactory to the Required Consenting Lenders. Among other things, the Updated Governance Documents shall reflect a form of the New Parent Company that provides for a tax efficient treatment satisfactory to the Required Consenting Lenders, in consultation with the Debtors.

Further, the applicable Updated Governance Documents will contain the maximum waiver of fiduciary duties (including waiver of corporate opportunities and any similar doctrines for other investment opportunities) permitted by law. The Updated Governance Documents shall be included in the Plan Supplement.

### I. Governance and Board of the Reorganized Debtors

Control of the New Parent Company will be vested in the New Parent Board, who will manage and govern the affairs of the New Parent Company. As of the Effective Date, the terms of the current members of the board of directors of the Debtors shall expire, and the initial boards of directors, including the New Parent Board, and the officers of each of the Reorganized Debtors shall be appointed in accordance with the respective governance documents for the New Parent Company and the Updated Governance Documents, as applicable. The New Parent Board will be comprised of seven (7) directors, with such directors initially being as follows upon the Effective Date: (a) four (4) directors designated and appointed by the Term Loan Agent; (b) one (1) director designated and appointed by AG Energy Funding, LLC; (c) one (1) director designated and appointed by MSD Credit Opportunity Fund, L.P.; and (d) one (1) independent director. Each director will have one vote; provided, that any director appointed by the Term Loan Agent will have the right to vote on behalf of any other director appointed by the Term Loan Agent when and to the extent any such other director appointed by the Term Loan Agent is not present.

4812-2168-3656

In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the New Parent Board and any Person proposed to serve as an officer of the Reorganized Debtors shall be disclosed at or before the Confirmation Hearing, in each case to the extent the identity of such proposed director or officer is known at such time. To the extent any such director or officer of the Reorganized Debtors is an Insider, the Debtors also will disclose the nature of any compensation to be paid to such director or officer. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the Updated Governance Documents and other constituent documents of the Reorganized Debtors.

## J.     Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and the officers and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

## K.     Section 1146 Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity interest, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Exit Facility; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### L. Director and Officer Liability Insurance

On or before the Effective Date, the Debtors shall obtain director and officer liability insurance coverage following the Effective Date on terms no less favorable to the insureds than the Debtors' existing director and officer coverage and with an aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director and officer coverage.

### M. Management Incentive Plan

After the Effective Date, the New Parent Company will negotiate in good faith to implement a Management Incentive Plan; provided that such Management Incentive Plan shall be subject to the approval of the New Parent Board.

### N. Employee and Retiree Benefits

Unless otherwise provided in the Plan and subject to approval by the New Parent Board, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### O. Retained Causes of Action

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, and excluding the Litigation Trust Trusts Causes of Action, in accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and shall have the exclusive right, authority, and discretion to (without further order of the Bankruptcy Court) determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw, or litigate to judgment any and all Retained Causes of Action that the Debtors or the Estates may hold against any Entity, whether arising before or after the Petition Date. The Debtors reserve and shall retain the foregoing Retained Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases.

Unless a Retained Cause of Action is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order of the Bankruptcy Court, the Debtors expressly reserve such Retained Cause of Action (including any counterclaims) for later adjudication by the Reorganized Debtors. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral, estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Causes of Action (including counterclaims) on or after the Confirmation of the Plan.

## P. Litigation Trust

The Litigation Trust will be governed by the Litigation Trust Agreement, which will be filed as part of the Plan Supplement. On the Effective Date, the Reorganized Debtors, on their own behalf and on behalf of the Litigation Trust Beneficiaries, shall execute the Litigation Trust Agreement and shall take all other steps necessary to establish the Litigation Trust in accordance with and pursuant to the terms of the Litigation Trust Agreement.

The Litigation Trust shall be established as a liquidating grantor trust for the purpose of liquidating and distributing the Litigation Trust Assets to the Litigation Trust Beneficiaries in accordance with this Plan and Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. All parties and Litigation Trust Beneficiaries shall treat the transfers in trust described herein as transfers to the Litigation Trust Beneficiaries for all purposes of the Internal Revenue Code of 1986, as amended (including, sections 61(a)(12), 483, 1001, 1012, and 1274). All the parties and Litigation Trust Beneficiaries shall treat the transfers in trust as if all the transferred assets, including all the Litigation Trust Assets, had been first transferred to the Litigation Trust Beneficiaries and then transferred by the Litigation Trust Beneficiaries. The Litigation Trust Beneficiaries shall be treated for all purposes of the Internal Revenue Code of 1986, as amended, as the grantors of the Litigation Trust and the owners of the Litigation Trust. The Litigation Trustee shall file returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulations section 1.671 4(a) or (b). All parties, including the Litigation Trust Beneficiaries and the Litigation Trustee shall value the Litigation Trust Assets consistently and such valuations shall be used for all federal income tax purposes.

The Reorganized Debtors shall transfer the Litigation Trust Assets to the Litigation Trust. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax. Upon delivery of the Litigation Trust Assets to the Litigation Trust, the Reorganized Debtors shall be released from all liability with respect to the delivery of such distributions.

The Litigation Trust Agreement shall provide for the appointment of the Litigation Trustee. The Litigation Trustee shall be selected by the Required Consenting Lenders, and the Debtors will disclose the identity of the initial Litigation Trustee in the Plan Supplement. The retention of the Litigation Trustee shall be approved in the Confirmation Order.

The Litigation Trustee shall have the power to administer the assets of the Litigation Trust in accordance with the Litigation Trust Agreement. The Litigation Trustee shall be the estate representative designated to prosecute any and all Litigation Trust Causes of Action. Without limiting the generality of the foregoing, the Litigation Trustee shall (a) hold, administer and prosecute the assets of the Litigation Trust and any proceeds thereof; (b) have the power and authority to retain, as an expense of the Litigation Trust, attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Litigation Trustee under the Litigation Trust Agreement; (c) make distributions as provided in the Litigation Trust Agreement; and (d) provide periodic reports and updates regarding the status of the administration of the Litigation Trust. The Litigation Trustee shall be deemed a Disbursing Agent under the Plan when making distributions to holders of Litigation Trust Interests pursuant to the Litigation Trust Agreement.

As soon as reasonably practicable after the Effective Date, the Reorganized Debtors will transfer the GUC Cash Pool, if any, to the Litigation Trust to fund its operations under the Plan and the Litigation Trust Agreement. Under no circumstances shall the Debtors or the Reorganized Debtors be required to contribute any of their respective assets to the Litigation Trust other than the GUC Cash Pool and the Litigation Trust Assets.

The Debtors or Reorganized Debtors, as applicable, shall provide the Litigation Trust with reasonable access to the books and records of the Debtors or Reorganized Debtors concerning the Litigation Trust Causes of Action. In connection with the transfer of the Litigation Trust Causes of Action, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) to the extent related to the Litigation Trust Causes of Action shall be shared by the Litigation Trust and the Reorganized Debtors and shall vest in the Litigation Trustee and attorneys, agents, and representatives to the extent necessary to effect such shared privilege. The Debtors or the Reorganized Debtors, as the case may be, and the Litigation Trustee are authorized to take all necessary actions to effectuate the sharing and vesting of such privileges. The Confirmation Order shall provide that the Litigation Trustee's receipt of the shared privileges shall be without waiver of any such privileges, in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors' Estates. The Litigation Trustee shall not waive any privilege with respect to any documents or communication covered under this Section without the prior written consent of the Reorganized Debtors.

The transfer of the GUC Cash Pool and the Litigation Trust Assets to the Litigation Trust shall be made, as provided herein, for the benefit of the Litigation Trust Beneficiaries. Upon the transfer of the GUC Cash Pool and the Litigation Trust Assets, the Debtors or the Reorganized Debtors, as the case may be, shall have no interest in or with respect to the GUC Cash Pool, the Litigation Trust Assets or the Litigation Trust. To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Litigation Trust Assets shall be deemed to have been retained by the Reorganized Debtors and the Litigation Trustee shall be deemed to have been designated as a representative of the Reorganized Debtors pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of the Reorganized Debtors. Notwithstanding the foregoing, all net proceeds of such Litigation Trust Assets shall be transferred to the Litigation Trust to be distributed to the Litigation Trust Beneficiaries consistent with the terms of the Plan and the Litigation Trust Agreement.

## Q. Release of Debtors

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after**

the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

R.    **Release of Liens**

Except as otherwise provided in the Plan, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.D. of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. On and after the Effective Date, any holder of such Secured Claim (and the applicable agents for such holder), at the expense of the Reorganized Debtors, shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

Without limiting the automatic release provisions of the immediately preceding paragraph: (i) except for distributions required under Article II. and Article III.D. of the Plan, no other distribution under the Plan shall be made to or on behalf of any Claim holder unless and until such holder executes and delivers to the Debtors or Reorganized Debtors such release of liens or otherwise turns over and releases such Cash, pledge or other possessory liens; and (ii) any such holder that fails to execute and deliver such release of liens within 180 days of the Effective Date shall be deemed to have no Claim against the Debtors or their assets or property in respect of such Claim and shall not participate in any distribution under the Plan.

**S.      Releases by the Debtors**

**Except as provided for in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party[13] is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Exit Facility, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement, the DIP Facility, the Plan, the Exit Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Exit Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the Plan, in the event Class 6 accepts the Plan or the Standing Motion is denied, then the Standing Motion Claims against the Term Loan Secured Parties shall be released pursuant to Article VIII.C of the Plan. In the event Class 6 does not accept the Plan and the Standing Motion is granted, then the Standing Motion Claims against the Term Loan Secured Parties shall be included in the Litigation Trust Causes of Action and shall not be released by the Debtors, the Reorganized Debtors, or their Estates. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release obligations of any party or Entity under the Plan, or any document, instrument, or agreement executed to implement the Plan.**

The Debtors submit that the consideration provided in exchange for the releases set forth in Article VIII.C of the Plan includes, among other things, the DIP Facility and the Exit Facility, both of which are critical to the Debtors' successful reorganization and emergence from Chapter 11. Furthermore, if Class 6 votes to accept the Plan, then consideration provided in exchange for the releases set forth in Article VIII.C of the Plan also includes the $500,000 of funding for the

---

[13] Pursuant to the Plan, "Released Parties" means "except as provided in Article VIII.C of the Plan, collectively, and in each case solely in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Term Loan Lenders; (d) the Term Loan Agent; (e) the DIP Lenders; (f) the DIP Agent; (g) the Exit Lenders; (h) the Exit Agent; and (i) with respect to each of the foregoing entities in clauses (a) through (h), such Entity's current and former affiliates and subsidiaries, and such Entities' and their current and former affiliates' and subsidiaries' directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, principals, members, employees, agents, advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the Petition Date; *provided, however,* that notwithstanding the foregoing, R.J. Sikes, Gary Humphreys, Marty Robertson, GMHR Operations, LLC, RJS Holdings, LLC, KCM Enterprises, LP, the Debtors' equity holders as of the Petition Date, and any entity related to R.J. Sikes, Gary Humphreys, or Marty Robertson, other than the Debtors or the Reorganized Debtors, shall not be "Released Parties" under the Plan."

GUC Cash Pool and the Term Loan Secured Parties' agreement to reduce the amount of the Term Loan Deficiency Claim to the amount of all other Allowed General Unsecured Claims. All other claims against the Term Loan Secured Parties, besides the Standing Motion Claims, have been released by the Debtors pursuant to the DIP Financing Order.

**T. Releases by Holders of Claims and Interests**

**Except as provided for in the Plan or Confirmation Order, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in or out-of-court restructuring efforts, Intercompany Claims, the Exit Facility, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Facility, the Plan, the Exit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Exit Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Causes of Action arising from any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence, or willful misconduct of such applicable Released Party. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release obligations of any party or Entity under the Plan, or any document, instrument, or agreement executed to implement the Plan.**

**U. Exculpation**

**Except as provided for in the Plan or Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any Claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Facility, the Exit Facility, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for Causes of Action arising from any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence, or willful misconduct of such applicable Exculpated Party, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

**The Section 1125(e) Protected Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Each of the Section 1125(e) Protected Parties shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.**

V. **Injunction**

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

W. **Protections against Discriminatory Treatment**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## X.     Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## Y.     Retention of Jurisdiction

To the fullest extent permitted by applicable law, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

- decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

- resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, the Schedules of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

- ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

- adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

- adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

- enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

- enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

- resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

- issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

- resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary to implement such releases, injunctions, and other provisions;

- resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI of the Plan;

- enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

- determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

- enter an order concluding or closing the Chapter 11 Cases;

- adjudicate any and all disputes arising from or relating to distributions under the Plan;

- consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

- determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

- hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

- hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and released granted in the Plan, including under Article VIII of the Plan, regardless of whether such termination occurred prior to or after the Effective Date;

- enforce all orders previously entered by the Bankruptcy Court; and

- hear any other matter not inconsistent with the Bankruptcy Code.

## Z. Modifications and Amendments, Revocation, or Withdrawal of the Plan

Except as otherwise specifically provided in the Plan, the Debtors reserve the right, with the consent of the Required Consenting Lenders, to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights, with the consent of the Required Consenting Lenders, to revoke or withdraw, or, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the Solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

The Debtors reserve the right, with the consent of the Required Consenting Lenders, to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant

4812-2168-3656

to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE IX.
## LEGAL PROCEEDINGS

**OTHER THAN AS EXPRESSLY SET FORTH IN ARTICLE VIII OF THE PLAN, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF ACTION, AVOIDANCE ACTIONS, OR OBJECTIONS TO PROOFS OF CLAIM. ALL SUCH RIGHTS ARE SPECIFICALLY PRESERVED, UNLESS SPECIFICALLY RELEASED UNDER THE PLAN.**

The following is a summary of material litigation involving the Debtors that existed as of the Petition Date, including potential Claims and Causes of Action that arose as a result of the filing of the Chapter 11 Cases.

### A. *MAALT, LP v. Sequitur Permian, LLC, Case No. CV19-003*

Case No. CV19-003 in the 51st Judicial District Court for Irion County, Texas. The suit involves certain claims, including claims for breach of contract. The case is currently pending.

### B. *Standing Motion Claims*

As set forth in more detail in the Standing Motion, the Committee has asserted that Alleged Claims exist against the Term Loan Secured Parties and the ABL Lender, including (i) avoidance claims under the Uniform Fraudulent Transfer Act and section 544(b) of the Bankruptcy Code against the Term Loan Secured Parties arising out of their funding of the New Loans made under the November 9, 2017 Term Loan Credit Agreement, and (ii) a claim pursuant to section 553(b) of the Bankruptcy Code against PlainsCapital Bank in connection with PlainsCapital Bank's prepetition sweep of the Debtors' funds after declaring an event of default on June 3, 2020.

### C. Recovery on Preference Actions and Other Avoidance Actions

During the ninety (90) days immediately preceding the Petition Date (the "Preference Period"), while presumed insolvent, the Debtors made various payments and other transfers to Creditors on account of antecedent debts. Some of those payments may be subject to avoidance and recovery as preferential and/or fraudulent transfers pursuant to sections 329, 544, 545, 547, 548, 549, 550, and 553(b) of the Bankruptcy Code.

The Debtors' Statements of Financial Affairs identify the parties who received payments and transfers from the Debtors, which payments and transfers may be avoidable under the Bankruptcy Code.

### D. Retained Causes of Action or Litigation Trust Causes of Action

Creditors and other parties in interest should understand that certain legal rights, Claims and causes of action the Debtors may have against them, if any exist, are retained under the Plan for prosecution by the Reorganized Debtors or the Litigation Trustee, unless expressly released under the Plan. As such, Creditors and other parties in interest are cautioned not to rely on (i) the absence of the listing of any legal right, Claim or cause of action against a particular Creditor or other party in interest in the Disclosure Statement, Plan, Schedules of Assets and Liabilities, or Statement of Financial Affairs; or (ii) the absence of litigation or demand prior to the Effective Date as any indication that the Debtors, the Reorganized Debtors, or the Litigation Trustee do not possess or do not intend to prosecute a particular legal right, Claim or Cause of Action if a particular Creditor or other party in interest votes to accept the Plan. It is the expressed intention of the Debtors, through the Plan, to preserve Retained Causes of Action and the Litigation Trust Causes of Action whether now known or unknown. Furthermore, the Debtors reserve the right to pursue collection efforts against counterparties to any and all contracts and leases, including rejected contracts and leases, for any unpaid amounts owed to the Debtors or the Reorganized Debtors, as applicable.

The Schedule of Retained Causes of Action and the Schedule of Litigation Trust Causes of Action will be filed with the Plan Supplement. Unless otherwise agreed among the Debtors, the Committee, and the Required Consenting Lenders, the Litigation Trust Causes of Action shall include, at a minimum, (i) the Standing Motion Claims against the Term Loan Secured Parties, unless Class 6 votes to accept the Plan or the Standing Motion is denied, in which case the Standing Motion Claims against the Term Loan Secured Parties are released, (ii) the Standing Motion Claims against the ABL Lender, (iii) all potential Causes of Action against R.J. Sikes, RJS Holdings, KCM Enterprises, Gary Humphreys, Marty Robertson, GMHR Operations, or any other person or entity that is not a Released Party under the Plan, including entities related to Gary Humphreys, Marty Robertson, or R.J. Sikes other than the Debtors or the Reorganized Debtors; and (iv) all other Avoidance Actions.

## ARTICLE X.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A. Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interests (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the

Plan, holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### B. Disbursing Agent

All distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

### C. Rights and Powers of Disbursing Agent

#### 1. Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated in the Plan; and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

#### 2. Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

### D. Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### 1. Record Date for Distributions

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests shall be closed, and the Debtors shall not be required to make any further changes in the record holders of any of the Claims or Interests. The Debtors or the Disbursing Agent shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date. The Debtors and the Disbursing Agent shall be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

#### 2. Delivery of Distributions in General

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record

Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; provided further, however, that the address for each holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that holder.

### 3. Minimum Distributions

No fractional shares of New Equity Interests shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Equity Interests that is not a whole number, the actual distribution of shares of New Equity Interests shall be rounded down to the nearest whole share. The total number of authorized shares of New Equity Interests to be distributed to holders of Allowed Claims and Allowed Interests (as applicable) shall be adjusted as necessary to account for the foregoing rounding. To the extent Cash is distributed under the Plan, no Cash payment of less than $50.00 shall be made to a holder of an Allowed Claim on account of such Allowed Claim, and such amounts shall be retained by Reorganized Debtors.

### 4. Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

### E. Manner of Payment

1. All distributions of the New Equity Interests to the holders of Allowed Claims under the Plan shall be made by the Disbursing Agent.

2. All distributions of the Exit Facility under the Plan shall be made by the Disbursing Agent.

3. All distributions of Cash to the holders of Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor.

4. At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

**F.     Distributions to Holders of General Unsecured Claims**

1.     On or before the date that is 180 days after the Effective Date, the Disbursing Agent shall distribute to each holder of an Allowed General Unsecured Claim its Pro Rata share of the Litigation Trust Interests.

2.     Distributions on account of Disputed General Unsecured Claims shall be held in the Disputed Claims Reserve until such Claims have been either Allowed or Disallowed. To the extent a Disputed General Unsecured Claim becomes Allowed, the distribution reserved for such Claim shall be distributed to the holder thereof. To the extent a Disputed General Unsecured Claim becomes Disallowed, the distribution reserved for such Claim shall be distributed Pro Rata to holders of Allowed Class 6 General Unsecured Claims.

3.     For purposes of distributions to holders of Allowed Class 6 General Unsecured Claims pursuant to Article VI.F and Article III.D.6 of the Plan, "Pro Rata" means, as to a particular holder of a Claim in Class 6, the ratio that the amount of such Claim held by such Class 6 Claim holder bears to the aggregate amount of all Class 6 General Unsecured Claims (including any Allowed Term Loan Deficiency Claims), and such ratio shall be calculated as if all Disputed Class 6 General Unsecured Claims are Allowed Claims as of the Effective Date.

**G.     Section 1145 Exemption**

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Equity Interests as contemplated by Article III.D of the Plan, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of securities. In addition, under section 1145 of the Bankruptcy Code, such New Equity Interests will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and subject to any restrictions in the Reorganized Debtors' Updated Governance Documents.

**H.     Compliance with Tax Requirements**

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors and/or the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Reorganized Debtors, and the Disbursing Agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and the Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

### I.     Allocations

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### J.     No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

### K.     Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

### L.     Setoffs and Recoupment

Except as expressly provided in the Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim under the Plan shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder. In no event shall any holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

### M.     Claims Paid or Payable by Third Parties

#### 1.     Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the

holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

## 2.     Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## 3.     Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE XI.
## ALTERNATIVES TO THE PLAN

### A.     Chapter 7 Liquidation

Attached hereto as **Exhibit 3** is a Liquidation Analysis that demonstrates that Creditors will receive a greater distribution under the Plan than a hypothetical liquidation under chapter 7 of the Bankruptcy Code.  The analysis provided is believed to be reasonable and conservative. Readers are urged to review the notes and assumptions contained in the Liquidation Analysis.

As demonstrated in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the additional administrative expenses associated with the appointment of a chapter 7 trustee and the chapter 7 trustee's retention of professionals, the significantly higher amount of General Unsecured Claims that would exist in a chapter 7 case due to the rejection of royalty agreements and other Executory Contracts and Unexpired Leases

that would otherwise be assumed under the Plan, the additional reclamation claims that would exist in a chapter 7 case with respect to the Debtors' three mines, and the addition of real and personal property tax claims to the chapter 7 claims pool that would have otherwise been paid in full under the Plan. Additionally, DIP Facility Claims are secured by, among other things, the proceeds of Avoidance Actions, so it is possible that in a chapter 7 liquidation, some or all of the DIP Facility Claims would be satisfied from the proceeds of Avoidance Actions before any such proceeds would become available for unsecured creditors.

Moreover, even if Class 6 does not accept the Plan, holders of Allowed Class 6 General Unsecured Claims will receive not less than such holders would receive or retain under chapter 7 of the Bankruptcy Code because such holders would be entitled to receive the proceeds of the Litigation Trust Assets, if any, under the Plan, which would be the same proceeds, if any, that such holders would be entitled to receive in a chapter 7 case.

## B.       Dismissal

If dismissal of the Chapter 11 Cases were to occur, the Debtors would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code. In the event of dismissal, it is highly unlikely that holders of General Unsecured Claims would receive any amount on their Claims. Dismissal would force a race among Creditors to take over and dispose of the Debtors' available assets. Even the most diligent holders of General Unsecured Claims would likely fail to realize any recovery on their Claims.

## C.       Exclusivity and Alternative Plan Potential

Pursuant to section 1121 of the Bankruptcy Code, the Debtors have the exclusive right to file a plan of reorganization on or before October 7, 2020, and the exclusive right to solicit the plan of reorganization on or before December 6, 2020 (the "Exclusive Periods"). Because the Debtors have Filed the Plan and seek its confirmation during the Exclusive Periods, no other alternative plans can be proposed or solicited at this time. Moreover, the Debtors believe that any alternative plan would not be viable and would not provide the same recovery to Creditors as that proposed under the current Plan. The Debtors therefore believe that the Plan is in the best interest of Creditors.

## ARTICLE XII.
## FEASIBILITY

The Bankruptcy Code requires the Debtors to demonstrate that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. Distributions to Creditors under the Plan do not depend upon the Reorganized Debtors' future business operations. Rather, such distributions are based upon (1) Cash on hand; (2) the ABL Priority Collateral; (3) the MAALT Priority Collateral; (4) the issuance and distribution of the New Equity Interests; (5) the Exit Facility; (6) the GUC Cash Pool (if any); and (7) interests in the Litigation Trust, as applicable.

Attached as **Exhibit 4** are the Debtors' Financial Projections with respect to the Reorganized Debtors (the "Financial Projections"). The Financial Projections show that the

Reorganized Debtors will have adequate liquidity and funding to meet their obligations. Further, the Financial Projections evidence that the Reorganized Debtors are not likely to need financial reorganization or liquidation.

Therefore, the Debtors believe the Plan is feasible and is not likely to be followed by subsequent liquidation or the need for further financial reorganization of the Debtors.

## ARTICLE XIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Creditors should carefully consider the following factors, as well as the other information contained in this Disclosure Statement (as well as the documents delivered herewith or incorporated by reference herein) before deciding whether to vote to accept or to reject the Plan.

The principal purpose of the Chapter 11 Cases is the formulation of the Plan, which establishes how Claims against and Interests in the Debtors will be satisfied.  Under the Plan, certain Claims may receive partial distributions, and other Claims may not receive any distributions at all.  Interests will receive no distributions.

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

### 3. The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

To the extent a Class of Claims rejects the Plan, the Debtors may still seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them will ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan. There is no assurance that an alternative plan will be confirmed or that the Chapter 11 Cases will not be converted to a liquidation. Holders of Interests will receive no

recovery under the Plan or in a liquidation. If a liquidation or protracted reorganization were to occur, there is a risk that there would be little, if any, value available for distribution to the holders of Claims.

### 5. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 7. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 8. Releases, Injunctions, and Exculpation Provisions May not be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### B.     Failure to Confirm or Consummate the Plan

If the Plan is not confirmed and consummated, it is possible that an alternative plan can be negotiated and presented to the Bankruptcy Court for approval; however, there is no assurance that the alternative plan will be confirmed, that the Chapter 11 Cases will not be converted to a liquidation, or that any alternative chapter 11 plan could or would be formulated on terms as favorable to the Creditors as the terms of the Plan.  Holders of Interests will receive no recovery under the Plan or in a liquidation.  If a liquidation or protracted reorganization were to occur, there is a risk that there would be little, if any, value available for distribution to the holders of Claims.

### C.     Claim Estimates May Be Incorrect

There can be no assurance that the estimated Allowed Claim amounts set forth herein are correct.  The actual Allowed amounts of Claims may differ from the estimates.  The estimated amounts are subject to certain risks.  If one or more of these risks or uncertainties materializes, or if underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein.

### D.     Risks Related to Debtors' Business and Industry Conditions

The risks associated with the Debtors' business and industry include, but are not limited to:

- risk of direct financial impact attributable to a significant safety or other hazardous incident;

- the current uncertainty in the global economy;

- changes in global supply and demand for oil and natural gas;

- the level of oil and natural gas exploration and production activity;

- the current uncertain regarding the impact of COVID-19

- limited ability to obtain financing and pursue business opportunities because of debt level;

- credit risk relating to nonperformance by customers;

- the price and availability of alternative fuels; and

- technological advances affecting energy consumption.

4812-2168-3656

### E. Risks Relating to the New Equity Interests

#### 1. No Current Public Market for Securities

There is currently no market for the New Equity Interests, and there can be no assurance as to the development or liquidity of any market for the New Equity Interests. The New Equity Interests to be issued under the Plan will not be listed on or traded on any nationally recognized market or exchange as of the Effective Date.

The Reorganized Debtors are under no obligation to list the New Equity Interests on any national securities exchange. Therefore, there can be no assurance that the New Equity Interests will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the New Equity Interests may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, the New Equity Interests could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtor. Accordingly, holders of the New Equity Interests may bear certain risks associated with holding securities for an indefinite period of time.

Further, the New Equity Interests to be issued under the Plan have not been registered under the Securities Act, any state securities laws or the laws of any other jurisdiction. Absent such registration, the New Equity Interests may be offered or sold only in transactions that are not subject to, or that are exempt from, the registration requirements of the Securities Act and other applicable securities laws.

#### 2. Implied Valuation of New Equity Interests Not Intended to Represent the Trading Value of the New Equity Interests

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Equity Interests in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (iv) other factors that generally influence the prices of securities. The actual market price of the New Equity Interests is likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Equity Interests to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Equity Interests in the public or private markets.

#### 3. No Intention to Pay Dividends

The Reorganized Debtors do not anticipate paying any dividends on the New Equity Interests as they expect to retain any future cash flows for debt reduction and to support their

operations. As a result, the success of an investment in the New Equity Interests will depend entirely upon any future appreciation in the value of the New Equity Interests. There is, however, no guarantee that the New Equity Interests will appreciate in value or even maintain their initial value.

### F.      Inability to Close the Exit Facility

The Exit Facility is subject to certain closing risks, and to the extent that the Exit Facility is not fully funded, the Debtors may be unable to consummate the Plan.

### G.      Certain Tax Implications of the Plan

Holders of Claims should carefully review Article XIV of this Disclosure Statement, "Certain United States Federal Income Tax Consequences of the Plan" to determine how the tax implications of the Plan may affect such holders.

### H.      Uncertainty of Recovery Under Litigation Trust

The value of the Litigation Trust Assets is uncertain and will depend on the disposition of the Litigation Trust Causes of Action. There is no guarantee that the Litigation Trust Causes of Action will generate proceeds for distribution to holders of Litigation Trust Interests.

### I.      Disruptions to Information Systems and Cyber Security Attacks

In the ordinary course of business, the Debtors have relied, and the Reorganized Debtors will continue to rely, upon information systems, some of which are managed by third parties, to process, transmit and store digital information, and to manage or support a variety of business processes and activities. The secure operation of such systems, and the processing and maintenance of this information is critical to business operations and strategy. Despite actions to mitigate or eliminate risk, the Reorganized Debtors' information systems may be vulnerable to damage, disruptions, or shutdowns due to the activity of hackers, employee error or malfeasance, or other disruptions including, power outages, telecommunication or utility failures, natural disasters, or other catastrophic events. The occurrence of any of these events could compromise the information systems and the information stored there could be accessed, publicly disclosed, lost or stolen. Any such access, disclosure, or other loss of information could result in legal claims or proceedings, liability or regulatory penalties under laws protecting the privacy of personal information, disrupt operations, and damage the Reorganized Debtors' reputation which could adversely affect their business, financial condition, and results of operations.

In August 2020, the Debtors experienced a network security incident that prevented access to certain information technology systems and data within the Debtors' network. The Debtors are taking immediate steps to isolate the issue and are working to implement a technical recovery plan. The Debtors continue to evaluate the impact of this incident, including assessing the scope of applicable insurance coverage. The Debtors have an insurance policy that they believe provides coverage for the incident and are working with the insurance carrier regarding potential recovery under the policy. The Debtors are not yet able to determine the financial impact of this incident, which may be material. Any impacts from this incident may result in an

adverse effect on the Reorganized Debtors' business, financial condition, and results of operations.

## ARTICLE XIV.
## CERTAIN UNITED STATES FEDERAL INCOME TAX
## CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to us and certain Holders of Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and we do not intend to seek a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the Plan discussed below. Events occurring after the date of this Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Plan. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to us or any holder of a Claim. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or to holders of Claims in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, non-U.S. persons, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities or currencies, including those that market to market, insurance companies, financial institutions, grantor trusts, tax-exempt organizations, small business investment companies, real estate investment trusts, regulated investment companies, persons that have a functional currency other than the U.S. dollar, certain former citizens and long term residents of the United States, and persons that will hold an equity interest or a security in the Debtor as part of a position in a straddle or as part of a hedging, conversion or integrated transaction for U.S. federal income tax purposes). In addition, this summary does not address estate tax, gift tax, Medicare tax on investment income, alternative minimum tax, foreign, state, or local tax consequences of the Plan.

THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.

4812-2168-3656

A.     **U.S. Federal Income Tax Consequences Under the Plan to Holders of Existing Equity Interests of Vista HoldCo**

Vista HoldCo is a limited liability company and is treated as a partnership for federal income tax purposes and therefore is not subject to federal income tax. Instead, Holders of its Interests are required to report their respective shares of Vista HoldCo's income, gain, loss, deduction or credit for any portion of Vista HoldCo's taxable year that such Interest Holder was a partner for federal income tax purposes.

1.     **Cancellation of Indebtedness Income**

Vista HoldCo will incur and intends to report cancellation of debt ("COD") income as of the Effective Date to the extent that any debt of Vista HoldCo is not satisfied, or intended to be satisfied, in full on the Effective Date, unless a specific exception applies. For example, if the cancellation is of a debt that would have otherwise been deductible by Vista HoldCo, no COD income is recognized. A taxpayer is required to report COD income as taxable income in the year in which realized, unless an exception applies. Generally, a taxpayer in bankruptcy is permitted to exclude from taxable income any COD income arising out of the bankruptcy, and a taxpayer that is not in bankruptcy but who or which is insolvent may exclude COD income, but only to the extent of such taxpayer's insolvency. In the case of a partnership, both the bankruptcy and insolvency exception must be determined and applied at the partner level. Thus, even though Vista HoldCo is both insolvent and in bankruptcy, a Holder of an Interest in Vista HoldCo will be permitted to exclude its share of any COD income properly allocated to such holder from Vista HoldCo only to the extent such holder is itself insolvent or only if (a) such holder is itself under the jurisdiction of the Bankruptcy Court in a case under the Bankruptcy Code (i.e., a case under title 11 of the United States Code), and (b) the relevant debt is discharged by the Bankruptcy Court or pursuant to a plan approved by the Bankruptcy Court.

To the extent that a Holder of an Interest in Vista HoldCo is entitled to exclude any COD income properly allocated to it by Vista HoldCo from such Holder's income because of the insolvency or bankruptcy exception, that Holder will be required to reduce the amount of certain of such Holder's tax attributes, including any net operating loss carryforwards and, subject to certain limitations, the tax basis of such Holder's assets held as of the beginning of the Holder's next succeeding taxable year.

2.     **Gain or Loss from the Disposition of Assets**

Certain of the Debtors' Restructuring Transactions will constitute a taxable disposition of its assets, and the Debtors will recognize gain or loss based on the difference between the fair market value and the tax basis of the assets sold, transferred, or disposed, as applicable. The Debtors anticipate that the disposition of their assets will create a loss for federal income tax purposes. Holders of Vista HoldCo's Interests will be required to report their respective shares of this loss for any portion of Vista HoldCo's taxable year that such Interest Holder was a partner for federal income tax purposes. The Debtors believe this loss should offset some of the COD income that will flow through to the Holders of Interests of Vista HoldCo.

### B.    Federal Income Tax Consequences to Holders of Claims

The U.S. federal income tax consequences of the Plan to U.S. holders of Claims (including the character, amount and timing of income, gain or loss recognized) generally will depend upon, among other factors: (i) the manner in which the U.S. holder acquired a Claim; (ii) the length of time a Claim has been held; (iii) whether a Claim was acquired at a discount; (iv) whether the U.S. holder has taken a bad debt deduction in the current or prior years; (v) whether the U.S. holder has previously included accrued but unpaid interest with respect to a Claim; and (vi) the U.S. holder's method of tax accounting.  Therefore, U.S. holders of Claims are urged to consult their tax advisors for information that may be relevant to their specific situation and circumstances and the particular tax consequences to such Holders as a result thereof.

### C.    Other Considerations for U.S. Holders

#### 1.    Accrued Interest

A portion of the consideration received by U.S. Holders of Allowed Claims may be attributable to accrued but untaxed interest on such Claims.  In general, to the extent any amount received (whether Cash, or other property) by a Holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the holder's gross income under the Holder's normal method of accounting). Conversely, a Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each Holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

#### 2.    Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain recognized by a U.S. Holder upon the disposition of a debt instrument of an Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of market discount on the debt constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with market discount if it is acquired other than at original issue and if the U.S. holder's adjusted tax basis in such instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount (equal to the product of 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, and the number of remaining whole years to maturity).

Any gain recognized by a U.S. holder on the disposition of debt instruments that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debt instruments were considered to be held by the U.S. Holder (unless such U.S. Holder elected to include market discount in income as it accrued).  To the extent that debt instruments that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on such debt instruments

(i.e., up to the time of the exchange) but was not recognized by the U.S. holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

### D.    Information Reporting and Back-Up Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Furthermore, all distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the applicable withholding rate.

Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. These categories are very broad; however, there are numerous exceptions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

### E.    Consequences of Ownership and Disposition of the New Equity Interests

Holders of Interests of the Debtors should recognize a loss equal to the amount of their adjusted basis.  Holders of such Interests should consult their tax advisors as to the amount, timing and character of such loss.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM OR INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS OF CLAIMS AND INTERESTS ARE

URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL AND APPLICABLE OTHER TAX CONSEQUENCES OF THE PLAN.

**F.    Consequences of Litigation Trust**

Pursuant to the Plan, certain of the Debtors' assets will be deemed to be transferred to Litigation Trust Beneficiaries. For federal income tax purposes, any such assets deemed transferred to the Litigation Trust will be treated by the Debtors and by the Litigation Trust Beneficiaries as having been distributed to the Litigation Trust Beneficiaries, with such Litigation Trust Beneficiaries then transferring the assets to the Litigation Trust in exchange for beneficial interests in the Litigation Trust. The Debtors will not retain a beneficial interest in the Litigation Trust; instead, the beneficial interest in the Litigation Trust will be held by the Litigation Trust Beneficiaries. It is intended that the Litigation Trust be treated, for U.S. federal income tax purposes, as a liquidating trust and as a grantor trust, with the Litigation Trust Beneficiaries receiving Litigation Trust Interests being treated as the grantors and deemed owners of the Litigation Trust Assets.

## ARTICLE XV.
## CONCLUSION

This Disclosure Statement provides information regarding the Debtors' bankruptcy and the potential benefits that might accrue to holders of Claims against and Interests in the Debtors under the Plan as proposed. The Plan is the result of extensive efforts by the Debtors and their advisors to provide the holders of Allowed Claims with a meaningful recovery. The Debtors believe that the Plan is feasible and will provide each holder of a Claim against the Debtors with an opportunity to receive greater benefits than those that would be received by any other alternative. The Debtors, therefore, urge interested parties to vote in favor of the Plan.

Dated: August 18, 2020

VISTA PROPPANTS & LOGISTICS, LLC
on behalf of itself and all other Debtors

By: */s/ Gary Barton*                              .
Gary Barton
Chief Restructuring Officer
Vista Proppants and Logistics, LLC, *et al*.

**EXHIBIT 1 TO THE DISCLOSURE STATEMENT**

**CHAPTER 11 PLAN**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Vista Proppants and Logistics, LLC, *et al.*,[1] | § | Case No. 20-42002-elm11 |
| | § | |
| Debtors. | § | (Jointly Administered) |

**SECOND AMENDED JOINT PLAN OF REORGANIZATION OF**
**VISTA PROPPANTS AND LOGISTICS, LLC, *ET AL.*,**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Stephen M. Pezanosky
State Bar No. 15881850
Matthew T. Ferris
State Bar No. 24045870
David L. Staab
State Bar No. 24093194
**HAYNES AND BOONE, LLP**
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile: 214.651.5940
Email: stephen.pezanosky@haynesboone.com
Email: matt.ferris@haynesboone.com
Email: david.staab@haynesboone.com

**COUNSEL FOR THE DEBTORS**
**AND DEBTORS-IN-POSSESSION**

Dated: August 18, 2020

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Vista Proppants and Logistics, LLC (7817) ("Vista HoldCo"); VPROP Operating, LLC (0269) ("VPROP"); Lonestar Prospects Management, L.L.C. (8451) ("Lonestar Management"); MAALT Specialized Bulk, LLC (2001) ("Bulk"); Denetz Logistics, LLC (8177) ("Denetz"); Lonestar Prospects, Ltd. (4483) ("Lonestar Ltd."); and MAALT, LP (5198) ("MAALT"). The location of the Debtors' service address is 4413 Carey Street, Fort Worth, TX 76119-4219.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION,  CONSTRUCTION OF TERMS, COMPUTATION OF TIME, AND GOVERNING LAW ............... 1
- A. Defined Terms. ........................................................................................ 1
- B. Rules of Interpretation and Construction of Terms. ........................................ 1
- C. Computation of Time. ............................................................................... 1
- D. Governing Law. ....................................................................................... 2
- E. Reference to Monetary Figures. ................................................................... 2
- F. Reference to the Debtors or the Reorganized Debtors. ...................................... 2

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND DIP FACILITY CLAIMS ..................................................................................................... 2
- A. Administrative Claims ................................................................................ 2
- B. Professional Compensation Claims. .............................................................. 3
- C. Priority Tax Claims. .................................................................................. 4
- D. DIP Facility Claims. .................................................................................. 4

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....... 5
- A. Classification in General. ............................................................................ 5
- B. Grouping of Debtors for Convenience Only. ................................................... 5
- C. Summary of Classification of Claims and Interests. .......................................... 5
- D. Treatment of Claims and Interests. ............................................................... 6
- E. Special Provision Governing Unimpaired Claims. ........................................... 11
- F. Elimination of Vacant Classes. ................................................................... 11
- G. Voting Classes, Presumed Acceptance by Non-Voting Classes. .......................... 11
- H. Intercompany Interests. ............................................................................. 11
- I. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code. .................... 12
- J. Controversy Concerning Impairment. ........................................................... 12
- K. Subordinated Claims. ................................................................................ 12
- L. No Waiver. ............................................................................................. 12

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ................................ 12
- A. Corporate Existence. ................................................................................. 12
- B. Reorganized Debtors. ................................................................................ 13
- C. Restructuring Transactions. ........................................................................ 13
- D. Sources of Plan Distributions. ..................................................................... 13
- E. Vesting of Assets in the Reorganized Debtors. ................................................ 15
- F. Cancellation of Existing Equity and Agreements. ............................................ 15
- G. Corporate Action. .................................................................................... 15
- H. Updated Governance Documents. ................................................................ 16
- I. Governance and Board of the Reorganized Debtors. ......................................... 16
- J. Effectuating Documents; Further Transactions. ............................................... 17
- K. Section 1146 Exemption. ........................................................................... 17
- L. Director and Officer Liability Insurance. ....................................................... 18
- M. Management Incentive Plan. ....................................................................... 18
- N. Employee and Retiree Benefits. ................................................................... 18

i

O.   Retained Causes of Action. ........................................................................... 18
P.   Litigation Trust ............................................................................................. 19

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
         ..................................................................................................... 21
A.   Assumption and Rejection of Executory Contracts and Unexpired Leases. .. 21
B.   Indemnification Obligations. ......................................................................... 21
C.   Claims Based on Rejection of Executory Contracts or Unexpired Leases. .... 22
D.   Cure of Defaults for Executory Contracts and Unexpired Leases Assumed. . 22
E.   Preexisting Obligations to the Debtors under Executory Contracts and
     Unexpired Leases. ......................................................................................... 23
F.   Insurance Policies. ........................................................................................ 23
G.   Modifications, Amendments, Supplements, Restatements, or Other
     Agreements. .................................................................................................. 23
H.   Reservation of Rights. ................................................................................... 23
I.   Nonoccurrence of Effective Date. ................................................................. 24
J.   Contracts and Leases Entered Into After the Petition Date. ........................... 24

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................... 24
A.   Timing and Calculation of Amounts to Be Distributed. ................................. 24
B.   Disbursing Agent. ......................................................................................... 25
C.   Rights and Powers of Disbursing Agent. ....................................................... 25
D.   Delivery of Distributions and Undeliverable or Unclaimed Distributions. .... 25
E.   Manner of Payment. ...................................................................................... 26
F.   Distributions to Holders of General Unsecured Claims. ................................ 27
G.   Section 1145 Exemption ............................................................................... 27
H.   Compliance with Tax Requirements. ............................................................. 27
I.   Allocations. ................................................................................................... 28
J.   No Postpetition Interest on Claims. ............................................................... 28
K.   Foreign Currency Exchange Rate. ................................................................. 28
L.   Setoffs and Recoupment. ............................................................................... 28
M.   Claims Paid or Payable by Third Parties. ...................................................... 28

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
         DISPUTED CLAIMS .............................................................................. 29
A.   Claims Administration Responsibilities. ........................................................ 29
B.   Estimation of Claims and Interests. ............................................................... 30
C.   Adjustment to Claims or Interests without Objection. .................................... 30
D.   Time to File Objections to Claims. ................................................................ 30
E.   Disallowance of Claims or Interests. ............................................................. 30
F.   Amendments to Claims or Interests. .............................................................. 31
G.   No Distributions Pending Allowance. ............................................................ 31
H.   Distributions After Allowance. ...................................................................... 31

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS
         ..................................................................................................... 32
A.   Release of Debtors. ....................................................................................... 32

ii

B. Release of Liens. ................................................................................. 32
C. Releases by the Debtors. ..................................................................... 33
D. Releases by Holders of Claims and Interests. ..................................... 34
E. Exculpation. ......................................................................................... 34
F. Injunction. ............................................................................................ 35
G. Protections Against Discriminatory Treatment. ................................... 35
H. Reimbursement or Contribution. ......................................................... 35

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION  AND CONSUMMATION
OF THE PLAN .................................................................................. 36
A. Conditions Precedent to Confirmation. ................................................ 36
B. Conditions Precedent to Effectiveness. ................................................ 36
C. Waiver of Conditions. .......................................................................... 37
D. Effect of Failure of Conditions. ........................................................... 37

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....... 37
A. Modification and Amendments. ............................................................ 37
B. Effect of Confirmation on Modifications. ............................................ 38
C. Revocation or Withdrawal of Plan. ...................................................... 38

ARTICLE XI. RETENTION OF JURISDICTION .................................................................. 38

ARTICLE XII. MISCELLANEOUS PROVISIONS .............................................................. 40
A. Immediate Binding Effect. .................................................................... 40
B. Additional Documents. ......................................................................... 40
C. Payment of Statutory Fees. .................................................................. 41
D. Statutory Committee and Cessation of Fee and Expense Payment. .............. 41
E. Reservation of Rights. ........................................................................... 41
F. Successors and Assigns. ........................................................................ 41
G. Notices. ................................................................................................. 41
H. Term of Injunctions or Stays. ............................................................... 43
I. Entire Agreement. ................................................................................. 43
J. Exhibits. ................................................................................................ 43
K. Nonseverability of Plan Provisions. ..................................................... 43
L. Votes Solicited in Good Faith. .............................................................. 43
M. Closing of Chapter 11 Cases. ............................................................... 44
N. Waiver or Estoppel. .............................................................................. 44
O. Controlling Document. .......................................................................... 44

# INTRODUCTION

The Debtors hereby propose this Plan under section 1121 of the Bankruptcy Code for the resolution of the outstanding Claims against and Interests in the Debtors. Holders of Claims or Interests may refer to the Disclosure Statement, filed contemporaneously with the Plan, for a summary and description of the Plan and certain related matters.

ALL HOLDERS OF CLAIMS OR INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## CONSTRUCTION OF TERMS, COMPUTATION OF TIME, AND GOVERNING LAW

A.     *Defined Terms.*

All capitalized terms used herein and not defined elsewhere in the Plan shall have the meanings assigned to them in the Glossary of Defined Terms attached to the Plan as **Exhibit A**. Any capitalized term used herein and not otherwise defined in the Plan, but that is defined in the Bankruptcy Code, has the meaning assigned to that term in the Bankruptcy Code.  Any capitalized term used herein and not otherwise defined in the Plan or in the Bankruptcy Code, but that is defined in the Bankruptcy Rules, has the meaning assigned to that term in the Bankruptcy Rules.

B.     *Rules of Interpretation and Construction of Terms.*

For purposes of the Plan: (1) any reference in the Plan to an existing document or exhibit Filed or to be Filed means that document or exhibit as it may have been or may be amended, supplemented, or otherwise modified; (2) unless otherwise specified, all references in the Plan to sections, articles, and exhibits are references to sections, articles, or exhibits of the Plan; (3) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety and not to any particular portion of the Plan; (4) captions and headings contained in the Plan are inserted for convenience and reference only, and are not intended to be part of or to affect the interpretation of the Plan; (5) wherever appropriate from the context, each term stated in either the singular or the plural includes the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (6) unless otherwise specified, all references in the Plan to exhibits are references to the exhibits in the Plan Supplement; (7) any reference to an Entity as a Holder of a Claim or Interest includes the Entity's successors and assigns; (8) any reference to docket numbers of documents Filed in the Chapter 11 Cases are references to docket numbers under the Bankruptcy Court's CM/ECF system; and (9) the rules of construction outlined in section 102 of the Bankruptcy Code and in the Bankruptcy Rules apply to the Plan.

C.     *Computation of Time.*

Unless otherwise specifically provided herein, in computing any period, date, or deadline prescribed or allowed in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  If the

1

date on which a transaction may or must occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.   *Governing Law.*

Subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules.

E.   *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.   *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

# ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND DIP FACILITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Compensation Claims, Priority Tax Claims, and DIP Facility Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.   *Administrative Claims*

Except to the extent that a holder of an Allowed Administrative Claim and the Debtor or the Reorganized Debtor, as applicable, against which such Allowed Administrative Claim is asserted, in each case with the prior written consent of the Term Loan Agent, agree to less favorable treatment for such holder, each holder of an Allowed Administrative Claim (other than holders of Professional Compensation Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (i) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); or (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than ten (10) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and

2

conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (iv) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; and (v) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except for Professional Compensation Claims and DIP Facility Claims, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors no later than the Administrative Claim Bar Date. Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (i) 30 days after the Effective Date and (ii) 30 days after the Filing of the applicable request for payment of the Administrative Claims, if applicable. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for such payment of such Administrative Claims that do not File and serve such a request by the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any action by the Bankruptcy Court.

B. *Professional Compensation Claims.*

1. Final Fee Applications and Payment of Professional Compensation Claims.

All requests for payment of Professional Compensation Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than the Professional Compensation Claim Bar Date; provided, however, that Ordinary Course Professionals shall be compensated in accordance with the terms of the Ordinary Course Professionals Order. Objections to Professional Compensation Claims must be Filed and served on the Reorganized Debtors and the Professional to whose application the objections are addressed no later than the Professional Compensation Claim Objection Deadline. The Bankruptcy Court shall determine the Allowed amounts of such Professional Compensation Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Compensation Claims in Cash in the amount the Bankruptcy Court allows by Final Order, including from the Professional Compensation Claim Reserve, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Compensation Claim Amount on the Effective Date.

2. Professional Compensation Claim Reserve.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Compensation Claim Reserve with Cash equal to the Professional Compensation Claim Amount. The Professional Compensation Claim Reserve shall be maintained in trust solely for the

3

Professionals. No liens, claims, or Interests shall encumber the Professional Compensation Claim Reserve in any way. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors; *provided* that obligations with respect to Professional Compensation Claims shall not be limited nor deemed limited to the balance of funds held in the Professional Compensation Claim Reserve. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Compensation Claim Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court and shall be subject to the Liens securing the Exit Facility, without any further action by the lenders thereunder or order of the Bankruptcy Court.

   3.  <u>Professional Compensation Claim Amount</u>.

   Professionals shall reasonably estimate their unpaid Professional Compensation Claims and other unpaid fees and expenses incurred prior to and as of the Effective Date, and shall deliver such estimate to the Debtors no later than fifteen (15) days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Compensation Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

   4.  <u>Post-Confirmation Fees and Expenses</u>.

   Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.  *Priority Tax Claims.*

   Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor or the Reorganized Debtor, as applicable, against which such Allowed Priority Tax Claim is asserted, in each case with the prior written consent of the Term Loan Agent, agree to less favorable treatment for such holder, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

D.  *DIP Facility Claims.*

   As of the Effective Date, the DIP Facility Claims shall be Allowed in an amount equal to the total amount outstanding under the DIP Facility on the Effective Date, including principal, interest, fees, and expenses. Except to the extent that a holder of an Allowed DIP Facility Claim

agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP Facility Claim, each such holder thereof shall receive its Pro Rata share of (i) Cash equal to all outstanding interest, fees, and expenses due under the DIP Facility and (ii) in lieu of repayment in Cash in full of the principal amount outstanding under the DIP Facility, the Tranche B Exit Facility Notes in an amount equal to twice the outstanding amount of principal due under the DIP Facility on the Effective Date; and all commitments under the DIP Facility shall terminate.

# ARTICLE III.
# CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification in General.*

The Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

B.      *Grouping of Debtors for Convenience Only.*

The Plan groups the Debtors together solely for the purpose of describing treatment of Claims and Interests under the Plan and confirmation of the Plan. Although the Plan applies to all of the Debtors, the Plan constitutes seven (7) distinct Plans, one for each Debtor, and for voting and distribution purposes, each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable.  To the extent there are no Allowed Claims or Interest in a Class with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.  Except as otherwise provided in the Plan, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim.  The grouping of the Debtors in this manner shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal Entities, or cause the transfer of any Assets, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities.

C.      *Summary of Classification of Claims and Interests.*

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Term Loan Secured Claims | Impaired | Entitled to Vote |
| Class 4 | PlainsCapital ABL Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | MAALT Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 7 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 8 | Interests in Debtors other than Vista HoldCo | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 9 | Interests in Vista HoldCo | Impaired | Not Entitled to Vote (Deemed to Reject) |

D.     *Treatment of Claims and Interests.*

1.     <u>Class 1 – Other Secured Claims</u>

(a)     *Classification*: Class 1 consists of any Allowed Other Secured Claims against any Debtor.

(b)     *Treatment*:  On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Other Secured Claim, each holder of an Allowed Other Secured Claim Shall receive, at the option of the applicable Debtor, with the prior written consent of the Required Consenting Lenders, the following:

(i)     Payment in full in Cash of its Allowed Class 1 Claim;

(ii)     The collateral securing its Allowed Class 1 Claim;

(iii)     Reinstatement of its Allowed Class 1 Claim; or

(iv)     Such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

4832-8436-3464

(c)    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 - Other Priority Claims</u>

(a)    *Classification*: Class 2 consists of any Allowed Other Priority Claims against any Debtor.

(b)    *Treatment*: Each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to the full amount of such Allowed Class 2 Claim on the later of (i) the Effective Date, or (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction, contract, or other agreement giving rise to such Allowed Class 2 Claim.

(c)    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Claims in Class 2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – Term Loan Secured Claims</u>

(a)    *Classification*: Class 3 consists of all Allowed Term Loan Secured Claims against any Debtor.

(b)    *Allowance*: On the Effective Date, the Term Loan Secured Claims shall be Allowed in the amount of $369,300,998.02 *minus* the amount of the Term Loan Deficiency Claim *plus* (i) accrued but unpaid interest, including default interest, under the Term Loan Documents as of the Petition Date, and (ii) unpaid reasonable and documented fees, expenses, costs, and other charges incurred or accrued by the Term Loan Agent in connection with any and all aspects of the Chapter 11 Cases as of the Effective Date, subject to the provisions of the DIP Financing Order and this Plan.

(c)    *Treatment*: On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Term Loan Secured Claim, each holder of an Allowed Term Loan Secured Claim shall receive the following:

(i)    Its Pro Rata share of 100% of the New Parent Units in the New Parent Company, which New Parent Company shall receive 100% of the equity interests of VPROP (which shall continue to hold the equity interests of its direct and indirect subsidiaries);

(ii)    Its Pro Rata share of Tranche C Exit Facility Notes equal to $50,000,000; and

(iii)    The right to participate in Tranche A of the Exit Facility up to its Pro Rata share of $30,000,000 of new money in exchange for an equal amount of Tranche A Exit Facility Notes.

7

(d) *Voting*: Class 3 is Impaired under the Plan. Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. Class 4 – PlainsCapital ABL Secured Claims

(a) *Classification*: Class 4 consists of all Allowed PlainsCapital ABL Secured Claims against any Debtor.

(b) *Allowance*: On the Effective Date, the PlainsCapital ABL Secured Claims shall be Allowed in the aggregate amount equal to the value of ABL Priority Collateral securing such PlainsCapital ABL Secured Claims.

(c) *Treatment*: On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed PlainsCapital ABL Secured Claim, each holder of an Allowed PlainsCapital ABL Secured Claim shall receive the ABL Priority Collateral securing such Allowed PlainsCapital ABL Secured Claims.

(d) *Voting*: Class 4 is Unimpaired under the Plan. Holders of Allowed Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

5. Class 5 – MAALT Secured Claims

(a) *Classification*: Class 5 consists of all Allowed MAALT Secured Claims against any Debtor.

(b) *Allowance*: On the Effective Date, the MAALT Secured Claims shall be Allowed in the aggregate amount equal to the value of the collateral securing such MAALT Secured Claims.

(c) *Treatment*: On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each MAALT Secured Claim, each holder of an Allowed MAALT Secured Claim shall receive, at the option of applicable Debtor, with the prior written consent of the Required Consenting Lenders, the following:

(i) The collateral securing its Allowed MAALT Secured Claim;

(ii) Reinstatement of its Allowed MAALT Secured Claim; or

(iii) Such other treatment rendering its Allowed MAALT Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

4832-8436-3464

(d) *Voting*: Class 5 is Unimpaired under the Plan. Holders of Allowed Claims in Class 5 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

6. Class 6 - General Unsecured Claims

(a) *Classification*: Class 6 consists of all Allowed General Unsecured Claims, including the Allowed Term Loan Deficiency Claims (if any) against any Debtor.

(b) *Treatment*:

(i) **IF AND ONLY IF CLASS 6 VOTES TO <u>ACCEPT</u> THIS PLAN, THE FOLLOWING TREATMENT:**

On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Litigation Trust Interests, and the Litigation Trust shall be funded by a GUC Cash Pool in the amount of $500,000. The GUC Cash Pool shall be utilized or distributed at the discretion of the Litigation Trustee, subject to the terms of the Litigation Trust.

Further, if the holders of Class 6 Claims vote to accept this Plan, solely for purposes of calculating distributions from the Litigation Trust, the holders of Allowed Term Loan Deficiency Claims shall limit their distributions from the Litigation Trust to the amount they would receive if their Allowed Term Loan Deficiency Claims were equal to the total value of all other Allowed General Unsecured Claims; <u>provided</u>, <u>however</u>, that such limitation shall no longer apply after all Allowed General Unsecured Claims, other than Allowed Term Loan Deficiency Claims, have been paid in full, after which time payments shall continue to be made on account of the Allowed Term Loan Deficiency Claims until such Claims have also been paid in full.

As set forth in Article VIII.C of the Plan, in the event that Class 6 accepts the Plan or the Standing Motion is denied, then the Standing Motion Claims against the Term Loan Secured Parties shall be released by the Debtors, the Reorganized Debtors, and their Estates.

(ii) **IF AND ONLY IF CLASS 6 VOTES TO <u>REJECT</u> THIS PLAN, THE FOLLOWING TREATMENT:**

On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim (including Allowed Term Loan Deficiency Claims), each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of

the Litigation Trust Interests, and the Litigation Trust shall receive no funding for the GUC Cash Pool. The holders of Allowed Term Loan Deficiency Claims shall not be required to waive any portion of their Allowed Term Loan Deficiency Claims if the holders of Class 6 Claims vote to reject the Plan.

As set forth in Article VIII.C of the Plan, in the event that Class 6 rejects the Plan and the Standing Motion is granted, then the Standing Motion Claims against the Term Loan Secured Parties shall be included in the Litigation Trust Causes of Action and shall not be released by the Debtors, the Reorganized Debtors, and their Estates.

(c) *Voting*: Class 6 is Impaired under the Plan. Holders of Allowed General Unsecured Claims in Class 6, including holders of Allowed Term Loan Deficiency Claims, are entitled to vote to accept or reject the Plan.

7. <u>Class 7 - Intercompany Claims</u>

(a) *Classification*: Class 7 consists of all Intercompany Claims.

(b) *Treatment*: On the Effective Date, Class 7 Claims shall be, at the option of the Debtors, with the consent of the Required Consenting Lenders, either (i) Reinstated, or (ii) cancelled, released, and extinguished without any distribution.

(c) *Voting*: Class 7 is Unimpaired to the extent the Class 7 Claims are Reinstated and Impaired to the extent the Class 7 Claims are cancelled. Holders of Allowed Claims in Class 7 are conclusively deemed to have accepted or rejected the Plan pursuant to sections 1126(f) or 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

8. <u>Class 8 – Interests in Debtors Other than Vista HoldCo</u>

(a) Classification: Class 8 consists of all Interests in Debtors other than Vista HoldCo.

(b) Treatment: On the Effective Date, all existing Interests in each of the Debtors, other than Interests in Vista HoldCo, shall be, at the option of the applicable Debtor, with the consent of the Required Consenting Lenders, either (i) Reinstated, or (ii) cancelled, released, and extinguished without any distribution, and will be of no further force or effect.

(c) Voting: Class 8 is Unimpaired to the extent the Class 8 Interests are Reinstated and Impaired to the extent the Class 8 Interests are cancelled. Holders of Allowed Interests in Class 8 are conclusively deemed to have accepted or rejected the Plan pursuant to sections 1126(f) or 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

9.      Class 9 – Interests in Vista HoldCo

        (a)     *Classification*:  Class 9 consists of all Interests in Vista HoldCo, which consists of all Existing Equity.

        (b)     *Treatment*: All Interests in Vista HoldCo shall be canceled, released, and extinguished as of the Effective Date and will be of no further force or effect. Holders of an Interest in Vista HoldCo will not receive any distribution on account of such Interest.

        (c)     *Voting*: Class 9 is Impaired under the Plan. Holders of Class 9 Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Class 9 Interests are not entitled to vote to accept or reject the Plan.

E.      *Special Provision Governing Unimpaired Claims.*

        Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

F.      *Elimination of Vacant Classes.*

        Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

G.      *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

        Only holders of Allowed Claims in Class 3 and Class 6 are entitled to vote to accept or reject the Plan. Holders of Claims in Class 3 and Class 6 will receive Ballots containing detailed voting instructions.

        If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

H.      *Intercompany Interests.*

        To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the holders of New Equity Interests, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.

I.      *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.*

If any Class of Claims entitled to vote on the Plan does not vote to accept the Plan, the Debtors may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with Article X of the Plan and the Bankruptcy Code.

J.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

K.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

L.      *No Waiver.*

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Claim or Interest.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Corporate Existence.*

Except as otherwise provided in the Plan, the Updated Governance Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

B.     *Reorganized Debtors.*

On the Effective Date, the New Parent Board shall be established, and the Reorganized Debtors shall adopt their Updated Governance Documents. The Reorganized Debtors shall have the authority to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

C.     *Restructuring Transactions.*

On the Effective Date, the Term Loan Lenders will contribute (the "Contribution"), Pro Rata, all of their rights, title and interests as lenders in and to VPROP under the Term Loan Agreement (the "Specified Pre-Petition Debt") as described in Article III.D.3 herein.  Following the Issuance (as defined below), Vista HoldCo shall transfer 100% of the equity interests of (representing all of its ownership interests in) VPROP to the New Parent Company (the "VPROP Equity Transfer") and the Specified Pre-Petition Debt shall be extinguished. Following the VPROP Equity Transfer, the holders of Existing Equity of Vista HoldCo will dissolve Vista HoldCo.

Further, on the Effective Date, the applicable Debtors or Reorganized Debtors shall enter into any other transaction and shall take any other actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan. The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

D.     *Sources of Plan Distributions.*

Distributions under the Plan shall be funded with: (1) Cash on hand; (2) the ABL Priority Collateral; (3) the MAALT Priority Collateral; (4) the issuance and distribution of the New Equity Interests; (5) the Exit Facility; (6) the GUC Cash Pool (if any); and (7) interests in the Litigation Trust, as applicable.

1.      <u>Issuance of Equity Interests.</u>

On the Effective Date, the New Parent Company will issue the New Equity Interests, Pro Rata, to the holders of the Allowed Term Loan Secured Claims (the "<u>Issuance</u>"). New Parent Company will take all necessary corporate action to effect the Issuance. The Issuance is authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests. On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents necessary to effect the Issuance. All of the shares, units or equity interests (as the case may be based on how the New Equity Interests are denominated) of the New Equity Interests issued shall be duly authorized, validly issued, fully paid, and non-assessable.

2.      <u>Exit Facility.</u>

On the Effective Date, the Reorganized Debtors shall be authorized to enter into the Exit Facility and execute the Exit Facility Documents substantially in the form contained or described in the Plan Supplement, and any related agreements or filing without the need for any further corporate or organizational action and without further action by or approval of the Bankruptcy Court. The terms of the Tranche A Exit Facility Notes, Tranche B Exit Facility Notes, and Tranche C Exit Facility Notes shall include (i) interest of LIBOR + 9.50% paid in kind for the first year, (ii) original issue discount of 3.00%, (iii) 4 year term, and (iv) no amortization. Additionally, the Exit Facility Documents shall provide that Tranche A Facility Notes shall have priority over the Tranche B Facility Notes, which shall have priority over the Tranche C Facility Notes.

Confirmation shall be deemed approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Bankruptcy Court previously, and the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility, including any and all documents required to enter into the Exit Facility, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtors, in consultation with the Exit Agent, may deem to be necessary to consummate entry into the Exit Facility.

On the Effective Date, (a) upon the granting of Liens in accordance with the Exit Facility, the Exit Agent shall have valid, binding and enforceable Liens on the collateral specified in the Exit Facility Documents, which Liens shall be deemed perfected as of the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facility Documents; and (b) upon the granting of guarantees, mortgages, pledges, Liens and other security interests in accordance with the Exit Facility Documents, the guarantees, mortgages, pledges, Liens and other security interests granted to secure the obligations arising under the Exit Facility shall be granted in good faith and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents.

E.    *Vesting of Assets in the Reorganized Debtors.*

Except with respect to the Litigation Trust Assets and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan (including the Exit Facility Documents) or the Plan Supplement, on the Effective Date, all property in each Estate, all Retained Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Retained Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Failure to include a Cause of Action on the Schedule of Retained Causes of Action shall not constitute a waiver or release of such Cause of Action. A Schedule of Retained Causes of Action shall be included in the Plan Supplement.

F.    *Cancellation of Existing Equity and Agreements.*

On the Effective Date, except to the extent otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such cancelled instruments and other documentation will have no rights arising from or relating to such instruments and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.

Notwithstanding the foregoing, the DIP Facility and Term Loan Facility shall continue in effect to the extent necessary to (i) allow the DIP Agent and the Term Loan Agent, as applicable in accordance with Article II and Article III of the Plan, to make distributions to the holders of DIP Facility Claims and Term Loan Secured Claims; (ii) allow the DIP Agent and the Term Loan Agent to maintain any right of indemnification, exculpation, contribution, subrogation or any other claim or entitlement it may have under the DIP Loan Documents or the Term Loan Documents, or both; (iii) permit the DIP Agent and the Term Loan Agent to appear before the Bankruptcy Court or any other court of competent jurisdiction after the Effective Date; (iv) permit the DIP Agent and the Term Loan Agent to perform any functions that are necessary to effectuate the foregoing; and (v) to exercise rights and obligations relating to the interests of the DIP Secured Parties or Term Loan Secured Parties, or both.

G.    *Corporate Action.*

On the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) selection of the directors and officers for the Reorganized Debtors as named in the Plan or the Plan Supplement; (2) the distribution of the equity interest of Reorganized VPROP; (3) implementation of the Restructuring Transactions;

(4) entry into the Exit Facility Documents; (5) adoption of the Updated Governance Documents; (6) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (7) funding of the GUC Cash Pool; (8) the establishment of the Litigation Trust; and (9) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).

All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. As applicable, on or prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, shall be authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Equity Interests, the Updated Governance Documents, the Exit Facility Documents, interests in the Litigation Trust, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

H.    *Updated Governance Documents.*

On or immediately prior to the Effective Date, the Updated Governance Documents shall be adopted as may be necessary to effectuate the transactions contemplated by the Plan. Each of the Reorganized Debtors will file its Updated Governance Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. The Updated Governance Documents will prohibit the issuance of non-voting equity securities, to the extent required under Bankruptcy Code section 1123(a)(6). After the Effective Date, the Reorganized Debtors may amend and restate their respective Updated Governance Documents and other constituent documents as permitted by the terms thereof and applicable law. The Updated Governance Documents shall be in form and substance reasonably satisfactory to the Required Consenting Lenders. Among other things, the Updated Governance Documents shall reflect a form of the New Parent Company that provides for a tax efficient treatment satisfactory to the Required Consenting Lenders, in consultation with the Debtors.

Further, the applicable Updated Governance Documents will contain the maximum waiver of fiduciary duties (including waiver of corporate opportunities and any similar doctrines for other investment opportunities) permitted by law. The Updated Governance Documents shall be included in the Plan Supplement.

I.    *Governance and Board of the Reorganized Debtors.*

Control of the New Parent Company will be vested in the New Parent Board, who will manage and govern the affairs of the New Parent Company. As of the Effective Date, the terms of the current members of the board of directors of the Debtors shall expire, and the initial boards

16

of directors, including the New Parent Board, and the officers of each of the Reorganized Debtors shall be appointed in accordance with the respective governance documents for the New Parent Company and the Updated Governance Documents, as applicable. The New Parent Board will be comprised of seven (7) directors, with such directors initially being as follows upon the Effective Date: (a) four (4) directors designated and appointed by the Term Loan Agent; (b) one (1) director designated and appointed by AG Energy Funding, LLC; (c) one (1) director designated and appointed by MSD Credit Opportunity Fund, L.P.; and (d) one (1) independent director. Each director will have one vote; *provided*, that any director appointed by the Term Loan Agent will have the right to vote on behalf of any other director appointed by the Term Loan Agent when and to the extent any such other director appointed by the Term Loan Agent is not present.

In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the New Parent Board and any Person proposed to serve as an officer of the Reorganized Debtors shall be disclosed at or before the Confirmation Hearing, in each case to the extent the identity of such proposed director or officer is known at such time. To the extent any such director or officer of the Reorganized Debtors is an Insider, the Debtors also will disclose the nature of any compensation to be paid to such director or officer. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the Updated Governance Documents and other constituent documents of the Reorganized Debtors.

J. *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and the officers and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

K. *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity interest, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Exit Facility; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other

17

similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

L.      *Director and Officer Liability Insurance.*

On or before the Effective Date, the Debtors shall obtain director and officer liability insurance coverage following the Effective Date on terms no less favorable to the insureds than the Debtors' existing director and officer coverage and with an aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director and officer coverage.

M.      *Management Incentive Plan.*

After the Effective Date, the New Parent Company will negotiate in good faith to implement a Management Incentive Plan; *provided* that such Management Incentive Plan shall be subject to the approval of the New Parent Board.

N.      *Employee and Retiree Benefits*

Unless otherwise provided in the Plan and subject to approval by the New Parent Board, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

O.      *Retained Causes of Action.*

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, and excluding the Litigation Trust Causes of Action, in accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and shall have the exclusive right, authority, and discretion to (without further order of the Bankruptcy Court) determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw, or litigate to judgment any and all Retained Causes of Action that the Debtors or the Estates may hold against any Entity, whether arising before or after the Petition Date.  The Debtors reserve and shall retain the foregoing Retained Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases.

4832-8436-3464

Unless a Retained Cause of Action is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order of the Bankruptcy Court, the Debtors expressly reserve such Retained Cause of Action (including any counterclaims) for later adjudication by the Reorganized Debtors. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral, estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Causes of Action (including counterclaims) on or after the Confirmation of the Plan.

P.    *Litigation Trust*

The Litigation Trust will be governed by the Litigation Trust Agreement, which will be filed as part of the Plan Supplement. On the Effective Date, the Reorganized Debtors, on their own behalf and on behalf of the Litigation Trust Beneficiaries, shall execute the Litigation Trust Agreement and shall take all other steps necessary to establish the Litigation Trust in accordance with and pursuant to the terms of the Litigation Trust Agreement.

The Litigation Trust shall be established as a liquidating grantor trust for the purpose of liquidating and distributing the Litigation Trust Assets to the Litigation Trust Beneficiaries in accordance with this Plan and Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. All parties and Litigation Trust Beneficiaries shall treat the transfers in trust described herein as transfers to the Litigation Trust Beneficiaries for all purposes of the Internal Revenue Code of 1986, as amended (including, sections 61(a)(12), 483, 1001, 1012, and 1274). All the parties and Litigation Trust Beneficiaries shall treat the transfers in trust as if all the transferred assets, including all the Litigation Trust Assets, had been first transferred to the Litigation Trust Beneficiaries and then transferred by the Litigation Trust Beneficiaries. The Litigation Trust Beneficiaries shall be treated for all purposes of the Internal Revenue Code of 1986, as amended, as the grantors of the Litigation Trust and the owners of the Litigation Trust. The Litigation Trustee shall file returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) or (b). All parties, including the Litigation Trust Beneficiaries and the Litigation Trustee shall value the Litigation Trust Assets consistently and such valuations shall be used for all federal income tax purposes.

The Reorganized Debtors shall transfer the Litigation Trust Assets to the Litigation Trust. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax. Upon delivery of the Litigation Trust Assets to the Litigation Trust, the Reorganized Debtors shall be released from all liability with respect to the delivery of such distributions.

The Litigation Trust Agreement shall provide for the appointment of the Litigation Trustee. The Litigation Trustee shall be selected by the Required Consenting Lenders, and the Debtors will disclose the identity of the initial Litigation Trustee in the Plan Supplement. The retention of the Litigation Trustee shall be approved in the Confirmation Order.

The Litigation Trustee shall have the power to administer the assets of the Litigation Trust in accordance with the Litigation Trust Agreement. The Litigation Trustee shall be the estate representative designated to prosecute any and all Litigation Trust Causes of Action. Without limiting the generality of the foregoing, the Litigation Trustee shall (a) hold, administer

19

and prosecute the assets of the Litigation Trust and any proceeds thereof; (b) have the power and authority to retain, as an expense of the Litigation Trust, attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Litigation Trustee under the Litigation Trust Agreement; (c) make distributions as provided in the Litigation Trust Agreement; and (d) provide periodic reports and updates regarding the status of the administration of the Litigation Trust. The Litigation Trustee shall be deemed a Disbursing Agent under the Plan when making distributions to holders of Litigation Trust Interests pursuant to the Litigation Trust Agreement.

As soon as reasonably practicable after the Effective Date, the Reorganized Debtors will transfer the GUC Cash Pool, if any, to the Litigation Trust to fund its operations under the Plan and the Litigation Trust Agreement. Under no circumstances shall the Debtors or the Reorganized Debtors be required to contribute any of their respective assets to the Litigation Trust other than the GUC Cash Pool and the Litigation Trust Assets.

The Debtors or Reorganized Debtors, as applicable, shall provide the Litigation Trust with reasonable access to the books and records of the Debtors or Reorganized Debtors concerning the Litigation Trust Causes of Action. In connection with the transfer of the Litigation Trust Causes of Action, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) to the extent related to the Litigation Trust Causes of Action shall be shared by the Litigation Trust and the Reorganized Debtors and shall vest in the Litigation Trustee and attorneys, agents, and representatives to the extent necessary to effect such shared privilege. The Debtors or the Reorganized Debtors, as the case may be, and the Litigation Trustee are authorized to take all necessary actions to effectuate the sharing and vesting of such privileges. The Confirmation Order shall provide that the Litigation Trustee's receipt of the shared privileges shall be without waiver of any such privileges, in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors' Estates. The Litigation Trustee shall not waive any privilege with respect to any documents or communication covered under this Section without the prior written consent of the Reorganized Debtors.

The transfer of the GUC Cash Pool and the Litigation Trust Assets to the Litigation Trust shall be made, as provided herein, for the benefit of the Litigation Trust Beneficiaries. Upon the transfer of the GUC Cash Pool and the Litigation Trust Assets, the Debtors or the Reorganized Debtors, as the case may be, shall have no interest in or with respect to the GUC Cash Pool, the Litigation Trust Assets or the Litigation Trust. To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Litigation Trust Assets shall be deemed to have been retained by the Reorganized Debtors and the Litigation Trustee shall be deemed to have been designated as a representative of the Reorganized Debtors pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of the Reorganized Debtors. Notwithstanding the foregoing, all net proceeds of such Litigation Trust Assets shall be transferred to the Litigation Trust to be distributed to the Litigation Trust Beneficiaries consistent with the terms of the Plan and the Litigation Trust Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court, will be deemed rejected by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) previously were assumed or rejected by the Debtors; (2) previously expired or terminated pursuant to their own terms; (3) are specifically designated on the Schedule of Assumed Contracts and Leases; (4) are subject to a motion to assume Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (5) are subject to a motion to assume an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such assumption is after the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections, as applicable, of the Executory Contracts and Unexpired Leases set forth in the Plan and the Schedule of Assumed Contracts and Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Lenders, reserve the right to alter, amend, modify, or supplement the Schedules identified in Article V of the Plan and in the Plan Supplement at any time through and including 45 days after the Effective Date. Any Executory Contracts or Unexpired Leases removed from the Schedule of Assumed Contracts and Leases after the Effective Date shall be deemed rejected as of the date the Reorganized Debtors file a notice reflecting the same.

B.    *Indemnification Obligations.*

All indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable as of the Petition Date, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date. Any indemnification obligations

21

to Former Directors and Officers of the Debtors shall be terminated on the Effective Date and be of no further force and effect.

C.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, (3) the Effective Date, or (4) the date after the Effective Date that the applicable Schedules are altered, amended, modified, or supplemented, but only with respect to any Executory Contract or Unexpired Lease thereby affected. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.D.6 of the Plan.

D.    *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. Pursuant to the Approval Order, the Debtors shall provide for notices of proposed assumption and proposed cure amounts and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has

been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

E.    *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

F.    *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

G.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.    *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Contracts and Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty

23

(30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under the Plan.

I.    *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

J.    *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interests (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.     *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.     *Rights and Powers of Disbursing Agent.*

    1.     Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated in the Plan; and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

    2.     Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

    1.     Record Date for Distribution.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests shall be closed, and the Debtors shall not be required to make any further changes in the record holders of any of the Claims or Interests. The Debtors or the Disbursing Agent shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date. The Debtors and the Disbursing Agent shall be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

    2.     Delivery of Distributions in General.

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided, however*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further, however*, that the address for each

holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that holder.

      3.     <u>Minimum Distributions</u>.

No fractional shares of New Equity Interests shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Equity Interests that is not a whole number, the actual distribution of shares of New Equity Interests shall be rounded down to the nearest whole share. The total number of authorized shares of New Equity Interests to be distributed to holders of Allowed Claims and Allowed Interests (as applicable) shall be adjusted as necessary to account for the foregoing rounding. To the extent Cash is distributed under the Plan, no Cash payment of less than $50.00 shall be made to a holder of an Allowed Claim on account of such Allowed Claim, and such amounts shall be retained by Reorganized Debtors.

      4.     <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

E.    *Manner of Payment.*

      1.     All distributions of the New Equity Interests to the holders of Allowed Claims under the Plan shall be made by the Disbursing Agent.

      2.     All distributions of the Exit Facility under the Plan shall be made by the Disbursing Agent.

      3.     All distributions of Cash to the holders of Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor.

      4.     At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.      *Distributions to Holders of General Unsecured Claims.*

1.      On or before the date that is 180 days after the Effective Date, the Disbursing Agent shall distribute to each holder of an Allowed General Unsecured Claim its Pro Rata share of the Litigation Trust Interests.

2.      Distributions on account of Disputed General Unsecured Claims shall be held in the Disputed Claims Reserve until such Claims have been either Allowed or Disallowed. To the extent a Disputed General Unsecured Claim becomes Allowed, the distribution reserved for such Claim shall be distributed to the holder thereof. To the extent a Disputed General Unsecured Claim becomes Disallowed, the distribution reserved for such Claim shall be distributed Pro Rata to holders of Allowed General Unsecured Claims.

3.      For purposes of Article VI.F and Article III.D.6, "Pro Rata" means, as to a particular holder of a Claim in Class 6, the ratio that the amount of such Claim held by such Class 6 Claim holder bears to the aggregate amount of all Class 6 General Unsecured Claims (including any Allowed Term Loan Deficiency Claims), and such ratio shall be calculated as if all Disputed Class 6 General Unsecured Claims are Allowed Claims as of the Effective Date.

G.      *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Equity Interests as contemplated by Article III.D of the Plan, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of securities. In addition, under section 1145 of the Bankruptcy Code, such New Equity Interests will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and subject to any restrictions in the Reorganized Debtors' Updated Governance Documents.

H.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors and/or the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Reorganized Debtors, and the Disbursing Agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and the Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

27

I.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

J.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

K.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

L.      *Setoffs and Recoupment.*

Except as expressly provided in the Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided, however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim under the Plan shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder. In no event shall any holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

M.      *Claims Paid or Payable by Third Parties.*

   1.      <u>Claims Paid by Third Parties</u>.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the

holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### ARTICLE VII.
### PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors, with respect to all Interests and Claims shall have the authority to:  (1) File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Interests or Claims immediately prior to the Effective Date.

29

Except as otherwise specifically provided in the Plan, after the Effective Date, the Litigation Trustee, with respect to General Unsecured Claims only, shall have the authority to: (1) File, withdraw, or litigate to judgment, objections to Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. After the Effective Date, the Litigation Trustee shall have and retain any and all rights and defenses the applicable Debtor had with respect to any General Unsecured Claim immediately prior to the Effective Date.

B.      *Estimation of Claims and Interests.*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, and the Litigation Trustee, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

C.      *Adjustment to Claims or Interests without Objection.*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Time to File Objections to Claims.*

Except as otherwise specifically provided in the Plan and unless extended by order of the Bankruptcy Court, any objections to Claims shall be Filed on or before the later of (1) 180 days after the Effective Date and (2) such other period of limitation as may be specifically fixed by a Final Order of the Bankruptcy Court for objecting to such claims.

E.      *Disallowance of Claims or Interests.*

Except as otherwise specifically provided in the Plan, any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544,

545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as any objection to those Claims or Interests have been settled or a Bankruptcy Court order with respect thereto has been entered.

All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as provided in the Plan or otherwise agreed, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

F.      *Amendments to Claims or Interests.*

On or after the Effective Date, a Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors and any such new or amended Claim or Interest Filed shall be deemed disallowed in full and expunged without any further action; provided, however, that Governmental Units shall not be required to obtain authorization of the Bankruptcy Court or the Reorganized Debtors to File or amend a Proof of Claim prior to the bar date applicable to the Claim of such Governmental Unit.

G.      *No Distributions Pending Allowance.*

If an objection to a Claim or Interest or portion thereof is Filed as set forth in Article VII of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

H.      *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Release of Debtors.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

B.    *Release of Liens.*

Except as otherwise provided in the Plan, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.D. of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. On and after the Effective Date, any holder of such Secured Claim (and the applicable agents for such holder), at the expense of the Reorganized Debtors, shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or

32

department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

Without limiting the automatic release provisions of the immediately preceding paragraph: (i) except for distributions required under Article II. and Article III.D. of the Plan, no other distribution under the Plan shall be made to or on behalf of any Claim holder unless and until such holder executes and delivers to the Debtors or Reorganized Debtors such release of liens or otherwise turns over and releases such Cash, pledge or other possessory liens; and (ii) any such holder that fails to execute and deliver such release of liens within 180 days of the Effective Date shall be deemed to have no Claim against the Debtors or their assets or property in respect of such Claim and shall not participate in any distribution under the Plan.

C.      *Releases by the Debtors.*

Except as provided for in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Exit Facility, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement, the DIP Facility, the Plan, the Exit Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Exit Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary herein, in the event Class 6 accepts the Plan or the Standing Motion is denied, then the Standing Motion Claims against the Term Loan Secured Parties shall be released pursuant to this Article VIII.C of the Plan. In the event Class 6 does not accept the Plan and the Standing Motion is granted, then the Standing Motion Claims against the Term Loan Secured Parties shall be included in the Litigation Trust Causes of Action and shall not be released by the Debtors, the Reorganized Debtors, or their Estates. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release obligations of any party or Entity under the Plan, or any document, instrument, or agreement executed to implement the Plan.

33

D.      *Releases by Holders of Claims and Interests.*

**Except as provided for in the Plan or Confirmation Order, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in or out-of-court restructuring efforts, Intercompany Claims, the Exit Facility, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Facility, the Plan, the Exit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Exit Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Causes of Action arising from any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence, or willful misconduct of such applicable Released Party. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release obligations of any party or Entity under the Plan, or any document, instrument, or agreement executed to implement the Plan.**

E.      *Exculpation.*

**Except as provided for in the Plan or Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any Claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Facility, the Exit Facility, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for Causes of Action arising from any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence, or willful misconduct of such applicable Exculpated Party, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

**The Section 1125(e) Protected Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of**

34

acceptances or rejections of the Plan or such distributions made pursuant to the Plan. **Each of the Section 1125(e) Protected Parties shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.**

F.      *Injunction.*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant

holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to Confirmation.*

The following are conditions precedent to confirmation of the Plan that shall be satisfied or waived in writing in accordance with Article IX.C of the Plan:

1.    the Bankruptcy Court shall have approved a Disclosure Statement with respect to the Plan in form and substance acceptable to (i) the Debtors and (ii) the Required Consenting Lenders; and

2.    the Confirmation Order, the Plan, and the Plan Documents shall be in form and substance acceptable to (i) the Debtors and (ii) the Required Consenting Lenders.

B.    *Conditions Precedent to Effectiveness.*

The following are conditions precedent to the occurrence of the Effective Date, each of which shall be satisfied or waived in writing in accordance with Article IX.C of the Plan:

1.    the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to (i) the Debtors and (ii) the Required Consenting Lenders; and the Confirmation Order (a) shall not have been reversed or vacated or be subject to a then-effective stay, and (b) shall have become a Final Order;

2.    the Plan and the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any amendments, modifications, or supplements made after the Confirmation Date but before the Effective Date, shall be in form and substance acceptable to (i) the Debtors and (ii) the Required Consenting Lenders;

3.    the Updated Governance Documents shall have been in place, effective, and filed where required;

4.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

5.    the Professional Compensation Claim Reserve shall have been established and funded with the Professional Compensation Claim Amount;

6.    the Debtors, subject to the sole discretion of the Required Consenting Lenders, shall have assumed, assigned, rejected, and/or amended all Unexpired Leases and Executory Contracts;

7.     the Exit Facility shall have been consummated (with all conditions precedent thereto having been satisfied or waived); and

8.     all documents necessary to consummate the Plan shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith.

C.     *Waiver of Conditions.*

The conditions to Confirmation and the Effective Date set forth in Article IX of the Plan may be waived only with the prior written consent of (i) the Debtors and (ii) the Required Consenting Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or Consummate the Plan.

D.     *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.     *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtors reserve the right, with the consent of the Required Consenting Lenders, to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights, with the consent of the Required Consenting Lenders, to revoke or withdraw, or, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

4832-8436-3464

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the Solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

The Debtors reserve the right, with the consent of the Required Consenting Lenders, to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

To the fullest extent permitted by applicable law, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, the Schedules of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

38

4.      ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary to implement such releases, injunctions, and other provisions;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI of the Plan;

13.     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     enter an order concluding or closing the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

39

17.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and released granted in the Plan, including under Article VIII of the Plan, regardless of whether such termination occurred prior to or after the Effective Date;

22.      enforce all orders previously entered by the Bankruptcy Court; and

23.      hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect.*

Subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Additional Documents.*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) to the extent required by applicable law with respect to such fees that have accrued as of the Effective Date. Any such fees that accrue after the Effective Date, if any, shall be paid by the Litigation Trust, unless otherwise ordered by the Bankruptcy Court.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall (other than for purposes of filing final fee applications and obtaining Bankruptcy Court approval of same) dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.  <u>Counsel to Debtors</u>:

    Haynes and Boone, LLP
    301 Commerce St., Suite 2600
    Fort Worth, Texas 76102
    Attn: Stephen Pezanosky, Matt Ferris, and David Staab
    Stephen.Pezanosky@haynesboone.com
    Matt.Ferris@haynesboone.com
    David.Staab@haynesboone.com

2.  <u>Counsel to DIP Agent and Term Loan Agent</u>:

    Sidley Austin LLP
    2021 McKinney Ave #2000
    Dallas, Texas 75201
    Attn: Charles Persons and Dennis Twomey
    cpersons@sidley.com
    dtwomey@sidley.com

3.  <u>Counsel to the Committee</u>:

    Kilpatrick Townsend & Stockton LLP
    2001 Ross Avenue, Suite 4400
    Dallas, TX 75201
    Attn: Patrick J. Carew
    pcarew@kilpatricktownsend.com

    -and-

    Kilpatrick Townsend & Stockton LLP
    The Grace Building
    1114 Avenue of the Americas
    New York, New York, 10036-7703
    Attn: Todd Meyers, David Posner, and Kelly Moynihan
    tmeyers@kilpatricktownsend.com
    dposner@kilpatricktownsend.com
    kmoynihan@kilpatricktownsend.com

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

42

4832-8436-3464

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, the Plan (including the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Exhibits.*

All exhibits and documents included in the Plan are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://www.kccllc.net/vista. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the

Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such Plan document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

Dated: August 18, 2020

VISTA PROPPANTS & LOGISTICS, LLC
on behalf of itself and all other Debtors


By: /s/ Gary Barton
Gary Barton
Chief Restructuring Officer
Vista Proppants and Logistics, LLC, *et al.*

## EXHIBIT A

### GLOSSARY OF DEFINED TERMS

***ABL Lender*** means PlainsCapital Bank, in its capacity as the lender under the PlainsCapital ABL Credit Agreement.

***ABL Priority Collateral*** means the accounts receivable of Lonestar Prospects, Ltd. and Finished Sand Inventory of Lonestar Prospects, Ltd., and any proceeds thereof, including bank accounts containing such proceeds, and general intangibles relating thereto in existence as of the Petition Date, as set forth in the DIP Financing Order.

***Administrative Claim*** means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

***Administrative Claim Bar Date*** means the first Business Day that is thirty (30) days after the Effective Date or such earlier deadline established by an order of the Bankruptcy Court.

***Affiliate*** has the meaning prescribed in section 101(2) of the Bankruptcy Code.

***Allowed [...] Claim*** means an Allowed Claim in the particular Class or category specified.

***Allowed [...] Interest*** means an Allowed Interest in the particular Class or category specified.

***Allowed*** means, with respect to any Claim or Interest, except as otherwise provided in the Plan, a Claim or Interest allowable under section 502 of the Bankruptcy Code: (a) for which a Proof of Claim or proof of interest was timely Filed, and as to which no objection or other challenge to allowance thereof has been Filed, or if an objection or challenge has been timely Filed, such Claim or Interest is allowed by Final Order; (b) for which a Proof of Claim or proof of interest is not Filed and that has been listed in a Debtors' Schedules of Assets and Liabilities or Schedule of Equity Security Holders and is not listed as disputed, contingent, or unliquidated; or (c) that is deemed allowed under the Plan. For purposes of determining the amount of an Allowed Claim or Allowed Interest, there shall be deducted therefrom the amount of any claim that the Debtors may hold against the Creditor or equity security holder under section 553 of the Bankruptcy Code or under the doctrine of recoupment. There is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) for a Claim to be Allowed under the Plan. The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

1

*Allowed Claim* means any Claim that is Allowed.

*Approval Order* means the Final Order approving the Disclosure Statement.

*Avoidance Actions* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by any of the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law.

*Ballot* means the applicable form or forms of ballot(s) to be distributed to holders of Claims entitled to vote on the Plan and on which the acceptance or rejection of the Plan is to be indicated.

*Bankruptcy Code* means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

*Bankruptcy Court* means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure and the local bankruptcy rules prescribed by the Bankruptcy Court.

*Bar Date* means August 31, 2020, the date established by the Bankruptcy Court by which Proofs of Claim must be Filed with respect to such Claims, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the holders of such Claims or Interests from the requirement of Filing Proofs of Claim.

*Business Day* means any day other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

*Cash* means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

*Causes of Action* means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542,

2

543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

*Chapter 11 Cases* means the bankruptcy cases commenced by the Debtors on June 9, 2020, by the filing of voluntary Chapter 11 petitions in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, Case Numbers 20-42002, 20-42003, 20-42004, 20-42005, 20-42006, 20-42007, and 20-42008, which are jointly administered under Case Number 20-42002.

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code, Filed against any of the Debtors.

*Claims and Balloting Agent* means Kurtzman Carson Consultants LLC.

*Claims Register* means the official register of Claims maintained by the Claims and Balloting Agent.

*Class* means a category of Claims or Interests as described in the Plan pursuant to section 1122(a) of the Bankruptcy Code.

*CM/ECF* means the Bankruptcy Court's Case Management and Electronic Case Filing system.

*Confirmation* means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A of the Plan having been (a) satisfied or (b) waived pursuant to Article IX.C of the Plan.

*Confirmation Date* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket maintained for the Chapter 11 Cases.

*Confirmation Hearing* means the hearing held by the Bankruptcy Court to consider confirmation of the Plan.

*Confirmation Order* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

*Consummation* means the occurrence of the Effective Date.

*Creditor* has the meaning prescribed in section 101(10) of the Bankruptcy Code.

3

*Cure Claim* means a Claim based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

*Debtor* means one of the Debtors.

*Debtors* means, collectively, the Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: Vista Proppants and Logistics, LLC (7817) ("Vista HoldCo"); VPROP Operating, LLC (0269) ("VPROP"); Lonestar Prospects Management, L.L.C. (8451) ("Lonestar Management"); MAALT Specialized Bulk, LLC (2001) ("MAALT Bulk"); Denetz Logistics, LLC (8177) ("Denetz"); Lonestar Prospects, Ltd. (4483) ("Lonestar Prospects"); and MAALT, LP (5198) ("MAALT"). The location of the Debtors' service address is 4413 Carey Street, Fort Worth, TX 76119-4219.

*DIP Agent* means Ares Capital Corporation, in its capacity as administrative agent under the DIP Credit Agreement.

*DIP Borrower* means VPROP Operating, LLC, as a debtor and debtor-in-possession.

*DIP Cash Collateral Account* means the separate segregated account of VPROP Operating, LLC in which all proceeds of the DIP Facility are deposited.

*DIP Commitment* means, with respect to each DIP Lender, the commitment of such DIP Lender to make DIP Loans in the aggregate amount set forth for such DIP Lender on Annex I of the DIP Credit Agreement or in the most recent assignment and assumption or other documentation contemplated by the DIP Credit Agreement executed by such DIP Lender, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such DIP Lender pursuant to the terms of the DIP Credit Agreement. The aggregate amount of the DIP Commitments of the DIP Lenders as of the closing date of the DIP Facility is $11,000,000.

*DIP Credit Agreement* means the Senior Secured Debtor-in-Possession Credit Agreement dated as of June 12, 2020, among the DIP Borrower, the DIP Guarantors, the DIP Secured Parties.

*DIP Facility* means the senior secured term loan credit facility provided by the DIP Secured Parties in connection with the DIP Loan Documents and approved by the Bankruptcy Court pursuant to the DIP Financing Order.

*DIP Facility Claim* means a Claim held by any of the DIP Secured Parties arising under the DIP Facility.

*DIP Fees* means the fees in the amounts set forth in the DIP Credit Agreement.

4

***DIP Financing Order*** means the Final Order (I) Authorizing the Debtors to (A) Obtain Post-petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c), 364(d)(1) and 364(e) and (B) Utilize Cash Collateral of Prepetition Secured Entities, (II) Granting Adequate Protection to Prepetition Secured Entities, and (III) Granting Related Relief, dated July 16, 2020, [Docket No. 219] entered in the Chapter 11 Cases.

***DIP Guarantors*** means Lonestar Prospects, Ltd.; Lonestar Prospects Management, L.L.C.; MAALT, L.P.; Denetz Logistics, L.L.C.; MAALT Specialized Bulk, LLC; and Vista Proppants and Logistics, LLC.

***DIP Lenders*** means, collectively, Ares Capital Corporation; Ares Capital CP Funding LLC; AC American Fixed Income IV, L.P.; Federal Insurance Company; Ares Centre Street Partnership, L.P.; SC ACM Private Debt Fund L.P.; Great American Life Insurance Company; SA Real Assets 20 Limited; Premia LV1 Ltd.; MSD Credit Opportunity Fund, L.P.; SOF Investments II, L.P.; and AG Energy Funding, LLC.

***DIP Loan Documents*** means, collectively, the DIP Credit Agreement, the other definitive documentation with respect to the DIP Facility, and any related security documents.

***DIP Loans*** means the non-amortizing senior secured delayed draw term loans made from time to time by the DIP Lenders to the DIP Borrower under the DIP Facility in accordance with the DIP Loan Documents.

***DIP Secured Parties*** means, collectively, the DIP Agent and the DIP Lenders.

***Disbursing Agent*** means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to the Plan.

***Disclosure Statement*** means the disclosure statement for the Plan, including all exhibits and schedules thereto.

***Disputed Claim*** means a Claim in a particular Class as to which a Proof of Claim has been Filed or is deemed to have been Filed under applicable law or an Administrative Claim as to which an objection has been or is Filed in accordance with the Plan, the Bankruptcy Code or the Bankruptcy Rules, which objection has not been withdrawn or determined by a Final Order. For the purposes of the Plan, a Claim is a Disputed Claim prior to any objection to the extent that (a) the amount of a Claim specified in a Proof of Claim exceeds the amount of any corresponding Claim scheduled by the Debtors in the Schedules of Assets and Liabilities; (b) any corresponding Claim scheduled by the Debtors in the Schedules of Assets and Liabilities has been scheduled as disputed, contingent or unliquidated, irrespective of the amount scheduled; (c) no corresponding Claim has been scheduled by the Debtors in the Schedules of Assets and Liabilities; or (d) the Claim is subject to disallowance pursuant to section 502(d) of the Bankruptcy Code.

**Disputed Claims Reserve** means a reserve held by the Disbursing Agent on account of the Disputed Claims in Class 6 pending allowance in an amount equal to their Pro Rata (as determined in accordance with Article VI.F.3 of the Plan) share of Litigation Trust Interests.

**Distribution Record Date** means the Confirmation Date.

**Effective Date** means the date that is the first Business Day after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect, and (b) all conditions to the effectiveness of the Plan have been satisfied or waived as provided in the Plan.

**Entity** means any Person, estate, trust, Governmental Unit, or the United States trustee, as set forth in section 101(15) of the Bankruptcy Code.

**Estate Property** means all right, title, and interest in and to any and all property of every kind or nature, owned by the Debtors or their Estates on the Petition Date as defined by section 541 of the Bankruptcy Code.

**Estates** means the bankruptcy estates of the Debtors and all Estate Property comprising the Debtors' bankruptcy estates within the meaning of section 541 of the Bankruptcy Code.

**Exculpated Parties** means, collectively, and in each case, in its capacity as such: (a) the Debtors, (b) Reorganized Debtors; (c) any official committees appointed in the Chapter 11 Cases and each of their respective members; (d) such Released Parties that are fiduciaries to the Debtors' Estates; and (e) with respect to each of the foregoing, such Entity and its current and former affiliates, and such Entity's and its current and former affiliates' equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the Petition Date.

**Executory Contract** means an executory contract or unexpired lease as such terms are used in section 365 of the Bankruptcy Code, including all operating leases, capital leases, and contracts to which any Debtor is a party or beneficiary.

**Existing Class A Unit** means 1 Class A Unit of Vista HoldCo held by GHMR.

**Existing Common Units** means the 57,544,774 Common Units of Vista HoldCo held by Lonestar Prospects Holdings Company, L.L.C.; Gary Humphreys, Future New Deal, Ltd.; Marty Robertson; M&J Partnership, Ltd.; FR Sand Holdings LLC; Tim Probert; the Term Loan Agent; Ares Credit Strategies Insurance Dedicated Fund Series Interests of the SALI Multi-Series Fund, L.P.; Ares Jasper Funds, L.P.; Ares ND Credit Strategies Fund LLC; and ARCC VS Corp.

*Existing Equity* means (a) Existing Common Units of Vista HoldCo and (b) Existing Class A Unit.

*Exit Agent* means Ares Capital Corporation in its capacity as the administrative agent under the Exit Facility.

*Exit Facility* means a new senior secured delayed draw term loan credit facility to be provided to VPROP with an aggregate face value of approximately $102 million, comprised of (i) Tranche A Exit Facility Notes, (ii) Tranche B Exit Facility Notes, and (iii) Tranche C Exit Facility Notes.

*Exit Facility Documents* means all agreements, documents, and instruments executed and/or delivered with, to, or in favor of the Exit Agent and the Exit Lenders in connection with the Exit Facility, including , without limitation, certain security agreements, mortgages, financing statements, collateral agreements, collateral trust agreements, deposit account control agreements, blocked account control agreements, securities account control agreements, and other collateral documents and agreements.

*Exit Lenders* means the lenders from time to time party to the Exit Facility Documents, including, as applicable, the Term Loan Lenders and the DIP Lenders.

*File*, *Filed*, or *Filing* means, as to any document or pleading, properly and timely file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

*Final Order* means an order or judgment (a) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired; or (b) in the event an appeal, writ of certiorari, or motion for reargument or rehearing has been Filed, such judgment or order has not been reversed, modified, stayed, or amended.

*First Reserve* means FR Sand Holdings LLC

*Former Directors and Officers* means the former directors and officers of the Debtors who were no longer directors and officers of the Debtors as of the Petition Date.

*GAAP* means generally accepted accounting principles as in effect from time to time in the United States.

*GHMR* means GHMR Operations, LLC.

*General Unsecured Claim* means any Claim that is not: (a) a DIP Facility Claim; (b) an Administrative Claim; (c) a Professional Compensation Claim; (d) a Priority Tax Claim; (e) an Other Secured Claim; (f) an Other Priority Claim; (g) a Term Loan Secured Claim; (h) a PlainsCapital ABL Secured Claim; (i) a MAALT Secured Claim; or (j) an Intercompany Claim.

***Governmental Unit*** means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

***GUC Cash Pool*** means (i) if Class 6 votes to accept the Plan, $500,000.00 in Cash; or (ii) if Class 6 votes to reject the Plan, $0.00 in Cash. The GUC Cash Pool shall be distributed by the Reorganized Debtors to the Litigation Trust as soon as reasonably practicable following the Effective Date. The GUC Cash Pool shall be used to fund the operation of the Litigation Trust or distributions to Litigation Trust Beneficiaries at the discretion of the Litigation Trustee, subject to the terms of the Litigation Trust Agreement.

***Impaired*** or ***Impairment*** means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

***Insider*** has the meaning set forth in section 101(31) of the Bankruptcy Code.

***Intercompany Claims*** means any Claim held by a Debtor against a Debtor.

***Intercompany Interest*** means an Interest in a Debtor other than Vista Proppants and Logistics, LLC, held by another Debtor.

***Interest*** means any Equity Security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

***Interim DIP Financing Order*** means the Interim Order (I) Authorizing the Debtors to (A) Obtain Post-petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c), 364(d)(1) and 364(e) and (B) Utilize Cash Collateral of Prepetition Secured Entities, (II) Granting Adequate Protection to Prepetition Secured Entities, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (IV) Granting Related Relief, dated June 12, 2020, [Docket No. 67] entered in the Chapter 11 Cases.

***Judicial Code*** means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

***Lien*** means a lien, security interest, or other interest or encumbrance as defined in section 101(37) of the Bankruptcy Code asserted against any Estate Property.

***Litigation Trust*** means the grantor trust that shall be established by the Debtors pursuant to the terms of the Plan and the Litigation Trust Agreement for the benefit of the Litigation Trust Beneficiaries.

8

*Litigation Trust Agreement* means the agreement setting forth the terms and conditions of the Litigation Trust, which shall be in the form contained in the Plan Supplement and shall be in form and substance acceptable to the Debtors and the Required Consenting Lenders.

*Litigation Trust Assets* means (i) the Litigation Trust Causes of Action and (ii) the GUC Cash Pool.

*Litigation Trust Beneficiaries* means holders of Litigation Trust Interests.

*Litigation Trust Causes of Action* means those Causes of Action set forth on the Schedule of Litigation Trust Causes of Action to be included in the Plan Supplement. Unless otherwise agreed among the Debtors, the Committee, and the Required Consenting Lenders, the Litigation Trust Causes of Action shall include (i) the Standing Motion Claims against the Term Loan Secured Parties, unless Class 6 votes to accept the Plan or the Standing Motion is denied, in which case the Standing Motion Claims against the Term Loan Secured Parties are released, (ii) the Standing Motion Claims against the ABL Lender, (iii) all potential Causes of Action against R.J. Sikes, RJS Holdings, KCM Enterprises, Gary Humphreys, Marty Robertson, GMHR Operations, or any other person or entity that is not a Released Party under the Plan, including entities related to Gary Humphreys, Marty Robertson, or R.J. Sikes other than the Debtors or the Reorganized Debtors; and (iv) all other Avoidance Actions.

*Litigation Trust Interests* means the beneficial interests in the Litigation Trust issued to holders of Allowed General Unsecured Claims (including holders of Allowed Term Loan Deficiency Claims) pursuant to Article III.D.6 of the Plan, which shall be entitled to share in distributions of proceeds of Litigation Trust Assets, if any.

*Litigation Trustee* means the Person appointed to act as trustee of the Litigation Trust in accordance with the terms of this Plan, the Confirmation Order, and the Litigation Trust Agreement, or any successor appointed in accordance with the terms of the Litigation Trust Agreement.

*MAALT Credit Agreement* means Loan Agreement, dated as of June 15, 2014 (as amended, supplemented, or otherwise modified prior to the Petition Date), by and among MAALT, L.P.; Denetz Logistics, L.L.C.; GHMR Operations, L.L.C.; Gary B. Humphreys; Martin W. Robertson; the Trust Guarantors (as defined therein) and the MAALT Lender.

*MAALT Documents* means the MAALT Credit Agreement and all other agreements, documents and instruments executed and/or delivered with, to or in favor of the MAALT Lender in connection with the MAALT Credit Agreement, including, without limitation, certain security agreements, mortgages, financing statements, collateral agreements, collateral trust agreements, deposit account control agreements, and other collateral documents and agreements.

*MAALT Facility* means the credit made available for borrowing under the MAALT Documents.

**MAALT Lender** means PlainsCapital Bank, in its capacity as the lender under the MAALT Credit Agreement.

**MAALT Priority Collateral** means the collateral in which the MAALT Lender has a first priority lien pursuant to the MAALT Documents.

**MAALT Secured Claims** means all Secured Claims arising in respect of the MAALT Facility.

**Management Incentive Plan** means the management incentive plan to be effectuated after the Effective Date by the New Parent Company, subject to the approval of the New Parent Board, pursuant to which certain members of management may be entitled to receive certain compensation from the New Parent Company.

**New Equity Interests** means 100% of the outstanding equity interests of the New Parent Company.

**New Parent Board** means the board of managers who will manage and govern the affairs of the New Parent Company and will be selected in accordance with Article IV of the Plan. The New Parent Board will be comprised of seven (7) directors, with such directors initially being as follows upon the Effective Date: (a) four (4) directors designated and appointed by the Term Loan Agent; (b) one (1) director designated and appointed by AG Energy Funding, LLC; (c) one (1) director designated and appointed by MSD Credit Opportunity Fund, L.P.; and (d) one (1) independent director. The identities and affiliations of the members of the New Parent Board shall be identified in the Plan Supplement on or before the date of the Confirmation Hearing, to the extent known at such time.

**New Parent Company** means the Delaware limited liability company to be formed by one or more of the holders of Allowed Term Loan Secured Claims on and after the Effective Date.

**New Parent Units** means the New Equity Interests to be issued to the holders of Allowed Term Loan Secured Claims; which will include control and voting rights, and certain economic rights.

**New Parent Unit Holders** means the holders of New Equity Interests in the New Parent Company that are New Parent Units.

**Ordinary Course Professional** means a Professional employed and retained pursuant to the Ordinary Course Professionals Order.

**Ordinary Course Professionals Order** means the *Order Authorizing Employment and Payment of Professionals Utilized in the Ordinary Course of Business* [Docket No. 367] entered in the Chapter 11 Cases.

**Other Priority Claim** means any Claim entitled to priority status pursuant to section 507(a) of the Bankruptcy Code that is not (a) a DIP Facility Claim; (b) an Administrative Claim, (c) a Professional Compensation Claim, or (d) a Priority Tax Claim.

**Other Secured Claim** means any Secured Claim, including any Secured Tax Claim, other than DIP Facility Claims, Term Loan Secured Claims, PlainsCapital ABL Secured Claims, and MAALT Secured Claims. Other Secured Claims includes any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more Debtors, the reimbursement obligation for which is either secured by a lien on collateral or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**Person** means and includes natural persons, corporations, limited partnerships, general partnerships, joint ventures, trusts, land trusts, business trusts, unincorporated organizations, or other legal entities, regardless of whether they are governments, agencies, or political subdivisions thereof.

**Petition Date** means June 9, 2020, the date on which the Debtors commenced the Chapter 11 Cases.

**PlainsCapital ABL Credit Agreement** means the Amended and Restated Loan Agreement, dated as of January 12, 2018 (as amended, supplemented or otherwise modified prior to the Petition Date), by and among Lonestar Prospects, Ltd.; Lonestar Prospects Holding Company, L.L.C.; Gary B. Humphreys; Martin W. Robertson; and the ABL Lender.

**PlainsCapital ABL Documents** means the PlainsCapital ABL Credit Agreement and all other agreements, documents and instruments executed and/or delivered with, to, or in favor of the ABL Lender in connection with the PlainsCapital ABL Credit Agreement, including, without limitation, certain security agreements, mortgages, financing statements, collateral agreements, collateral trust agreements, deposit account control agreements, blocked account control agreements, securities account control agreements, and other collateral documents and agreements.

**PlainsCapital ABL Facility** means the credit made available for borrowing under the PlainsCapital ABL Documents.

**PlainsCapital ABL Secured Claims** means all Secured Claims arising in respect of the PlainsCapital ABL Facility.

**Plan** means this *Joint Plan of Reorganization of Vista Proppants and Logistics, LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code*, as such document may be amended or modified, including the Plan Supplement, which is incorporated herein by reference.

11

*Plan Distribution* means a payment or distribution to holders of Allowed Claims, Allowed Interests, or other eligible Entities under the Plan.

*Plan Documents* means, collectively those documents in furtherance of Consummation of the Plan and/or to be executed in order to consummate the transactions contemplated under the Plan, which may be Filed by the Debtors with the Bankruptcy Court.

*Plan Supplement* means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, (a) in form and substance satisfactory to the Debtors and the Required Consenting Lenders, and (b) as may be altered, amended, modified, or supplemented from time to time in accordance with the terms of the Plan and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors no later than five (5) days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, including the following, as applicable (1) Updated Governance Documents; (2) either (a) the Exit Facility Documents or (b) a commitment letter and term sheet for the Exit Facility; (3) the Schedule of Assumed Contracts and Leases; (4) the Schedule of Retained Causes of Action; (5) the Schedule of Litigation Trust Causes of Action; (6) the Litigation Trust Agreement; and (7) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan.

*Priority Tax Claims* means any Unsecured Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

*Professional* means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code.

*Professional Compensation Claim* means a Claim for compensation or reimbursement of expenses of a Professional incurred on and after the Petition Date and prior to the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

*Professional Compensation Claim Amount* means the amount of Cash estimated by the Debtors to be sufficient to satisfy all Professional Compensation Claims incurred and unpaid as of the Effective Date.

*Professional Compensation Claim Bar Date* means forty-five (45) days after the Effective Date.

*Professional Compensation Claim Objection Deadline* means twenty-four (24) days after the Professional Compensation Claim Bar Date.

*Professional Compensation Claim Reserve* means an amount of Cash to be estimated by the Debtors prior to the Effective Date and sufficient to satisfy Professional Compensation

Claims, and together with any remaining Carve Out (as defined in DIP Financing Order) from the DIP Cash Collateral Account, shall be deposited into a segregated interest bearing account in the name of the Reorganized Debtors and shall only be used for payment and satisfaction of such Claims.

*Proof of Claim* means a proof of Claim Filed against any Debtor in the Chapter 11 Cases by the applicable Bar Date.

*Pro Rata* means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

*Reinstate*, *Reinstated*, or *Reinstatement* means with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

*Released Parties* means, except as provided in Article VIII.C of the Plan, collectively, and in each case solely in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Term Loan Lenders; (d) the Term Loan Agent; (e) the DIP Lenders; (f) the DIP Agent; (g) the Exit Lenders; (h) the Exit Agent; and (i) with respect to each of the foregoing entities in clauses (a) through (h), such Entity's current and former affiliates and subsidiaries, and such Entities' and their current and former affiliates' and subsidiaries' directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, principals, members, employees, agents, advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the Petition Date; *provided, however*, that notwithstanding the foregoing, R.J. Sikes, Gary Humphreys, Marty Robertson, GMHR Operations, LLC, RJS Holdings, LLC, KCM Enterprises, LP, the Debtors' equity holders as of the Petition Date, and any entity related to R.J. Sikes, Gary Humphreys, or Marty Robertson, other than the Debtors or the Reorganized Debtors, shall not be "Released Parties" under the Plan.

*Releasing Parties* means, collectively, (a) the Debtors; (b) the Reorganized Debtors; (c) the Term Loan Lenders; (d) the Term Loan Agent; (e) the DIP Lenders; (f) the DIP Agent; (g) the Exit Lenders; (h) the Exit Agent; (i) all holders of Claims or Interests who either (1) vote to accept or (2) do not opt out of granting the releases set forth in Article VIII of the Plan by returning the opt-out election form to be included with the ballot or notice of non-voting status; and (j) with respect to each of the foregoing entities in clauses (a) through (i), such Entity's its current and former affiliates and subsidiaries, and such Entities' and their current and former affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers,

13

principals, members, employees, agents, advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided, however*, that notwithstanding the foregoing, the Debtors' current equity holders, including Gary Humphreys and Marty Robertson shall not be "Releasing Parties" under the Plan.

*Reorganized Debtors* means the post-Reorganization successors to the Debtors and their estates.

*Restructuring Transactions* means the transactions described in Article IV.C of the Plan.

*Retained Causes of Action* means all Causes of Action that belong to the Debtors but shall not include Litigation Trust Causes of Action or Causes of Action against Released Parties.

*Required Consenting Lenders* means, to the extent required under the DIP Loan Documents, the DIP Agent and the Required Lenders.

*Required Lenders* means (a) at any time when there is only one DIP Lender, such Lender and (b) at any time where there are two (2) or more DIP Lenders, at least two (2) DIP Lenders holding DIP Loans and unused DIP Commitments (if any) representing more than fifty percent (50%) of the sum of (x) the aggregate principal amount of DIP Loans (without regard to any sale by a DIP Lender of a participation in any DIP Loan) outstanding at such time plus (y) the total unused DIP Commitments at such time. For purposes of this definition, any DIP Lenders that are Affiliated shall be deemed to be a single DIP Lender.

*Schedules* means, collectively, the Schedules of Assets and Liabilities, Schedule of Assumed Contracts and Leases, Schedule of Retained Causes of Action, the Schedule of Equity Security Holders, and Schedule of Litigation Trust Causes of Action.

*Schedules of Assets and Liabilities* means the schedules of assets and liabilities Filed by the Debtors in the Chapter 11 Cases, as may be amended, modified, or supplemented.

*Schedule of Assumed Contracts and Leases* means the schedule of Executory Contracts and Unexpired Leases to be assumed, and, if applicable, assigned, by the Debtors, to be Filed as part of the Plan Supplement.

*Schedule of Equity Security Holders* means the schedule of Interests required to be Filed pursuant to Bankruptcy Rule 1007(a)(3).

*Schedule of Litigation Trust Causes of Action* means the Litigation Trust Causes of Action set forth on the schedule to be Filed as part of the Plan Supplement.

14

*Schedule of Retained Causes of Action* means the Retained Causes of Action set forth on the schedule to be Filed as part of the Plan Supplement.

*Section 1125(e) Protected Parties* means the Exculpated Parties and such Released Parties that are fiduciaries other than to the Debtors' Estates.

*Secured Claim* means a Claim: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code. Secured Claims shall not include any such Claims secured by Liens that are avoidable, unperfected, subject to subordination, or otherwise unenforceable.

*Secured Tax Claim* means any Secured Claim that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

*Solicitation* means solicitation in accordance with the Approval Order of votes under the Plan.

*Solicitation Materials* means the Disclosure Statement (including all exhibits and appendices), Ballot, and any other materials to be used in the Solicitation of votes on the Plan.

*Standing Motion Claims* means the claims and causes of action described in the *Motion of the Official Committee of Unsecured Creditors for Order Granting (I) Leave, Standing and Authority to Commence and Prosecute Certain Claims on Behalf of the Debtors' Estates and (II) Related Relief* [Dkt. No. 333] that was filed by the Committee on August 3, 2020.

*Subordinated Claim* means a Claim that is subordinated to General Unsecured Claims pursuant to (a) a contract or agreement, (b) a Final Order declaring that such Claim is subordinated in right or payment, or (c) any applicable provision of the Bankruptcy Code, including section 510 of the Bankruptcy Code, or other applicable law. Subordinated Claims specifically include any Claim for punitive damages provided for under applicable law.

*Term Loans* means the loans, together with any accrued and unpaid interest, including any default interest, outstanding under the Term Loan Facility.

*Term Loan Agent* means Ares Capital Corporation in its capacity as the administrative agent under the Term Loan Agreement.

*Term Loan Agreement* means the Amended and Restated Senior Secured Credit Agreement dated as November 9, 2017 (as amended, supplemented or otherwise modified prior to the Petition Date) by and among Vista Proppants and Logistics, LLC, the Term Loan Borrower, the Term Loan Secured Parties.

4832-8436-3464

**Term Loan Borrower** means VPROP Operating, LLC.

**Term Loan Claim** means any Claim of the Term Loan Secured Parties arising under or related to the Term Loan Documents or the DIP Financing Order.

**Term Loan Deficiency Claim** means a Claim for the Allowed amount of the Term Loan Claims less the Allowed amount of the Term Loan Secured Claims, which amount shall be $225 million or such other amount as may be determined by the Court.

**Term Loan Documents** means the Term Loan Agreement and all other agreements, documents, and instruments executed and/or delivered with, to, or in favor of the Term Loan Agent or any Term Loan Lender in connection with the Term Loan Agreement, including, without limitation, certain security agreements, mortgages, financing statements, collateral agreements, collateral trust agreements, deposit account control agreements, blocked account control agreements, securities account control agreements, and other collateral documents and agreements.

**Term Loan Facility** means the credit made available for borrowing under the Term Loan Documents.

**Term Loan Lenders** means the lenders from time to time party to the Term Loan Agreement.

**Term Loan Secured Claim** means any Term Loan Claim that is a Secured Claim.

**Term Loan Secured Parties** means, collectively, the Term Loan Agent and the Term Loan Lenders.

**Tranche A Exit Facility Notes** means the notes in Tranche A of the Exit Facility in the amount of $30,000,000, subject to documentation, terms, and conditions acceptable to the Exit Lenders and the Debtors.

**Tranche B Exit Facility Notes** means the notes in Tranche B of the Exit Facility in an amount equal to twice the outstanding amount of principal due under the DIP Facility on the Effective Date, subject to documentation, terms, and conditions acceptable to the Exit Lenders and the Debtors.

**Tranche C Exit Facility Notes** means notes in Tranche C of the Exit Facility in the amount of $50,000,000, subject to documentation, terms, and conditions acceptable to the Exit Lenders and the Debtors.

**Unexpired Lease** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

16

*Unimpaired* means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

*United States* means the United States of America and all agencies thereof.

*Unsecured Claim* means a Claim that is not a Secured Claim. The term specifically includes any tort Claims or contractual Claims or Claims arising from damage or harm to the environment and, pursuant to section 506(a) of the Bankruptcy Code, any Claim of a Creditor against the Debtors to the extent that such Creditor's Claim is greater than the value of the Lien securing such Claim, any Claim for damages resulting from rejection of any Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code, and any Claim not otherwise classified under the Plan.

*Updated Governance Documents* means the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents, as applicable.

*Voting Deadline* means September 17, 2020 at 4:00 p.m., prevailing Central Time.

*Voting Record Date* means August 17,2020.

17

**EXHIBIT 2 TO THE DISCLOSURE STATEMENT**

**CORPORATE ORGANIZATION CHART**



19461518v.1

* less than .01%

4812-2168-3656

**EXHIBIT 3 TO THE DISCLOSURE STATEMENT**

**LIQUIDATION ANALYSIS**

**Exhibit 3: LIQUIDATION ANALYSIS**

**INTRODUCTION**

Often referred to as the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code[1] requires that a bankruptcy court find, as a condition to confirmation of a plan of reorganization, that each holder of a claim or interest in each impaired class either (i) has accepted the plan; or (ii) will receive or retain under the plan property of a value, as of the effective date of the confirmed plan, that is not less than the amount such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.[2]

To conduct this Liquidation Analysis, the Debtors and their advisors have taken the following steps:

   i)   estimated the cash proceeds that a chapter 7 trustee (a "Trustee") would generate if each Debtor's chapter 11 case was converted to a chapter 7 case as of the chapter 7 conversion date and the assets of such Debtor's Estate were liquidated (the "Liquidation Proceeds");

   ii)  determined the distribution that each holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme set forth in chapter 7 (the "Liquidation Distribution"); and

   iii) compared each holder's Liquidation Distribution to the distribution such holder would receive under the Debtors' chapter 11 Plan if the Plan were confirmed and consummated (the "Plan Distribution").

This Liquidation Analysis represents an estimate of cash distributions and recovery percentages based on a hypothetical chapter 7 liquidation of the Debtors' assets. It is therefore a hypothetical analysis based on certain assumptions discussed herein and in the Disclosure Statement. As such, asset values and claims discussed herein may differ materially from amounts referred to in the Plan and Disclosure Statement. The Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Plan and Disclosure Statement in their entirety, as well as the notes and assumptions set forth below.

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case involves the use of estimates and assumptions that, although considered reasonable by the Debtors based on their business judgment and input from their advisors, are subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended, and should not be used, for any other purpose.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement, to which this Liquidation Analysis is attached **Exhibit 3** or the Plan attached to the Disclosure Statement as **Exhibit 1**.

[2] Additional references to chapter 7 throughout this exhibit assumed to encompass similar insolvency proceedings in non-US jurisdictions. Local/jurisdictional laws and/or rules governing liquidation priorities outside the US are assumed to be generally consistent with those set forth in chapter 7 of the Bankruptcy Code. Any deviations of such laws and/or rules would not materially impact the conclusions of this analysis.

All of the limitations and risk factors set forth in the Disclosure Statement are applicable to this Liquidation Analysis and are incorporated by reference herein.  The underlying financial information in the Liquidation Analysis was prepared using policies that are generally consistent with those applied in historical financial statements but was not compiled or examined by independent accountants and was not prepared to comply with GAAP or SEC reporting requirements.

THE DEBTORS AND THEIR ADVISORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES CONTAINED HEREIN OR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS.  IN THE EVENT THESE CHAPTER 11 CASES ARE CONVERTED TO A CHAPTER 7 LIQUIDATION, ACTUAL RESULTS COULD VARY FROM THE ESTIMATES SET FORTH IN THIS LIQUIDATION ANALYSIS.

## BASIS OF PRESENTATION

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 7 liquidation commences on or about August 30, 2020 (the "Liquidation Date").  The pro forma values referenced herein are projected as of the Liquidation Date and utilize the June 30, 2020 balance sheet as a proxy for the balance sheet as of the assumed Liquidation Date (except for cash, DIP Facility balances and accrued and unpaid ch. 11 professional fees which were estimated as of the end of August).  The Debtors have assumed that the Liquidation Date is a reasonable proxy for the anticipated Effective Date.  The Liquidation Analysis was prepared on a legal entity basis for each Debtor and, for presentation purposes, summarized into a consolidated report.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based on a review of the Debtors' financial statements and projected results of operations and cash flow over the projection period to account for estimated liabilities, as necessary.  The cessation of business in a liquidation is likely to trigger certain claims and funding requirements that would otherwise not exist under the Plan absent a liquidation.  Such claims could include chapter 7 administrative expense claims, including, wind down costs, trustee fees, and professional fees, among other claims. Some of these claims and funding obligations could be significant and would be entitled to administrative or priority status in payment from Liquidation Proceeds.  The Debtors' estimates of Allowed Claims set forth in the Liquidation Analysis should not be relied on for the purpose of determining the value of any distribution to be made on account of Allowed Claims or Interests under the Plan.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

Chapter 7 administrative expense claims that arise in a liquidation scenario would be paid in full from the Liquidation Proceeds prior to proceeds being made available for distribution to holders of Allowed Claims. Under the "absolute priority rule," no junior creditor may receive any distributions until all senior creditors are paid in full, and no equity holder may receive any distribution until all creditors are paid in full.  The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

This Liquidation Analysis does not include any recoveries or related litigation costs resulting from any potential preference, fraudulent transfer, or other litigation or Avoidance Actions that may be available under the Bankruptcy Code because of the cost of such litigation, the uncertainty of the outcome, and potential disputes regarding these matters. In addition, the Liquidation Analysis assumes all customer contracts are terminated on the Liquidation Date. Rejection damages claims have been estimated for purposes of this analysis, however, actual claims could materially differ from estimates.  Finally, the Liquidation Analysis does not include estimates for the tax consequences that may be triggered upon the liquidation and sale of assets in the manner described above. Such tax consequences could be material.

### LIQUIDATION PROCESS

The Debtors' liquidation would be conducted pursuant to chapter 7 of the Bankruptcy Code. The Debtors have assumed that all secured creditors would quickly foreclose on their collateral leaving only Avoidance Actions for the Trustee to pursue for the benefit of the Debtors' creditors.

A summary of the Debtors' Liquidation Analysis noting assets to be liquidated, Liquidation Proceeds, liquidating adjustments and the Liquidation Distribution in a chapter 7 process, is as follows.

**************************

**Vista Proppants and Logistics**
**Debtors' Liquidation Analysis Summary**
**Consolidated**
*($'000 in USD)*

| Liquidation Analysis | FN | Jun-20 Proforma Balance Sheet Lonestar | LP | Bulk | Vista | Consolidated | Recovery Estimate - % Lonestar | LP | Bulk | Vista | Consolidated | Recovery Estimate - $ Ch. 7 Trustee / Class 2 & 6 | Plains Capital | DIP / Term Lenders | Other Secured | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | 1 | $ 2,799 | $ - | $ - | $ - | $ 2,799 | 100% | 0% | 0% | 0% | 100% | $ - | $ 2,174 | $ 625 | $ - | $ 2,799 |
| Restricted Cash | 2 | 3,000 | - | 205 | - | 3,205 | 100% | 0% | 100% | 0% | 100% | - | - | - | 3,205 | 3,205 |
| Accounts Receivable | 3, 4 | 12,406 | 3,678 | 1,113 | - | 17,198 | 8% | 3% | 4% | 0% | 7% | - | 854 | 280 | - | 1,134 |
| Inventory | 5, 6 | 7,980 | - | - | - | 7,980 | 24% | 0% | 0% | 0% | 24% | - | 1,933 | - | - | 1,933 |
| Prepaid Expenses | 7 | 5,354 | 31 | 97 | - | 5,482 | 1% | 0% | 0% | 0% | 1% | - | - | 73 | - | 73 |
| Property, Plant, and Equipment | 8 | 299,067 | 2,998 | 2,275 | - | 304,341 | 9% | 22% | 82% | 0% | 10% | - | 250 | 28,966 | 100 | 29,316 |
| Other Assets | 9 | 7,923 | 5 | - | - | 7,927 | 0% | 0% | 0% | 0% | 0% | - | - | - | - | - |
| Right of Use | 10 | 14,920 | 10,699 | 8,141 | - | 33,759 | 0% | 0% | 0% | 0% | 0% | - | - | - | - | - |
| Assets | | $ 353,449 | $ 17,411 | $ 11,831 | $ - | $ 382,691 | 10% | 4% | 18% | 0% | 10% | $ - | $ 5,211 | $ 29,944 | $ 3,305 | $ 38,460 |
| Avoidance Actions | 11 | | | | | | | | | | | Unknown | | | | Unknown |
| Chapter 7 Litigation | | | | | | | | | | | | Unknown | | | | Unknown |
| Chapter 7 Trustee Fees | 12 | | | | | | | | | | | Unknown | | | | Unknown |
| Liquidation Adjustments | | | | | | | | | | | | Unknown | | | | Unknown |
| Proceeds Available to Creditors | | | | | | | | | | | | Unknown | $ 5,211 | $ 29,944 | $ 3,305 | Unknown |

| Summary Waterfall Scenario | FN | Lonestar | LP | Bulk | Vista | Consolidated | Lonestar | LP | Bulk | Vista | Consolidated | Ch. 7 Trustee / Class 2 & 6 | Plains Capital | DIP / Term Lenders | Other Secured | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carve-Out Claims | 13 | $ - | $ - | $ - | $ 2,097 | $ 2,097 | 0% | 0% | 0% | 100% | 100% | $ - | $ - | $ 2,097 | $ - | $ 2,097 |
| Class 0 - DIP Claims | 14 | - | - | - | 7,000 | 7,000 | 0% | 0% | 0% | 100% | 100% | - | - | 7,000 | - | 7,000 |
| Class 1 - Other Secured Claims | 15 | 8,685 | 4 | 205 | - | 8,893 | 36% | 0% | 100% | 0% | 37% | - | - | - | 3,305 | 3,305 |
| Class 2 - Other Priority Claims | 16 | 1,334 | 206 | 46 | - | 1,586 | Unknown | Unknown | Unknown | Unknown | Unknown | Unknown | - | - | - | - |
| Class 3 - Term Loan Secured Claims | 17 | 369,980 | - | - | - | 369,980 | 5% | 0% | 1% | 0% | 6% | - | - | 20,847 | - | 20,847 |
| Class 4 - PlainsCapital ABL Secured Claims | 18 | 15,775 | - | - | - | 15,775 | 31% | 0% | 0% | 0% | 31% | - | 4,860 | - | - | 4,860 |
| Class 5 - MAALT Secured Claims | 19 | - | 3,043 | - | - | 3,043 | 0% | 12% | 0% | 0% | 12% | - | 351 | - | - | 351 |
| Chapter 11 Administrative Expenses | 20 | - | - | - | 250 | 250 | 0% | 0% | 0% | Unknown | 0% | Unknown | - | - | - | - |
| Class 6 - General Unsecured Claims | 21 | 418,215 | 14,615 | 15,722 | - | 448,552 | Unknown | Unknown | Unknown | Unknown | Unknown | Unknown | - | - | - | - |
| Class 7 - Intercompany Claims | 22 | 170,956 | 34,693 | 58,307 | - | 263,956 | 0% | 0% | 0% | 0% | 0% | - | - | - | - | - |
| Class 8 - Interests in Debtors Other than Vista Holdco | 23 | - | - | - | - | - | 0% | 0% | 0% | 0% | 0% | - | - | - | - | - |
| Class 9 - Interests in Vista Holdco | 24 | - | - | - | - | - | 0% | 0% | 0% | 0% | 0% | - | - | - | - | - |

| Class 6 - General Unsecured Claims | Lonestar | LP | Bulk | Vista | Consolidated |
|---|---|---|---|---|---|
| Trade Claims | $ 31,354 | $ 2,331 | $ 7,165 | $ - | $ 40,850 |
| Rejection Damages | 26,813 | 9,592 | 8,557 | - | 44,961 |
| Deficiency Claims | 360,049 | 2,692 | - | - | 362,741 |
| Class 6 - General Unsecured Claims | $ 418,215 | $ 14,615 | $ 15,722 | $ - | $ 448,552 |

**Footnotes to the Liquidation Analysis**

**Gross Liquidation Proceeds**

(1)     Cash and Cash Equivalents - The Liquidation Analysis assumes that all cash and cash equivalents are swept upon a Ch. 7 conversion by the secured lenders.

(2)     Restricted Cash - Relates to cash utilized to secure the Hogg Ranch reclamation guaranty and a workers' compensation insurance liability.  The Liquidation Analysis assumes that all restricted cash is swept upon a Ch. 7 conversion by the secured parties.

(3)     Accounts Receivable - Consists of trade amounts owed for frac sand, and transportation and logistics services provided to oilfield services companies and oil and gas exploration and production customers. The Liquidation Analysis assumes that any current customers would terminate any open contracts or PO's upon a Ch. 7 conversion.  Recovery amounts reflect offsets from customers due to business disruption, contract breach expenses and any related litigation costs.  The Liquidation Analysis assumes that all accounts receivable upon a conversion to Ch. 7 are collected by the secured lenders outside of the Ch. 7 proceeding.

(4)     Accounts Receivable - Related Party consists of invoices and accrued revenues due from Debtor related parties.

(5)     Inventory – Unfinished Sand consists of both wet sand and sand ore.  The Liquidation Analysis assumes that unfinished sand would not be finished and liquidated but rather used in connection with fulfilling the Debtors reclamation obligations to the sand reserve lessors.

(6)     Inventory – Finished Sand consists of dried frac sand generally loaded in rail cars and stored at both owned and leased locations.  The Liquidation Analysis assumes that finished sand inventory would be foreclosed on by the secured lender and would be liquidated by the lender outside of the Ch. 7 proceeding.

(7)     Prepaid Expenses - includes capital equipment spare parts for mining equipment, prepaid insurance, prepaid freight, deposits, and other prepaid items. The Liquidation Analysis assumes that prepaid expenses are unlikely to be recovered given the nature of the assets, except for a small recovery on capital equipment spare parts.

(8)     Property, Plant, and Equipment - Includes various asset groups – plants, machinery, buildings, office equipment, vehicles, and other.  These assets are generally believed to have some recoverable value based primarily on the liquidation of the mining equipment, while other types of assets are assumed to have a deminimus recoverable value (e.g., rail infrastructure, silos, pickup trucks, trailers, yellow iron, furniture, fixtures and computers).  The Liquidation Analysis assumes that the secured lenders would foreclose on their collateral and liquidate the assets outside of the Ch. 7 proceeding.  The liquidation of the mining equipment and silos is assumed to be through an auction scenario, whereby the equipment would be physically removed from the buildings and concrete pads, then trucked to an auction location.  The recovery percentage would be net of any costs to removal, disassembly, moving and auctioneer costs.

(9)     Other Assets - Consist of lease rights, depletion reserves, asset retirement obligation asset, and other items.  The Liquidation Analysis assumes that other assets are unlikely to be recovered given the nature of the assets.

(10)    Right of Use - Consists of the Debtors finance and operating lease obligations and is a GAAP accounting entry. The Right of Use asset and associated liability when netted together

results in a liability. The Liquidation Analysis assumes that right of use assets have no related value.

(11)   Avoidance Actions – Relates to potential avoidance actions available under the Bankruptcy Code (Note – Proceeds of avoidance actions are the collateral of the DIP Lender pursuant to the DIP Financing Agreement).

**Net Liquidation Adjustments**

(12)   Chapter 7 Trustee Fees consist of fees paid to the Trustee to liquidate the Debtors' Estates. The estimated expense of the chapter 7 Trustee is unknown given the unknown recoverability of the avoidance actions to be liquidated and distributed to unsecured creditors.  No further professional fees have been projected.

**Claims**

(13)   Carve-Out Claims - The DIP Financing Order grants superpriority status to Allowed Professional Compensation Claims earned, accrued, or incurred by Professionals at any time before or on the first business day following delivery of the Carve-Out Trigger Notice (as defined in the DIP Financing Order). Additionally, the DIP Financing Order provides for payment of Allowed Professional Compensation Claims, subject to the caps set forth in the Carve-Out (as defined in the DIP Financing Order), incurred after the date of the delivery by the DIP Agent of a Carve-Out Trigger Notice. The Liquidation Analysis assumes approximately $2.1 million in Claims under the Carve-Out provision of the DIP Financing Order at the Liquidation Date.

(14)   Class 0 - DIP Facility - The Bankruptcy Code and the DIP Financing Order grant superpriority administrative expense claim status to Claims made pursuant to the Debtors' DIP Loan Documents.  The Liquidation Analysis assumes DIP Facility Claims outstanding as of the Liquidation Date include unpaid principal and interest in the amount of approximately $7.0 million (Note – the Debtors' expect the $11 million DIP Facility to be fully drawn by the Effective Date)

(15)   Class 1 - Other Secured Claims represents the estimated amounts owed to other secured claimants on the Liquidation Date and generally related to the Hogg Ranch reclamation guaranty, the Texas & New Mexico Railway/Watco financing, a workers compensation insurance liability, and Secured Tax Claims.

(16)   Class 2 - Other Priority Claims represents the estimated amounts owed to the priority claimants on the Liquidation Date that are not (i) DIP Facility Claims, (ii) Administrative Claims, (iii) Professional Compensation Claims, or (iv) Priority Tax Claims.

(17)   Class 3 - Term Loan Secured Claims consist of Claims held by any of the Term Loan Secured Parties arising under or relating to the Term Loan Documents or the DIP Financing Order.

(18)   Class 4 - PlainsCapital ABL Secured Claims consist of all Secured Claims arising in respect of the PlainsCapital ABL Facility.

(19)   Class 5 - MAALT Secured Claims consist of Secured Claims arising in respect of the MAALT Facility.

(20)   Chapter 11 Administrative Expenses consist of estimated post-petition accrued and unpaid operating expenditures and other Administrative Claims estimated to be approximately $250,000 as of the Liquidation Date.

(21)     Class 6 - General Unsecured Claims consists of any Claims that are not: (a) DIP Facility Claims; (b) Administrative Claims; (c) Professional Compensation Claims; (d) Priority Tax Claims; (e) Other Secured Claims; (f) Other Priority Claims; (g) a Term Loan Secured Claim; (h) PlainsCapital ABL Secured Claim; (i) a MAALT Secured Claim; or (j) an Intercompany Claim. General Unsecured Claims include contract rejection damage claims, deficiency claims, and various other unsecured liabilities, including various contingent, unliquidated and disputed claims (e.g., reclamation claims). The actual amount of General Unsecured Claims could vary materially from these estimates. No order has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of General Unsecured Claims at the Debtors.

(22)     Class 7 - Intercompany Claims represents prepetition intercompany activity.

(23)     Class 8 - Interests in Debtors Other than Vista Holdco represents equity interests in the Debtors other than Vista Holdco.

(24)     Class 9 - Interests in Vista Holdco represents Vista Holdco's equity interests in the Debtors.

**************

### CONCLUSION

The Debtors have determined, as summarized in the table above, on the Effective Date, that the Plan will provide all Holders of Allowed Claims and Equity Interests with a recovery that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code. Accordingly, the Plan satisfies the requirement of 1129(a)(7) of the Bankruptcy Code.

**EXHIBIT 4 TO THE DISCLOSURE STATEMENT**

**FINANCIAL PROJECTIONS**

**Vista Proppants and Logistics**
**Financial Projections**
**$ in 000's**

| | | Exit | FY-20 | | FY-21 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | FN | 10/30 | 11/27 | 1/1 | 1/29 | 2/26 | 4/2 | 4/30 | 5/28 | 7/2 | 7/30 | 8/27 | 10/1 | 10/29 | 11/26 | 12/31 | Oct-20 Dec-21 |
| Number of Weeks | | 0 | 4 | 5 | 4 | 4 | 5 | 4 | 4 | 5 | 4 | 4 | 5 | 4 | 4 | 5 | 14 Months |
| Month | | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 | Dec-21 | |
| Total Receipts | 1 | $  - | $ 379 | $ 1,101 | $ 774 | 913 | $ 1,101 | 774 | 913 | $ 1,101 | 774 | 913 | $ 1,101 | 774 | 913 | $ 1,101 | $ 12,634 |
| Payroll & Benefits | 2 | - | (502) | (743) | (502) | (502) | (510) | (502) | (502) | (744) | (502) | (502) | (510) | (502) | (502) | (743) | (7,765) |
| Freight | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Repairs & Maintenance | | - | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (2,240) |
| Insurance | 3 | - | (206) | (206) | (206) | - | - | - | (1,176) | (206) | (206) | (206) | (206) | (206) | (206) | (206) | (3,234) |
| Rentals & Leases | 4 | - | (125) | (130) | (115) | (120) | (125) | (115) | (120) | (125) | (115) | (120) | (125) | (115) | (120) | (125) | (1,695) |
| Railcar Lease | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Operating Disbursements | | - | (580) | (410) | (2,433) | (317) | (317) | (317) | (317) | (317) | (317) | (317) | (317) | (317) | (317) | (317) | (6,904) |
| Operating Disbursements | | - | (1,572) | (1,649) | (3,415) | (1,098) | (1,111) | (1,093) | (2,275) | (1,552) | (1,299) | (1,304) | (1,317) | (1,299) | (1,304) | (1,550) | (21,838) |
| Ordinary Course Professionals | 5 | - | (50) | (50) | (17) | (17) | (17) | (17) | (17) | (17) | (17) | (17) | (17) | (17) | (17) | (17) | (300) |
| Board Fees | | - | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (210) |
| Interest & Fees | 6 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Disbursements | | - | (65) | (65) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (510) |
| Royalties | 7 | - | (623) | (123) | (123) | (277) | (123) | (123) | (464) | (123) | (123) | (464) | (123) | (123) | (464) | (1,056) | (4,332) |
| Restructuring Costs | 8 | (6,000) | (75) | (75) | - | - | - | - | - | - | - | - | - | - | - | - | (6,150) |
| **Net Cash Flow** | | **(6,000)** | **(1,956)** | **(810)** | **(2,796)** | **(494)** | **(165)** | **(474)** | **(1,857)** | **(605)** | **(679)** | **(886)** | **(371)** | **(679)** | **(886)** | **(1,537)** | **(20,195)** |
| Beginning Cash Balance | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Cash Flow | 9 | (6,000) | (1,956) | (810) | (2,796) | (494) | (165) | (474) | (1,857) | (605) | (679) | (886) | (371) | (679) | (886) | (1,537) | (20,195) |
| DIP Loan | | (11,000) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (11,000) |
| Tranche A: Exit Facility Notes | | 6,000 | 1,956 | 810 | 2,796 | 494 | 165 | 474 | 1,857 | 605 | 679 | 886 | 371 | 679 | 886 | 1,537 | 20,195 |
| **Ending Cash Balance** | | **$  -** | **$  -** | **$  -** | **$  -** | **$  -** | **$  -** | **$  -** | **$  -** | **$  -** | **$  -** | **$  -** | **$  -** | **$  -** | **$  -** | **$  -** | **$  -** |
| DIP Loan | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Tranche A: Exit Facility Notes | | 6,186 | 8,253 | 9,198 | 12,174 | 12,796 | 13,118 | 13,732 | 15,777 | 16,582 | 17,434 | 18,506 | 19,096 | 19,968 | 21,060 | 22,878 | 22,878 |
| Tranche B: Exit Facility Notes | | 22,000 | 22,518 | 22,759 | 22,954 | 23,150 | 23,398 | 23,598 | 23,800 | 24,054 | 24,260 | 24,468 | 24,729 | 24,941 | 25,154 | 25,423 | 25,423 |
| Tranche C: Exit Facility Notes | | 50,000 | 51,928 | 52,483 | 52,932 | 53,385 | 53,956 | 54,418 | 54,883 | 55,470 | 55,945 | 56,423 | 57,027 | 57,515 | 58,007 | 58,627 | 58,627 |
| **Exit Facility Notes** | 10 | **78,186** | **82,699** | **84,440** | **88,060** | **89,331** | **90,472** | **91,748** | **94,460** | **96,107** | **97,639** | **99,397** | **100,852** | **102,423** | **104,221** | **106,928** | **106,928** |
| **Available Liquidity** | | **23,814** | **21,747** | **20,802** | **17,826** | **17,204** | **16,882** | **16,268** | **14,223** | **13,418** | **12,566** | **11,494** | **10,904** | **10,032** | **8,940** | **7,122** | **7,122** |

**Presentation**

The Financial Projections are presented in a consistent format with forecasts included as part of the Debtors chapter 11 reporting. The projections contain non-GAAP financial measures. The Company has shown the results of all consolidated entities within the Financial Projections presented herein.

**Methodology**

The Financial Projections incorporate Management's operating assumptions after the Company's exit from Chapter 11 in October through the end of 2021 and continues to reflect nominal frac sand and industrial sand sales and greatly reduced operations at its facilities. The Company continues to maintain/operate the West Texas, Granbury and Tolar mines, as well as the Barnhart and Gonzalez transload facilities and a corporate office.

The Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors. In addition, the assumptions may not fully account for the uncertainty and disruption of business that may accompany a restructuring in bankruptcy court. Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the period of the Financial Projections will likely vary from the projected results. These variations may be material. Accordingly, no representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Reorganized Debtors to achieve the projected results of operations. In deciding whether to vote to accept or reject the proposed Plan, creditors must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections. Moreover, the Financial Projections were prepared solely in connection with the restructuring pursuant to the Plan.

**Principal Assumptions for the Financial Projections**

1. Revenue – The Financial Projections include revenue generated from providing nominal frac sand volumes to oil and gas customers in West Texas (approximately 23K tons per month) and providing industrial sand in Granbury.
2. Payroll – Projected at current staffing levels with approximately 50 corporate and field employees to maintain limited operations and the safety and security of the Debtors' facilities.
3. Insurance – Projected 2021 costs and financing similar to the Debtors' existing insurance policies.
4. Rentals and Leases – Projected costs includes the Debtors' corporate office, housing costs in West Texas and yellow iron rentals.
5. Ordinary Course Professionals – Projected costs generally include a tax preparation firm and a property tax consultant.
6. Interest and Fees – Projected based on the post-emergence capital structure as detailed in the "Capital Structure" section included herein and the Plan and the exhibits thereto.
7. Royalties – Projected based on expected amended and assumed royalty agreements reflecting cost savings from historical royalty payments.
8. Restructuring Costs – Projected exit costs associated with $500k GUC Cash Pool, 2019 property taxes and various contract cures (includes royalty agreements).
9. Working Capital – Working capital assumptions are based on the Company's historical cash conversion cycle. Working capital necessary for a restart of the Company's operations post-2021 has not been projected, such amounts could be material.
10. Capital Structure – The reorganized Company's estimated post-emergence capital structure is assumed to be effective upon emergence in October 2020. The Financial Projections assume the following key assumptions at emergence:
    a. Tranche A Exit Facility Notes – $30 million of exit notes with a LIBOR plus 9.5% PIK interest rate.
    b. Tranche B Exit Facility Notes – $22 million of exit notes with a LIBOR plus 9.5% PIK interest rate.
    c. Tranche C Exit Facility Notes – $50 million of exit notes with a LIBOR plus 9.5% PIK interest rate.